UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BLUE MATRIX LABS, LLC, | § | CASE NO. 15-52977 |
| HYDRO TOYS, LLC, | § | CASE NO. 15-52978 |
| PARADISE BEVERAGE, LLC, | § | CASE NO. 15-52980 |
| SHAGS, LLC, and | § | CASE NO. 15-52981 |
| PARADISE BEVERAGE LOGISTICS, LLC, | § | CASE NO. 15-52979 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | *(Joint Administration Requested)* |

### AFFIDAVIT OF WILLIAM R. PATTERSON IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

Before the undersigned notary public appeared William R. Patterson who, after being sworn, testified as follows:

1.     "My name is William R. (Bill) Patterson. I am over the age of twenty-one (21), am competent to make this Affidavit, and have never been convicted of a crime. I have personal knowledge of the facts as stated in this Affidavit. I am authorized to execute this Affidavit on behalf of Blue Matrix Labs, LLC ("**Blue Matrix**"), Hydro Toys, LLC ("**Hydro Toys**"), Paradise Beverage, LLC ("**Paradise Beverage**"), Paradise Beverage Logistics, LLC ("**Paradise Beverage Logistics**"), and Shags, LLC ("**Shags**", and collectively referred to as the "**Blue Matrix Entities**" or "**Debtors**").

2.     I am a Principal at Bridgepoint Consulting ("**Bridgepoint**") and currently serve as the Chief Restructuring Officer (the "**CRO**") of the Blue Matrix Entities. I have served in that capacity since November 6, 2015.

3.     In my capacity as the CRO, I am familiar with the daily operations and financial conditions of the Blue Matrix Entities.  I hereby submit this Affidavit in support of the Debtors' petitions and related first day motions in the above-captioned chapter 11 cases and to assist the

Court and other parties-in-interest in understanding the circumstances leading up to the commencement of these chapter 11 cases.  Except as otherwise indicated herein, all facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtors' operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth herein. I am authorized by the Debtors to submit this Affidavit.

## I. BACKGROUND

4.      On December 4, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").  The Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' bankruptcy cases and no official committee of unsecured creditors has yet been established.

5.      The purpose of the filing is to provide the Debtors with the means and opportunity to accomplish a sale of substantially all of their assets in a manner intended to maximize the value of the Debtors' estates for the benefit of their creditors and then wind down any of the Debtors' remaining operations or businesses in a timely and efficient manner.  As set forth in greater detail below, the Debtors are in significant need of cash and, without an infusion of cash, are unable to continue their ongoing operations as a going concern.  The only source of funding remaining to the Debtors is Kent BML Investments, L.P. ("**Kent BML Investments**"), which has provided debt financing to the Debtors prepetition and, subject to the Court's approval, has agreed to provide the Debtors' with debtor-in-possession financing to allow the debtors sufficient time to continue operating in chapter 11 and accomplish a sale of the Debtors' businesses and operations.

6.      Contemporaneously herewith, the Debtors have filed a motion seeking approval of, among other things, bidding procedures to be employed in connection with an auction of substantially all of the Debtors' assets ("**Bidding Procedures**"), approving the Stalking Horse Agreement (as herein defined) and related-expense reimbursements, and scheduling a hearing to approve the successful bid.  Under the proposed Bidding Procedures, KBIDC Investments, LLC, a newly formed entity owned by Kent BML Investments and Mr. Dave Chapman, another of the Debtors' prepetition lenders, has agreed to act as stalking horse bidder (the "**Stalking Horse Bidder**") for any auction sale of the Debtors' assets, subject to higher and better offers, pursuant to that certain Asset Purchase Agreement dated December 4, 2015, a copy of which is annexed as an exhibit to the Bid Procedures (the "**Stalking Horse Agreement**").  The Stalking Horse Agreement provides for, among other things, the sale of the Debtors' right, title and interest in substantially all of the Debtors' assets, free and clear of any and all liens, encumbrances, claims and other interests, except as otherwise set forth in the Stalking Horse Agreement.  The transaction is subject to higher or better offers as more particularly set forth in the bid procedures proposed in connection with the sale.  In consideration for the Acquired Assets (as defined in the Stalking Horse Agreement) to be purchased under the Stalking Horse Agreement, the Stalking Horse Bidder has agreed to provide consideration of a credit bid in an amount equal to $2,000,000 and the assumption of certain cure costs and other obligations, all upon the terms and subject to the conditions set forth in the Stalking Horse Agreement.

7.      As set forth in greater detail below, absent a sale of substantially all of their assets, the Debtors will be forced to immediately shut their doors and liquidate, which would result in significantly diminished recoveries to prepetition creditors and the Debtors' employees

being laid off and out of work.  Accordingly, for the reasons set forth herein, I believe that the sale is in the best interests of the Debtors, their estates and all of the creditors.

## II. BACKGROUND

8.      The Blue Matrix Entities develop innovative products across a spectrum of industries and operate principally through three subsidiaries: (a) Hydro Toys, (b) Paradise Beverage, and (c) Shags.

9.      Hydro Toys designs and produces unique water toys, including Hydro Toys® and the award-winning ZORBZ® water balloon line – a self-sealing water balloon.  The customers of Hydro Toys include a number of major retailers, including Walmart and Toys "R" Us, with the Spring and Summer constituting the most significant selling season.

10.      Paradise Beverage manufactured Pirate Energy® shots, which, although no longer in production, has remaining inventory that it is in the process of marketing.  Shags designs and produces the SHAGS® brands, consisting of innovative bean bag furniture and home accessories including dog beds, pillows, rugs and bath mats. Shags' selling seasons are the back to school and holiday seasons.  Blue Matrix has developed and owns rights to iWich, an innovative kitchen device that is in advanced development stage.  To the best of my knowledge and belief, Paradise Beverage Logistics has no assets and liabilities.

11.      Each of the referenced subsidiaries are in various stages of development and are in need of additional capital.  The Debtors have operated with a lean staff of employees. In addition to the CRO, the Debtors currently have only one employee: their chief operations officer.  The Debtors also currently contract for the services of a contract bookkeeper as well as a member of Blue Matrix who now serves as a consultant for the Debtors (the "**Consultant**").

12.      The Debtors headquarters was located in The Village of Bee Caves, Texas and recently relocated to New Braunfels, Texas.

**Organizational Structure**

13.     Blue Matrix was organized on December 10, 2012, by Kendall Harter as its sole Member and Manager.  Similarly, each of Shags, Paradise Beverage and Hydro Toys was organized by Mr. Harter as its sole Member and Manager on October 12, 2012, March 8, 2013, and October 15, 2013, respectively.  Thereafter, Mirjet, LP ("**Mirajet**"), an investment vehicle of Mr. Harter, was named the sole Member for Paradise Beverage and Shag.  Hydro Toys was contributed by Mr. Harter directly to Blue Matrix, which became Hydro Toy's sole Member on October 16, 2013.

14.     Paradise Beverage Logistics was organized and formed on July 16, 2015, by Blue Matrix as its Manager and Member.

15.     On October 16, 2015, Mirajet as sole Member of Shags and Paradise Beverage assigned its ownership of these entities to Blue Matrix.[1]  As of October 16, 2015, the resulting legal ownership of these entities is as follows:



**Capitalization**

16.     Throughout their history of operations, the Debtors have raised capital through various debt and equity investments.

---

[1] Blue Matrix later replaced Mr. Harter as the Manager of each of the Debtor subsidiaries.

17.     The approximate outstanding principal and interest as of the Petition Date of the Debtors' loan agreements are as follows:

a.      $1,016,666.66 to Dave Chapman, as lender under that certain Promissory Note to Blue Matrix Labs, LLC, dated September 26, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Chapman Promissory Note**").  The amounts outstanding under the Chapman Promissory Note were secured pursuant to that certain Security Agreement dated on or about September 26, 2013, between Blue Matrix and Mr. Chapman.  In addition, the obligations under the promissory note were guaranteed by Mr. Harter pursuant to that certain Guaranty Agreement by Kendall Harter for the benefit of Mr. Chapman dated on or about September 26, 2013.

b.      $3,267,487.38 to Kent BML Investments as (a) successor in interest to Jeffrey F. Kent under that certain Promissory Note of Blue Matrix, dated December 5, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Initial Kent Promissory Note**"), and (b) lender under that certain Amended and Restated Promissory Note of Blue Matrix, dated August 27, 2014, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Additional Kent Promissory Note**" and, together with the Initial Kent Note, the "**Kent Promissory Notes**" and together with the Chapman Promissory Note, the "**Promissory Notes**").  The proceeds of the loans under the Kent Promissory Notes were

to be used as working capital and to fund operations. The obligations under the Kent Promissory Notes were secured pursuant to those certain Security Agreements dated as of December 5, 2013, and June 4, 2014, respectively, between Blue Matrix and Kent BML Investments (as successor in interest to Jeffrey F. Kent. The First Amendment to the Amended and Restated Company Agreement of Blue Matrix converted $1,000,000 of funds advanced under the Initial Kent Promissory Note into 262.5 of membership units in Blue Matrix. Kent BML Investments later advanced another $1,000,000 to Blue Matrix under the Initial Kent Promissory Notes. As of the Petition Date, the total aggregate amount outstanding on account of the Kent Promissory Notes is $2,836,331.90. In addition, as set forth below, Kent BML Investments owns 32.4% of the membership interests in Blue Matrix.

18. The Chapman Promissory Note and the Kent Promissory Notes are secured by properly perfected, first and second priority liens on substantially all the assets of the Debtors, including, without limitation, substantially all of the trademarks and other Intellectual Property of the Debtors.

19. In 2015, as the financial condition of the Debtors deteriorated and additional funding was required, the Debtors began to raise capital through numerous factoring companies and other lenders. Certain of these factoring companies and other lenders may have filed financing statement relating to asserted liens on certain assets of the Debtors.

20. The approximate outstanding principal and accrued interest as of the Petition Date of the Debtors' factoring and other loan agreements are as follows:

a.      $182,771.62 to On Deck Capital, Inc., as lender under that certain Business Loan and Security Agreement dated February 16, 2015, as supplemented by the Business Loan and Security Agreement Supplement dated June 29, 2015, with guaranty by Mr. Harter;

b.      $60,386.25 to Eagle Business Credit, LLC, as lender under that certain Master Purchase and Sale Agreement with Blue Matrix Labs, LLC, dated March 2, 2015, with guaranties by Mr. Harter, Mirajet, LP, Paradise Beverage, Shags and Hydro Toys;

c.      $117,265.15 to 1st Global Capital LLC, as lender under that certain Merchant Agreement with Blue Matrix Labs, LLC, dated September 3, 2015, with Security Agreement and Guaranty by Mr. Harter;

d.      $56,219.17 to CapCall, LLC, as lender under that certain Merchant Agreement with Blue Matrix Labs, LLC, dated September 1, 2015, with Security Agreement and Guaranty by Mr. Harter;

e.      $117,718.69 to PowerUp Lending Group, Ltd., as lender under that certain Revenue Based Factoring Agreement with Blue Matrix Labs, LLC, dated September 4, 2015, with Security Agreement and Guaranty by Mr. Harter, Shags and Hydro Toys;

f.      $85,725.37 to S.O.S. Capital, Inc., as lender under that certain Purchase and Sale Agreement with Blue Matrix Labs, LLC, dated June 29, 2015, with Security Agreement and Guaranty by Mr. Harter;

g.     $46,605.69 to World Global Financing Inc., as lender under that certain Revenue Based Factoring Agreement with Blue Matrix Labs, LLC, dated August 17, 2015, with Security Agreement and Guaranty by Mr. Harter;

h.     $31,117.54 to Tony Scott Martin, as Lender under that certain Promissory Note with Blue Matrix Labs, LLC, dated November 14, 2014;

i.     $184,808.22 to Ron G. Harter, as Lender under that certain Unsecured Promissory Note with Blue Matrix Labs, LLC , dated August 6, 2013; and

j.     $235,589.94 to Continental American Corporate, d/b/a Pioneer Balloon, as Maker under Personal Promissory Note with Hydro Toys LLC and Mr. Harter, dated April 15, 2015.

21.     Mr. Harter has advised that he has invested over $2,000,000 in equity capital into the Companies.  As noted above, Kent BML Investments converted $1,000,000 of advances under the Initial Kent Note into equity to improve the capitalization of the Blue Matrix Entities. David Chapman and Kent BML Investments were awarded member interest units in exchange for providing loans to Blue Matrix.  The Debtors provided membership interests in exchange for services rendered to several parties, including Gary Young, Mark Roberts, and Digital Results LLC. Jeffrey Carpenter, a current employee of the Debtors, was awarded member units as part of an incentive package in early 2015.

22.     Blue Matrix's current ownership interests are detailed in the following table:

| Member | Units Held | % Interest |
|---|---|---|
| Mirajet, LP | 8,500.0 | 59.2% |
| Jeff Carpenter | 350.0 | 2.4% |
| Dave Chapman | 500.0 | 3.5% |
| Kent BML Investments | 4,655.0 | 32.4% |
| Gary Young | 150.0 | 1.0% |
| Mark Roberts | 150.0 | 1.0% |
| Digital Results LLC | 62.5 | 0.4% |
| | 14,367.5 | |

23.     In addition to their financings, the Debtors have various trade obligations to their suppliers, vendors, and brokers.  Prior to the Debtors' financial distress, vendors to Hydro Toys, Paradise Beverage, and Shags had provided terms for payment of goods and services rendered and each entity would pay its vendors from its own bank account.  As the cash position of the Blue Matrix Entities deteriorated, vendors began to restrict terms and required the Debtors pay cash on delivery.  Additionally, the payments to vendors were made from entities that may not have been the vendor's customer, giving rise to significant intercompany payables and receivables.

24.     As of November 20, 2015, under belief and information, the outstanding trade obligations for each of the Debtors to suppliers, vendors, and brokers was:

    a.      Hydro:        $780,256.40;

    b.      Shags:        $39,885.31;

    c.      Blue Matrix:  $86,026.23;

    d.      Paradise:     $71,814.65; and

    e.      Paradise Logistics: $0.

25.     Hydro Toy's main vendor, Pioneer Balloon, had agreed to term out $555,699.91 of past due payables under the Personal Promissory Note with Hydro Toys agreeing to pay the outstanding balance in twelve (12) equal installments of $47,827.11.  Upon information and belief, as of the date hereof, Hydro Toys owes Pioneer Balloon approximately $235,589.94 under the Personal Promissory Note and $639,755.82 of outstanding invoices.

**Involvement of Kent BML Investments**

26.     Kent BML Investments, made its first loan to the Debtors in December 2013.[2] Mr. Harter would periodically approach Kent BML Investments regarding the advancement of additional loans. Such loans were provided to finance working capital and the Debtors' operations throughout 2014 and 2015.

27.     In May 2015, Kent BML Investments retained an accounting firm to perform, with the assistance of the Debtors, a high level assessment of the Debtors' accounting capabilities and the books and records. The accounting firm reported to Kent BML Investments specific issues and recommendations for the Debtors, which were then communicated to the Debtors.

28.     On July 13, 2015, the Debtors engaged Bridgepoint to review and assess the Debtors' accounting records, complete the 2014 accounting information so that the 2014 tax return could be completed, and to complete a cash flow forecast of the Debtors' future cash needs.

29.     In mid-September 2015, Blue Matrix requested that Kent BML Investments agree to subordinate its debt to a new lender.  In the process of conducting due diligence regarding such request, it was discovered that the Debtors had unreported liabilities at various levels of the capital structure and were much further in debt than had previously been disclosed.[3] As a result of further discussions and input from Bridgepoint, the magnitude of the financial difficulties being encountered by Blue Matrix and the other Debtors became apparent.

---

[2] As noted above, Kent BL Investments replaced Mr. Kent as successor interest under the Initial Kent Promissory Note.

[3] Under the terms of the Kent Promissory Notes, absent the prior written consent of Kent BML Investment, the incurrence of any additional indebtedness in excess of $100,000 or liens, or any restriction on Blue Matrix's ability to grant liens to Kent BML Investments constituted an event of default. Kent BML Investments did not consent to the additional debt that was incurred.

30.     Kent BML Investments agreed to provide additional financing to the Debtors but only if the Debtors agreed to certain reasonable and limited initiatives, including a reduction in the Debtors' overhead. Kent BML Investments funded $80,000 on October 2, 2015.  Thereafter, and based upon current needs, the Debtors reduced their staff to two individuals (Jeff Carpenter, COO/Director of Sales and Wendy Harmon, Director of Customer Operations) in addition to the CRO and the Consultant. Ms. Harmon has subsequently resigned. Since early October, Kent BML Investments has been the sole source of funding for the Debtors, besides nominal cash receipts from operations. Mr. Hindman and Ms. Patel of Bridgepoint have provided contract chief financial officer and accounting services to the Debtors.  In addition, Jean Newmann has provided contract Controller services.  Jeff Carpenter and, until her departure, Wendy Harmon have been responsible for running the Debtors' day to day operations.

## Intellectual Property

31.     The Blue Matrix Entities own various intellectual property for each of its products.  At the time the liens securing the Promissory Notes were granted by Blue Matrix, substantially all of the intellectual property of the Blue Matrix Entities was owned by Blue Matrix.  Blue Matrix subsequently transferred certain of its intellectual property to the other Blue Matrix Entities for no consideration; this intellectual property remains encumbered by the liens securing the Promissory Notes.  Hydro Toys has numerous registered United States trademarks, including "ZORBZ", "Rapid Fill Rapid Fire", and "Explode and Reload" and is in the process of registering the "ZORBZ" trademark in China.  Hydro Toys has a number of patents pending related to the design and utility of certain of its products.  Blue Matrix has several allowed United States trademarks and is in the process of applying for non-provisional patents for iWich. Shags and Paradise have registered United States trademarks.

**Events Leading up to Chapter 11 Filing**

32.     The cash position of the Blue Matrix Entities has deteriorated over the last two years as sales have failed to meet expectations and product development costs have been higher than projected.  The Blue Matrix Entities have exhausted available options to raise additional debt or equity capital and do not have the financial capabilities to pay their vendors for products for the upcoming selling season.  Accordingly, the Debtors are faced with the unfortunate reality that, in order to have any possibility of repaying their prepetition creditors and lenders, and preserving the jobs of their employees, they will have to conduct a sale of substantially all of their assets under section 363 of the Bankruptcy Code.

33.     As set forth above, Hydro Toys is in the business of developing and selling a self-sealing water balloon.  This product was introduced into the marketplace in 2014 and enjoyed early success.  In 2015, Hydro Toys was able to get its product prominently placed in Walmart, Toys "R" Us and other major retailers.  Revenue for this product line grew from $0.3 million in 2014 to $1.5 million in 2015, year to date.  Hydro Toys entered the Canadian market in 2015 and licensed its brand to Funtastic Limited for sales in Australia.  Manufacturing and supply issues were being addressed and margins were increasing along with volume.  Projected revenues in 2015 were $5.5 million; however, unexpectedly, two major new competitors appeared in the marketplace from entities that were better capitalized and backed with significant advertising money.

34.     It was anticipated that Shags and Hydro Toys would be seasonal businesses but that Paradise Beverage would be a year-round product and, thus, would smooth over cash flows for the enterprise. Paradise Beverage was in the business of manufacturing energy drinks, including "power shot" with the flavor of an alcoholic drink but containing no alcohol.  The

market for these drinks, however, proved difficult to penetrate given high brand recognition of established competitors.

### Efforts to Sell Hydro Toys

35.     On October 1, 2015, the Debtors retained Global Toy Experts ("GTE"), a boutique investment bank that specializes in the toy industry, in an effort to market Hydro Toys. GTE's retention was timed to coincide with the Fall Toy Preview held October 5-8, 2015, an event that is hosted annually in Dallas, Texas by the Toy Industry Association, Inc.  GTE agreed to show the assets to up to ten (10) companies for a 30-day process, but would be entitled to compensation, "tail" protection, if any entities introduced by GTE to Hydro Toys during the referenced marketing period subsequently purchased Hydro Toys or its assets.  GTE, based on its long industry knowledge, reviewed a proprietary list of forty-five (45) potentially interested parties and reduced such list to eight (8) parties it concluded were the most likely buyers. Several of such parties signed non-disclosure agreements and conducted due diligence on the available assets.  Two of such parties expressed a high degree of interest in the assets and continued conducting diligence until shortly before the Petition Date.  As of the Petition Date, no viable offers had been submitted.  The Debtors retained Steve Velte of GTE, subject to Bankruptcy Court approval, to continue marketing the assets of Hydro Toys and the other Debtors in the hope of locating a bidder prepared to offer a "higher and better" bid.

### The Debtors' Cash Needs and Upcoming Liquidity Forecast

36.     The selling season of the Debtors' most successful line of products, ZORBS water balloons and accessories, is during late Spring and Summer.  To be prepared to meet demand from retailers during the short selling season, the Debtors must source raw materials and inputs from suppliers in advance.  In the coming weeks, the Debtors must purchase certain critical components from vendors in order to allow their manufacturer to remain on its manufacturing

timeline.  Because of their tenuous financial condition, the Debtors have been required to prepay or pay cash on delivery to their suppliers.

37.     The Debtors purchase certain of their accessories from a supplier in China.  Given the long shipping times, the Debtors have already submitted their orders to their supplier.  The Debtors typically prepay thirty percent (30%) of each order with the remaining seventy (70%) percent paid upon shipment.  The Debtors have placed certain orders with their supplier in China and have prepaid the thirty (30%) percent. The Debtors anticipate certain orders will be ready to ship in January while other orders will be placed around the end of January.  These later orders are dependent on molds, which the Debtors have ordered and paid for and expect to be delivered to the supplier in January.

38.     In order to meet these important supply chain deadlines, the Debtors need access to the funds under their proposed debtor-in-possession financing in the very near term.  Funds are also required to retain the already lean staff of employees and contractors, maintain their insurance policies, stay current with their tax obligations and maintain their business operations.

### **First Day Relief**

39.     The Debtors have filed their first day pleadings contemporaneously herewith to ensure that the Debtors' businesses continue to function while the Debtors work towards accomplishing a sale of their assets.[4]  For the reasons set forth below, I submit that (i) the relief requested in the first day pleadings is necessary to enable the Debtors to operate with minimal disruption during the pendency of their chapter 11 cases and (ii) approval of the first day pleadings is warranted.

---

[4] Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

**Lease Rejection Motion**

40.     The Debtors seek authority to reject a lease for office space, which they have vacated, and a sublease for a portion of the leased premises effective as of the Petition Date.  The Debtors also seek authority to reject a furniture lease for certain unneeded office furniture.  The Debtors are no longer in need of either the office space lease or the furniture lease and, therefore, they have determined, in their business judgment, to reject the foregoing leases in order to avoid incurring any costs and expenses, including any administrative expenses, that may be assessed under the leases.

**Employee Motion**

41.     The Debtors seek authorization, pursuant to sections 105(a), 363(b), and 507(a)(4) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) for the Debtors to pay current employees accrued and unpaid wages and benefits for work performed prepetition, and (ii) for the Debtors' bank to receive, process, honor and pay any and all checks, electronic fund transfers, and automatic payroll transfers drawn on the Debtors' accounts to the extent that such checks or transfers relate to any of the prepetition employee obligations (the "**Employee Wage Motion**").

42.     The Debtors have operated with a lean staff of employees. In addition to the CRO, the Debtors currently have only one employee[5]: their chief operations officer (the "**Employee**"). The Debtors also currently contract for the services of a contract bookkeeper (the "**Contractor**") as well as a member of Blue Matrix who now serves as a consultant for the Debtors (the "**Consultant**").  Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages for the Employee on a semimonthly basis (the

---

[5] The Debtors had an additional employee that resigned prior to the Petition Date.

"**Wage Obligations**"), through direct deposits into the Employee's bank account or by check. Debtors' estimated bi-weekly gross payroll (including obligations such as federal income taxes, social security, and Medicare contributions (collectively, the "**Payroll Tax Deductions**," and together with the Wage Obligations, the "**Employee Obligations**")), is approximately $3,300.

43. The Debtors customarily reimburse the Employee for a variety of business expenses incurred in the ordinary course of their business. Certain business expenses may be paid directly by the Employee and reimbursed upon review and approval by the Debtors. As of the Petition Date, the Debtors estimate no more than $3,000 of unreimbursed business expenses remain outstanding.

44. In addition, the Debtors have retained independent contractors to provide accounting and bookkeeping services after reducing its headcount in an effort to lower overhead costs. The Contractor works each Thursday and as needed throughout the rest of the week. At the end of each month, the Contractor invoices the Debtors' for hours worked. As of the Petition Date, the Debtors estimate their unpaid obligations to the Contractor are approximately $2,500.

45. In this case, any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employee's morale, dedication, confidence, and cooperation, and it would adversely impact the Debtors' relationship with its Employee at a time when their support is critical to the Debtors' efforts to reorganize. Accordingly, the Debtors request the request the Court approve the relief requested in the Employee Wage Motion.

**The Sale Motion**

46. By this Motion (the "**Sale Motion**"), the Debtors seek entry of two orders:

47. *First*, at an expedited hearing to be held on a date set by order of the Court, the Debtors request entry of an order, in substantially the form attached to the Sale Motion as Exhibit B (the "**Sale Procedures Order**"), among other things, (a) approving the Debtors'

proposed procedures for submitting and considering competing bids for the Acquired Assets, including the proposed form and manner of notice and the related dates and deadlines (the "**Sale Procedures**"), and (b) approving the Debtors' proposed Bid Protections (as defined in the Sale Motion) for the Buyer as the stalking horse bidder.

48.     ***Second***, the Debtors request the entry of an order (the "**Sale Order**"), (a) authorizing the Sale of the Acquired Assets to the Buyer as stalking horse bidder, or to a higher and better bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code; (b) to the extent necessary, authorizing the Debtors to assume and assign executory contracts pursuant to section 365 of the Bankruptcy Code; and (c) granting related relief.

49.     As set forth above, the Debtors' course of business leading up to the bankruptcy, and in particular their efforts to market Hydro Toys (the most valuable of Blue Matrix's subsidiaries), demonstrates that, to maximize the business opportunity for the Debtors, such efforts will require significantly more capital than the Debtors will be able to raise.  Notably, the business of Hydro Toys is seasonal with a Spring selling season.  In order to fulfill pending orders for the Spring, the Debtors must immediately move forward with contract manufacturing that their proposed debtor-in-possession lender is only willing to fund as debtor-in-possession financing in connection with a sale.  Accordingly, the Debtors wish to arrange for a sale of the Assets at the price that is most advantageous to their bankruptcy estates.

50.     To that end, the Debtors have negotiated the DIP Loan with Kent BML Investments.  Kent BML Investments and another of the Debtors' prepetition senior secured creditors  have agreed to join together to form KBIDC Investments, LLC  (the "**Buyer**") to serve as a stalking horse bidder for the Assets.  The Buyer has agreed to conduct due diligence

concerning the Assets and, if the proposed due diligence period is completed successfully, to serve as stalking-horse bidder for an auction for the Assets, per the terms reflected in the Asset Purchase Agreement (the "**APA**") attached as <u>Exhibit A</u> to the Sale Motion.  The proposed stalking-horse bid is a credit bid in the amount of $2,000,000, an amount which represents a forgiveness of (a) the DIP Loan that has been presented to this Court for approval by separate motion and (b) a portion of the pre-petition secured debt owed to the senior secured lenders.

51.     As set forth in the Sale Motion, in the event that the Buyer opts not to proceed at the end of their due diligence period, and, if the Debtors believe that the auction could go forward without the Buyer, the Debtors will advise the Court, and request that the Court approve revised sale procedures, ideally involving a back-up stalking horse bidder.  If the Buyer decides not to proceed to closing and the Debtors believe that no other Qualified Bids are likely to be forthcoming, the auction and proposed sale may be cancelled, and the Debtors will return to this Court to propose some other sale process or disposition of the case as may be appropriate.

52.     On December 3, 2015, the Debtors and Buyer executed the APA, which specifies the proposed terms for due diligence, sale procedures, stalking horse bidder protections, and the proposed transaction.  The principal terms of the APA are summarized and highlighted as follows:[6]

| Transaction | The Buyer will acquire designated Assets of the Debtors ("**Seller**"). |
|---|---|
| Purchase Price | The total consideration to be paid by Buyer under the APA (the "**Purchase Price**") consists of $2,000,000  in the form of a credit bid of the secured amounts owing to Buyer (a) under its prepetition secured debt and (b) under its DIP loan. |
| Acquired Assets | The Acquired Assets are set forth for in section 1.1 of <u>Exhibit A</u> hereto and  include an assignment of all licenses (to the extent assignable) and |

---

[6] To the extent there is any inconsistency between the description in this Motion and the terms of the APA, the APA shall control.

| | |
|---|---|
| | nondisclosure or inventions assignment agreements owned by Seller that relate to any of the Assets or are otherwise necessary or useful to make, have made, practice, use, import or sell any of the technology embodied in the other Assets.  All of the Acquired Assets transferred to Buyer will be free and clear of any liens, claims and encumbrances and any such liens, claims or encumbrances will attach to the proceeds of the sale.  Any assets not specifically transferred and assigned to Buyer, and any liabilities relating thereto, shall remain the property of Seller. |
| **Excluded Assets** | The Excluded Assets shall include all  of Sellers' right, title and interest in and to: <br><br> (i)  all Leases for real property not set forth on the Assumed Contracts Schedule (the "Excluded Leases"); <br><br> (ii) all Contracts not set forth on the Assumed Contracts Schedule or, if set forth on the Assumed Contracts Schedule, that Buyer elects by written notice to Sellers in accordance with Section 5.8 of the APA to remove from the Assumed Contracts Schedule (together with the Excluded Leases and the Rejected Contracts, the "Excluded Contracts"); <br><br> (iii)cash in an amount equal to the aggregate amount of accrued and unpaid fees and expenses owed by Sellers on account of services provided to the Sellers after the Petition Date, but prior to the Closing, by (A) Taube Summers Harrison Taylor Meinzer Brown LLP, (B) Bridgepoint Consulting, LLC and (C) Conley Rose, P.C.; <br><br> (iv)all avoidance or preference actions under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code for the benefit of any Seller under the Bankruptcy Code; <br><br> (v) all rights of the Sellers under the APA and any Ancillary Agreement; <br><br> (vi)all assets (whether in trust or otherwise) with respect to any Benefit Plan of the Sellers; and <br><br> (vii)   any assets that Buyer elects to treat as Excluded Assets on or prior to Closing. |
| **Closing** | The Transaction will close at a date as soon as possible after the approval of the Transaction by the Bankruptcy Court, subject to satisfaction of all closing conditions and receipt of Bankruptcy Court approval of the Transaction, but in no event later than forty-five (45) days from the Petition Date. |
| **Deposit** | A good-faith deposit of 10% of the Purchase Price will be provided by |

| | |
|---|---|
| | any bidder aside from the Buyer. |
| **Due Diligence and Cure Notice** | The Buyer will have a twenty-one (21) day due diligence period (the "**Due Diligence Period**") beginning upon the date of service of this Motion.<br><br>If, at the end of the Due Diligence Period, the Buyer opts not to proceed, then the Debtors will promptly provide notice to the Court and all potential bidders, and will seek revised approval for sale procedures if serious potential bidders have stepped forward; otherwise, the Debtors will seek to modify this sale process and propose to the Court some other means of proceeding. |
| **Relationship between Buyer and Debtors** | Kent BML Investments, a principal of the Buyer, owns approximately 32% of the LLC units of Blue Matrix. The transaction was negotiated between the CRO (and his professionals) and the Buyer in good faith. The Debtors will have no relationship or connection with the Buyer after the consummation of the sale. |
| **Notice Timing** | Notice of the hearing on the motion to approve the motion to sell will be provided as is necessary under the circumstances. |
| **Cure Amount and Notice** | Concurrently with the filing of this Motion, the Sellers shall provide written notice, in form and substance acceptable to Buyer, to each of the counterparties to the Contracts listed on the Assumed Contracts Schedule that, at the option of Buyer, the Sellers may assume and assign to Buyer such counterparty's Contract, notifying each such counterparty of the proposed Cure Costs for such Contract (each such notice, a "**Cure Notice**").  Each Cure Notice shall inform the counterparty that, if such counterparty objects to the assumption or assignment of its Contract or the amount of the Cure Costs arising prior to the Closing under such Contract, such counterparty must provide written notice of such objection to the Sellers and Buyer within 20 calendar days after the Petition Date. |

53.     The terms and conditions of the proposed transaction are set forth in the APA, and reference should be made to the APA for additional terms.

54.     Accordingly, the Debtors request that the Court enter a bidding procedures order as soon as possible, and a sale order after the Court has held a Sale Hearing.

## Proposed DIP Loan and APA

55.    By motion (the "**DIP Motion**"), pursuant to sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014, the Debtors seek entry of interim and final orders authorizing them to:

a.    obtain secured, superpriority postpetition financing in an aggregate amount up to Five Hundred Thousand Dollars ($500,000) (the "**DIP Facility**"), pursuant to section 364 of the Bankruptcy Code by entering into a secured debtor in possession credit agreement, substantially on the terms set forth in that certain Secured Super-Priority Debtor-in-Possession Credit Agreement between the Debtors and KBML Investments, LP (the "**DIP Lender**" or "**Kent BML Investments**"), a copy of which is annexed hereto as Exhibit A to the DIP Motion, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms (the "**DIP Credit Agreement**"),[7] any related loan and security documents (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**") between and among BML and Hydro, as Borrowers, Paradise Beverage LLC, Paradise Beverage Logistics LLC, and Shags LLC, as Guarantors, and Kent BML Investments, LP, as Lender (the "**DIP Lender**"), on the terms and subject to the conditions set forth therein;

b.    execute, deliver, and enter into the DIP Loan Documents and perform such other and further acts as may be necessary, required, or desirable in connection therewith;

c.    grant mortgages, security interests, superpriority administrative expense claims (including a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code), and liens to the DIP Lender, pursuant to section 364(d) of the Bankruptcy Code, subject in each case to the Carve-Out and subordinate only to the Permitted Liens, to secure amounts owing under the DIP Loan Documents;

d.    use the proceeds of the DIP Facility to fund (a) postpetition operating expenses of the Debtors incurred in the ordinary course of business, (b) costs and expenses of administration in accordance with the DIP Budget attached to Exhibit A to the DIP Credit Agreement and as provided in the DIP Orders and (c) working capital, capital expenditures, and other general corporate purposes of the Debtors, in the case of each of clauses (a), (b), and (c) above, strictly in accordance with the amounts and categories set forth in the DIP Budget or as otherwise consented to by the DIP Lender;

---

[7] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the DIP Credit Agreement.

e.     use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("**Cash Collateral**");

f.     grant adequate protection to the following parties (collectively, the "**Prepetition Secured Parties**") for the Debtors' use of their Cash Collateral and the granting of priming liens to secure the DIP Facility in the form of replacement liens on the Debtors' property, subordinate to the DIP Liens (as defined below): (i) Kent BML Investments, as (a) successor in interest to Jeffrey F. Kent under that certain Promissory Note of Blue Matrix, dated December 5, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Initial Kent Promissory Note**"), and (b) lender under that certain Amended and Restated Promissory Note of Blue Matrix, dated August 27, 2014, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Additional Kent Promissory Note**, and together with the Initial Kent Promissory Note, collectively, the "**Prepetition Kent Notes**"), and (ii) David Chapman, as lender under that certain Promissory Note, dated September 26, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Chapman Promissory Note**" and together with the Prepetition Kent Notes, the "**Prepetition Loans**" and any obligations arising under, or relating to, the Prepetition Loans, the "**Prepetition Secured Obligations**"); and

g.     scheduling a final hearing pursuant to Rule 4001 of the Bankruptcy Rules (a "**Final Hearing**").

56.     The Debtors propose to enter into the DIP Credit Agreement in order to fund the administration of their Chapter 11 Cases and accomplish the Sale of their assets, solely in accordance with the Budget.  The DIP Facility will provide the Debtors with up to $500,000 to fund necessary operations of the Debtors and to administer this Chapter 11 Cases through the closing date of the Sale of the Debtors' assets to the Buyer or to a qualified bidder that sets forth a higher or better offer.  Without such funding, the Debtors would have to cease operations and lose substantial value to the detriment of all creditors and would be unable to pay their professionals.  The specific terms and conditions of the DIP Facility and DIP Credit Agreement are set forth in the DIP Motion.

57.     The Debtors' estates have insufficient funds to conduct a sale process to maximize value and the Debtors believe that the value of the Purchased Assets will rapidly

diminish if a Sale is not quickly consummated. Given the exigent financial circumstances, the Debtors have no other source of financing aside from the DIP Lender. The Debtors are not aware of any other lender that would provide the DIP Loans other than the DIP Lender. The DIP Lender is the only party that has offered to discuss and negotiate the terms of financing, and is unwilling to provide DIP Facility on an unsecured basis or without receiving a priming lien. As such, the Debtors have determined that the DIP Facility offered by the DIP Lender is the best and only option for the critical post-petition financing. Thus, the Debtors require the immediate access to the DIP Facility in order to maintain their businesses pending the closing of the Sale so as to maximize the value of the Acquired Assets for the benefit of all creditors. The Debtors have negotiated with the DIP Lender to present the DIP Motion on a consensual basis in order to expedite the process and achieve the highest value possible for creditors.

58.     The loans under the DIP Facility will enable the Debtors to preserve the value of their assets during the chapter 11 sale process for the benefit of all creditors. Moreover, it is vital to the success of the bidding process outlined under the Sale Motion that the Debtors obtain approval to immediately access the DIP Facility, on an interim and final basis, as contemplated by the DIP Credit Agreement. Accordingly, the Debtors request the Court grant the relief requested in the DIP Motion.

## Appointment of CRO

59.     The Debtors request authorization to (i) employ and retain Bridgepoint to serve as financial advisors for the Debtors and for the purpose of providing a CRO, and (ii) designate William Patterson of Bridgepoint as the CRO, effective, *nunc pro tunc*, as of the Petition Date (the "**Bridgepoint Retention Application**").

60.     There are numerous issues with respect to the monetization of the assets of the Debtors and the bankruptcy process that need to be addressed in the course of the Debtors'

bankruptcy cases.  Bridgepoint and I have extensive experience in distressed entity and Chapter 11 work, and are well suited to assist the Debtors in the process of selling their assets and completing an orderly liquidation. Patterson has performed the services of a CRO, court-appointed receiver, and financial advisor in numerous chapter 11 cases. As set forth in my affidavit filed in support of the Bridgepoint Retention Application, I also have extensive experience in selling and marketing distressed companies both in and out of bankruptcy.

61.     Bridgepoint and I will provide financial advisory services in connection with the Debtors' bankruptcy filings pursuant to chapter 11 of the Bankruptcy Code.  These services are necessary to the success of these bankruptcy cases, and Bridgepoint and the Bridgepoint Professionals are well qualified to provide such services.  Given their experience with the Debtors' business, in fact, they are ideally situated, as their "ramp up" time in understanding the Debtors' position will be significantly less than any other advisors' would be.  Accordingly, the Debtors request the Court approve the Bridgepoint Retention.

## Engagement of Taube Summers

62.     The Debtors desire to employ Taube Summers Harrison Taylor Meinzer Brown LLP ("**Taube Summers**" or the "**Firm**") as counsel for the Debtors (the "**Taube Summers Retention Application**") pursuant to the retention agreement (the "**Retention Agreement**") attached as <u>Exhibit A</u> to the Taube Summers Retention Application.

63.     The Debtors selected the Firm because its attorneys have extensive experience in bankruptcy proceedings, including those involving intellectual property issues and the marketing and sale of property.  All of the Firm's attorneys that will represent the Debtors are members in good standing of the State Bar of Texas and are admitted to practice before the United States District Court for the Western District of Texas.  Accordingly, the Debtors believe that the Firm and its attorneys are well qualified to represent them in this case.

## Joint Administration

64.     The Debtors seek entry of an order authorizing and directing the joint administration of these cases under the case filed by Blue Matrix Labs, LLC.  Bankruptcy Rule 1015(b) authorizes this Court to enter an order directing the joint administration of these cases. The Debtors believe that to some degree there will be some similar issues between the Debtor entities.

65.     Joint administration of these cases is appropriate under the circumstances and will aid in the efficient administration of the cases.  The joint administration will save time and expense by making it unnecessary to file duplicate motions and conduct duplicate hearings. Moreover, the reduction in costs from joint administration will enhance the estates, thereby benefiting all creditors.  The Debtors further request that: (a) the Clerk of the Court maintain one docket for all pleadings filed in this case; (b) the Clerk of the Court maintain one service list for the service of the pleadings, orders, and notices in these cases; and (c) all pleadings and other papers be under filed under one case number.  Accordingly, the Debtors request entry of an order approving the joint administration of the Chapter 11 Cases for procedural purposed only.

## Retention of Global Toys

6.      The Debtors seek to retain GTE, as their broker and marketing agent, to market the Debtors' Assets, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, in accordance with the terms set forth in that certain retention letter, dated December 4, 2015 (the "**GTE Retention Agreement**"), and attached to the GTE Retention Application as Exhibit A. GTE was retained by the Debtors prior to the Petition Date to market certain of the Debtors' assets and is, therefore, in the most advantageous position and best equipped to continue marketing the Debtors after the commencement of these chapter 11 cases in hopes of assisting the Debtors in consummating a sale of substantially all of their assets.

7.      GTE is a boutique financial advisory firm that specializes in the toy industry.  The Debtors seek to retain GTE as their broker because of the GTE's experience and knowledge in the field of marketing and soliciting bids for the sales of businesses in the toy industry.  GTE is also well-situated to help the Debtors under these exigent circumstances in light of the fact that it served the Debtors pre-petition and is, therefore, familiar with the Debtors' businesses and their most valuable products and assets.

8.      The Debtors have also selected GTE because of its knowledge and familiarity with the Debtors' products and assets.  Since the Debtors entered into their prior retention agreement with GTE, the professionals at GTE have worked closely with Debtors' management, creditors, other professionals and advisors in exploring various strategic alternatives and otherwise assisting in preparing for the sale of the Debtors' assets in or out of bankruptcy.  Consequently, the Debtors believe that GTE has developed significant relevant experience and expertise regarding the Debtors and is, thus, both well-qualified and uniquely suited to deal effectively and efficiently with any issues that may arise in connection with the services to be rendered by GTE to the Debtors in their cases.

9.      The Debtors submit that the retention of GTE on the terms and conditions set forth herein is necessary and appropriate, is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and should be granted in all respects.  Accordingly, the Debtors respectfully request the entry of an order, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, authorizing the Debtors to employ and retain GTE as their broker and marketing agent and to perform such related services that will be necessary during these chapter 11 cases.

Further, Affiant sayeth not.

_____
William R. Patterson

SUBSCRIBED and SWORN TO BEFORE ME the undersigned authority this 4th day of December, 2015, to certify which witness my hand and seal of office.

_____
Notary Public, State of Texas

ANN MARIE JEZISEK
Notary Public, State of Texas
My Commission Expires
March 22, 2019