UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BLUE MATRIX LABS, LLC, | § | CASE NO. 15-52977 |
| HYDRO TOYS, LLC, | § | CASE NO. 15-52978 |
| PARADISE BEVERAGE, LLC, | § | CASE NO. 15-52980 |
| SHAGS, LLC, and | § | CASE NO. 15-52981 |
| PARADISE BEVERAGE LOGISTICS, LLC, | § | CASE NO. 15-52979 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | *(Joint Administration Requested)* |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND TO
GRANT SECURITY INTERESTS AND SUPER-PRIORITY ADMINISTRATIVE
EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d);
(B) AUTHORIZING THE DEBTORS TO CONTINUE USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363; (C) MODIFYING THE AUTOMATIC STAY
PURSUANT TO 11 U.S.C § 362; AND (D) SCHEDULING A
FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

**A Motion to Expedite Has Been Filed**

COME NOW Blue Matrix Labs, LLC ("**BML**"), Hydro Toys, LLC ("**Hydro Toys**"),

Paradise Beverage, LLC ("**Paradise Beverage**"), Shags, LLC ("**Shags**"), and Paradise Beverage

Logistics, LLC ("**Paradise Beverage Logistics**" and, collectively, the "**Debtors**"), debtors and

debtors in possession in the above-captioned chapter 11 cases, and file this motion (the "**Motion**"),

pursuant to sections 105(a), 361, 362, 363, 364, and 507 of title 11 of the United States Code (the

"**Bankruptcy Code**") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), for entry of interim and final orders authorizing the Debtors to

  a.  obtain secured, superpriority postpetition financing in an aggregate amount up to
      Five Hundred Thousand Dollars ($500,000) (the "**DIP Facility**"), pursuant to section
      364 of the Bankruptcy Code by entering into a secured debtor in possession credit
      agreement, substantially on the terms set forth in that certain Secured Super-Priority
      Debtor-in-Possession Credit Agreement between the Debtors and KBML

Investments, LP (the "**DIP Lender**" or "**Kent BML Investments**"), a copy of which is annexed hereto as **Exhibit A**, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms (the "**DIP Credit Agreement**"),[1] and any related loan and security documents (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**") between and among BML and Hydro, as Borrowers, Paradise Beverage LLC, Paradise Beverage Logistics LLC, and Shags LLC, as Guarantors, and Kent BML Investments, LP, as Lender (the "**DIP Lender**"), on the terms and subject to the conditions set forth therein;

b.  execute, deliver, and enter into the DIP Loan Documents and perform such other and further acts as may be necessary, required, or desirable in connection therewith;

c.  grant mortgages, security interests, superpriority administrative expense claims (including a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code), and liens to the DIP Lender, pursuant to section 364(d) of the Bankruptcy Code, subject in each case to the Carve-Out and subordinate only to the Permitted Liens, to secure amounts owing under the DIP Loan Documents;

d.  use the proceeds of the DIP Facility to fund (a) postpetition operating expenses of the Debtors incurred in the ordinary course of business, (b) costs and expenses of administration in accordance with the DIP Budget attached to Exhibit A to the DIP Credit Agreement and as provided in the DIP Orders and (c) working capital, capital expenditures, and other general corporate purposes of the Debtors, in the case of each of clauses (a), (b), and (c) above, strictly in accordance with the amounts and categories set forth in the DIP Budget or as otherwise consented to by the DIP Lender;

e.  use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("**Cash Collateral**");

f.  grant adequate protection to the following parties (collectively, the "**Prepetition Secured Parties**") for the Debtors' use of their Cash Collateral and the granting of priming liens to secure the DIP Facility in the form of replacement liens on the Debtors' property, subordinate to the DIP Liens (as defined below): (i) Kent BML Investments, LP, as (a) successor in interest to Jeffrey F. Kent under that certain Promissory Note of BML, dated December 5, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Initial Kent Promissory Note**"), and (b) lender under that certain Amended and Restated Promissory Note of BML, dated August 27, 2014, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Additional Kent Promissory Note**, and together with the Initial Kent Promissory Note, collectively, the "**Prepetition Kent Notes**"), and (ii) David Chapman, as lender

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the DIP Credit Agreement.

under that certain Promissory Note, dated September 26, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Chapman Promissory Note**" and together with the Prepetition Kent Notes, the "**Prepetition Loans**" and any obligations arising under, or relating to, the Prepetition Loans, the "**Prepetition Secured Obligations**"); and

g.      scheduling a final hearing pursuant to Rule 4001 of the Bankruptcy Rules (a "**Final Hearing**").

In support of this Motion, the Debtors respectfully state as follows:

## I. JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code, and the procedural predicates are Rules 2002, 4001, and 9014 of the Bankruptcy Rules.

## II. BACKGROUND

**A.      Procedural Background**

3.      On December 4, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

4.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

B. **Overview of the Debtors' Businesses and Pre-Petition Capital Structure**

6.　　The Debtors develop innovative products across a spectrum of industries and operate through three subsidiaries: (a) Hydro Toys, (b) Paradise Beverage, and (c) Shags.

7.　　Hydro Toys designs and produces unique water toys, including Hydro Toys® and the award-winning ZORBZ® water balloon line – a self-sealing water balloon.  Paradise Beverage manufactured Pirate Energy® shots, which is no longer in production, but has remaining inventory that it is in the process of marketing.  Shags designs and produces the SHAGS® brands, products consisting of innovative bean bag furniture and home accessories including dog beds, pillows, rugs and bath mats.  Blue Matrix has developed and owns the rights to iWich, an innovative kitchen device that is in advanced development stage.  Each of these businesses have been capital constrained and are competing against much better capitalized entities.

8.　　A full description of the businesses of the Debtors and the events leading up to the filing of the voluntary petitions by the Debtors is provided in the Declaration of William R. Patterson [Doc. 3] (the "**Patterson Declaration**"), which has been filed contemporaneously herewith.  On November 6, 2015, the Debtors retained Bridgepoint Consulting ("**Bridgepoint**") to provide certain financial advisory services to the Debtors and to have Mr. Patterson, a principal of Bridgepoint, to serve as the Debtors' Chief Restructuring Officer ("**CRO**").  Also prior to the Petition Date, the Debtors retained Global Toy Experts ("**GTE**"), a boutique investment bank that specializes in the toy industry, in an effort to market Hydro.  Contemporaneously herewith, the Debtors have filed a motion to retain Steve Velte of GTE to continue marketing the assets of Hydro and the other Debtors in the hope of locating a bidder prepared to offer a "higher and better" bid.

C. **Sale of the Debtors' Businesses**

9.　　As set forth in greater detail in the Patterson Declaration, the cash position of the Debtors has deteriorated over the last two years as sales have failed to meet expectations and product

development costs have been higher than projected. The Debtors have exhausted available options to raise additional debt or equity capital and do not have the financial capabilities to pay their vendors for products for the upcoming selling season. Accordingly, the Debtors are faced with the unfortunate reality that, in order to have any possibility of repaying their prepetition creditors and lenders, and preserving the jobs of their employees, they will have to conduct a sale of substantially all of their assets under section 363 of the Bankruptcy Code.

10.     Pursuant to that certain Asset Purchase Agreement dated December 3, 2015 (the "**Stalking Horse Agreement**"), KBIDC Investments, LLC[2] has agreed to act as stalking horse bidder (the "**Buyer**") for any auction sale of the Debtors' assets, subject to higher and better offers. The Stalking Horse Agreement provides for, among other things, the sale of the Debtors' right, title and interest in substantially all of the Debtors' assets, free and clear of any and all liens, encumbrances, claims and other interests, except as otherwise set forth in the Stalking Horse Agreement (the "**Sale**"). The transaction is subject to higher or better offers as more particularly set forth in the bid procedures to be approved by the Court in connection with the Sale. In consideration for the Acquired Assets (as defined in the Stalking Horse Agreement) to be purchased under the Stalking Horse Agreement, the Buyer has agreed to provide consideration of a credit bid in an amount equal to $2,000,000, including the forgiveness of amounts advanced pursuant to the DIP Credit Agreement, and the assumption of certain cure costs and other obligations, all upon the terms and subject to the conditions set forth in the Stalking Horse Agreement.

11.     The terms of the proposed Sale and the Stalking Horse Agreement are more fully described in the *Motion of the Debtors Pursuant to Section 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 for (I) an Order Approving Bidding Procedures*

---

[2] KDIC Investments, LLC is a limited liability company owned by Kent BML Investments and Dave Chapman, another of the Debtors' prepetition senior secured creditors.

*and Bid Protections for the Sale of Certain Designated Assets of the Debtors; and (II) an Order (A) Approving the Sale of Certain Designated Assets of the Debtors Free and Clear of all Liens, Claims, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief*, filed contemporaneously herewith (the "**Sale Motion**").  As set forth in the Sale Motion, absent a sale of substantially all of their assets, the Debtors will be forced to immediately shut their doors and liquidate, which would result in significantly diminished recoveries to prepetition creditors and the Debtors' employees and contractors being laid off and out of work.  Further information regarding the sale of the Debtors' businesses is provided in the Patterson Declaration.

**D.**     **The Proposed DIP Facility**

12.     The Debtors propose to enter into the DIP Credit Agreement in order to fund the administration of their Chapter 11 Cases and accomplish the Sale of their assets, solely in accordance with the budget set forth as Exhibit A to the DIP Credit Agreement (the "**Budget**").  The DIP Facility will provide the Debtors with up to $500,000 to fund necessary operations of the Debtors and to administer this Chapter 11 Cases through the closing date of the Sale of the Debtors' assets to the Buyer or to a qualified bidder that sets forth a higher or better offer.  Without such funding, the Debtors would have to cease operations and lose substantial value to the detriment of all creditors and would be unable to pay their professionals.

13.     Pursuant to Rule 4001 of the Bankruptcy Rules, the principal terms of the DIP Credit Agreement[3] are as follows:

**Borrowers:**        BML and Hydro Toys

**Guarantors:**       Paradise Beverage, Paradise Beverage Logistics and Shags

| | |
|---|---|
| **DIP Lender:** | Kent BML Investments |
| **DIP Loan Amount:** | A superpriority multiple draw term loan facility in an aggregate amount not to exceed $500,000. |
| | DIP Loan Agmt. at § 1.1 (Definition of "DIP Facility"), § 2.1. |
| **Maturity Date:** | The earliest of: |
| | (a) January 31, 2016; |
| | (b) the effective date of a plan of reorganization for in the Chapter 11 Cases; and |
| | (c) the date of acceleration or the termination of the DIP Facility. |
| | DIP Loan Agmt. at § 1.1 (Definition of "Maturity Date," "Schedule Maturity Date"). |
| **Use of Proceeds:** | Proceeds of the DIP Facility will be used to fund: |
| | (a) postpetition operating expenses of the Borrowers incurred in the ordinary course of business; |
| | (b) costs and expenses of administration in accordance with the DIP Budget and as provided for in the DIP Orders; and |
| | (c) working capital, capital expenditures, and other general corporate purposes of the Borrowers, strictly in accordance with the amounts and categories set forth in the DIP Budget or as otherwise consented to by the DIP Lender. |
| | DIP Loan Agmt. at § 2.2. |
| **Limitation on Use of Funds:** | No portion of the DIP Facility (other than the Investigation Fund (as defined and described in the DIP Orders)) shall be used, either directly or indirectly, for any services or expenses arising from or relating to the investigation, initiation, or prosecution of any action (i) contesting the validity, priority, or extent of the claims or Liens asserted by the DIP Lender or the Liens securing the Prepetition Secured Obligations, (ii) asserting claims or causes of action of any sort whatsoever (including, without limitation, avoidance claims) against the DIP Lender or any Person affiliated with the DIP Lender, (iii) preventing, hindering, or delaying the DIP Lender from enforcing any of its rights or remedies or realizing upon the assets that serve as collateral for the Obligations or (iv) seeking to modify any of the rights of the DIP Lender provided for in the DIP Loan Documents or the DIP Orders. |

DIP Loan Agmt. at § 1.1 (definition of "Carve-Out").

| | |
|---|---|
| **Repayment** | All commitments of the DIP Lender under the DIP Facility will terminate and all amounts outstanding under the DIP Credit Agreement, including, without limitation all premiums, interest, fees and expenses, shall be due and payable in full on the Maturity Date.[4]  Other payments are required under certain circumstances, including 30 days after the Interim DIP Order if a Final DIP Order has not been entered, if Extraordinary Proceeds are realized, or upon the Disposition of any of the Debtors or their subsidiaries. |

The Borrowers may repay the borrowings under the DIP Credit Agreement at any time.  Amounts repaid on the DIP Facility may not be re-borrowed.

DIP Loan Agmt. at §§  2.1, 2.3.

| | |
|---|---|
| **Funding Dates:** | The closing of the DIP Credit Agreement shall occur on the date that the conditions precedent to the initial extension of credit shall have been satisfied (or shall have been waived in the sole discretion of the DIP Lender) (the "**Closing Date**"). |

Upon the Closing Date, the Borrowers will be entitled to an initial extension of credit under the DIP Facility not to exceed $250,000.  Upon entry of the Final Order is entered, advances under the DIP Facility shall be available to the Borrowers on two business days' notice.  All Loans outstanding under the DIP Facility shall be advanced pursuant to the DIP Budget and shall become due and payable on the Maturity Date.

DIP Loan Agmt. at §§ 1.1 (Definition of "DIP Facility"), 2.1, 3.1.

| | |
|---|---|
| **Fees:** | The DIP Lender is not charging any fees in connection with the DIP Facility. |
| **Interest Rate:** | Six percent (6%) per annum. |

DIP Loan Agmt. at §§ 1.1 (Definition of "Base Rate"), 2.4.

| | |
|---|---|
| **Default Interest Rate:** | Two percent (2%) per annum above the non-default interest rate. |

DIP Loan Agmt. at § 2.4.

| | |
|---|---|
| **Liens and Priorities:** | Subject to the Carve-Out (as defined below), all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") will be secured |

---

[4] In the event that the Buyer  is the highest and best bidder for the Purchased Assets, pursuant to the terms of the Purchase Agreement, the Debtors' obligations to pay principal and interest under the DIP Credit Agreement will be forgiven and discharged upon closing of the transaction.  Stalking Horse Agreement at § 2.1(a).

by a first priority perfected priming lien (the "**DIP Lien**") upon all of the assets of the Debtors, whether now owned or hereafter acquired, and all proceeds thereof (the "**Collateral**") pursuant to sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code; <u>provided however</u>, that the Debtor's claims and causes of action under chapter 5 of the Bankruptcy Code, and the proceeds thereof, are excluded from the Collateral.

Subject to the Carve-Out, all DIP Obligations will be entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code.

DIP Loan Agmt. at §§ 2.1, 2.7; Interim DIP Order ¶ 15 (carving out Avoidance Actions)

**Carve-Out:** The term "**Carve-Out**" means:

(a) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and all fees payable to the clerk of the Bankruptcy Court, and

(b) all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors from and after the Petition Date (including pursuant to section 363 of the Bankruptcy Code) and any statutory committees appointed in the Chapter 11 Cases,

with each of (a) and (b) above in the amounts consistent with the Budget; <u>provided however</u>, that for purposes of clause (b) above, the amount of the Carve-Out shall not exceed the following amounts for each of the respective Estate Professionals (not including any pre-petition retainers received by any such professional), to the extent allowed by the Bankruptcy Court at any time: (i) $100,000 for Taube Summers Harrison Taylor Meinzer Brown LLP, as counsel to the Debtors;  (ii) $50,000 for Bridgepoint and the CRO; (iii) $5,000 for Conley Rose PC, as special IP counsel to the Debtors; and (iv) $15,000 for any professionals or professional firms retained by any Committee appointed in the Chapter 11 Cases, which amounts shall not be reduced by the amount of any compensation or reimbursement of budgeted expenses and fees incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked, and <u>provided further</u>, no portion of the Carve-Out shall be used, either directly or indirectly, for any services or expenses arising from or relating to the investigation, initiation, or prosecution of any action (a) contesting the validity, priority, or extent of the claims or Liens asserted by the DIP Lender or the Liens securing the Prepetition Loans, (b) asserting claims or causes of action of any sort whatsoever (including, without limitation, avoidance claims) against the DIP Lender or any Person affiliated with the DIP Lender, (c) preventing,

hindering, or delaying the DIP Lender from enforcing any of its rights or remedies or realizing upon the assets that serve as collateral for the Obligations, or (d) seeking to modify any of the rights of the DIP Lender provided for in the DIP Loan Documents or under the DIP Orders.

DIP Loan Agmt. at § 1.1 (Definition of "Carve-Out").

**Adequate Protection:** As adequate protection for the interest of the Prepetition Secured Parties in the Debtors' encumbered property on account of the granting of the DIP Liens, subordination to the Carve-Out, and the Debtors' use of Cash Collateral, the Prepetition Secured Parties shall receive adequate protection, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, in the form of replacement security interests and Liens in the DIP Collateral which shall be junior only to the Carve-Out, the DIP Credit Facility, and the Permitted Liens. The Debtors are aware that certain parties to factoring and other lending agreements entered into by the Debtors prior to the Petition Date may assert security interests in, or liens on, certain of the Acquired Assets. As the value of the collateral security is less than the amount outstanding to the Prepetition Secured Parties, the claims of such parties to factoring and other lending agreements should be considered unsecured and such claimants are not entitled to receive adequate protection of their interests.

**Validity of Liens** Unless a party in interest has timely filed an adversary proceeding or contested matter by the earlier of (i) the date that is the earlier of (x) the date of entry of an order of this Court approving the sale of a substantial portion of the Prepetition Collateral and (y) the date that is forty-five (45) days after the Petition Date, and (ii) if such a Challenge is brought, the date of a final judgment on such Challenge or, in each case, such later date (x) as has been agreed to, in writing, by the Prepetition Secured Parties in their sole discretion or (y) as has been ordered by the Court (the "**Challenge Period**"), (i) challenging the validity, enforceability, priority or extent of the Prepetition Loans or the Prepetition Secured Parties' liens on the Prepetition Collateral or (ii) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (clauses (i) and (ii), collectively, a "**Challenge**") against the Prepetition Secured Parties or their representatives, attorneys or advisors in connection with matters related to the Prepetition Loans, the Prepetition Collateral, and there is a final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter; *provided* that, as to the Debtors, all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date, and *provided further*, that the Committee may use up to $10,000 (the "**Investigation Fund**") from the Carve-Out to investigate the liens and claims against the Prepetition Secured Parties under the Prepetition Loans, but may not use

the Investigation Fund to initiate, assert, join, commence, support, or prosecute any actions or discovery with respect thereto.

Interim DIP Order, ¶ 25.

**Covenants:**

<u>Affirmative Covenants</u>: Among other things, (i) preserve corporate existence and business operations, (ii) comply in all respects with all material applicable laws, rules, regulations, orders, permits, and licenses, (iii) maintain the Loan Parties' insurance, (iv) maintain proper books and records, (v) provide the DIP Lender with visitation and inspection rights, (vi) provide periodic financial statements to the DIP Lender; and (vii) execute any further documents that may be reasonably required by the DIP Lender to enable the DIP Lender to exercise and enforce its rights hereunder and under the other DIP Loan Documents.

<u>Negative Covenants</u>: Among other things, the Loan Parties shall not (i)  grant any liens upon or with respect to any property that secured payment of any Debt or other obligation, (ii) dispose of the Loan Parties' property, except as contemplated by the Sale Motion, (iii) directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Debt, except for the Obligations and the Debt outstanding on the effective date, and (iv) engage in any transaction with any Affiliate on terms more favorable to such Affiliate than would have been obtainable in an arm's-length dealing except for transactions in the ordinary course of business that do not materially adversely affect the ability of the Loan Parties to repay the Obligations when due.

DIP Loan Agmt. at §§ 5.1, 5.2.

**Conditions to Initial Extension of Credit:**

Customary borrowing conditions, including documentation, certification of material facts, obtaining necessary third-party consents, approvals and waivers, and Bankruptcy Court approval.

DIP Loan Agmt. at § 3.1.

**Conditions to All Extensions of Credit:**

Customary borrowing conditions regarding the continued truth and correctness of all representations of the Loan Parties, the absence of an Event of Default, and the provision of a valid borrowing request.

DIP Loan Agmt. at § 3.2.

**Section 506(c):**

Subject only to and upon the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or the Prepetition Secured Parties upon, the DIP Collateral or the Prepetition

Collateral.

Interim DIP Order, ¶ 9.

**Indemnification:** The DIP Loan Documents shall provide that the Borrowers agree to indemnify the DIP Lender and its Affiliates and each of their respective stockholders, directors, officers, agents, attorneys and employees, and the successors and assigns of the foregoing (collectively, "**Indemnitees**"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against any Indemnitee in any way relating to or arising out of the DIP Loan Documents, any related transactions (whether actual or proposed) or any action taken or omitted by the DIP Lender under the DIP Loan Documents; *provided*, *however*, that no Borrower shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the bad faith, gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final non-appealable judgment.

DIP Loan Agmt. at § 8.9.

**Events of Default:** Events of Default under the DIP Credit Agreement include:

   a.  the failure to pay interest, principal or any other amounts payable hereunder as and when due; or

   b.  any representation or warranty made by a Loan Party in any DIP Loan Document or in any certificate agreement or statement delivered to the DIP Lender in connection with any DIP Loan Document shall prove to have been incorrect in any material respect when made; or

   c.  the DIP Loan Parties shall fail to perform or observe (i) any provision of *Section 5.2* of the DIP Credit Agreement (Negative Covenants) or (ii) any provision of *Section 5.1* or of any other DIP Loan Document (other those described in *Section 6.1*, *Section 6.1(b)* or clause (i) of this *Section 6.1*) for more than five (5) Business Days; or

   d.  without the consent of the DIP Lender, any DIP Loan Document shall, at any time after its execution and delivery, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability of any such DIP Loan Document shall be contested by the a Loan Party, or a Loan Party shall deny that the DIP Lender has any further liability or obligation under any

such DIP Loan Document; or

e.  (i) the Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of such Chapter 11 Cases) or converted to cases under chapter 7 of the Bankruptcy Code, (ii) any order shall be entered permitting, or a Loan Party shall file any pleading requesting any such relief, or (iii) a Loan Party shall have any obligation to make adequate protection payments, or otherwise provide adequate protection, other than as approved by the DIP Lender; or

f.  (i) the DIP Orders shall cease to be in full force and effect, (ii) a Loan Party shall fail to comply with the terms of the DIP Orders in any material respect, (iii) either DIP Order shall be amended, supplemented, stayed, reversed, vacated, or otherwise modified (or a Loan Party shall apply for authority to do so) without the prior written consent of the DIP Lender or (iv) any Obligation shall cease to be an allowed secured claim of the Loan Parties in the Chapter 11 Cases having the priority and collateral security as provided in the DIP Orders; or

g.  the Bankruptcy Court shall enter an order appointing a receiver, examiner or trustee as set forth in section 1104 of the Bankruptcy Code, in any of the Chapter 11 Cases; or

h.  any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party in interest executed by or on behalf of the Loan Parties) any other Person's motion to, disallow in whole or in part any claim of the DIP Lender or its priority or collateral security in respect of the Obligations or in respect of the Prepetition Loans; or

i.  the Interim DIP Order is not entered within 10 days from the Petition Date and the Final DIP Order is not entered within 30 Business Days from the Petition Date; or

j.  any of the DIP Loan Documents shall be amended or modified in a manner that is unacceptable to the DIP Lender, or a Loan Party shall file a motion or pleading seeking such relief; or

k.  the closing on a sale or transfer of substantially all of the assets of the Loan Parties shall not have occurred within forty-five (45) calendar days from the Petition Date; or

l.  if (i) actual disbursements under any line item of the DIP Budget for any four week rolling period exceed the budgeted disbursements for such period in such line item by more than five

percent (5.0%), or (ii) aggregate actual disbursements under the DIP Budget for any four week rolling period exceed the aggregate budgeted disbursements for such four week rolling period by more than ten percent (10.0%), unless the DIP Lender consents in writing to such deviation; or

m. if (i) actual receipts under any line item of the DIP Budget for any four week rolling period are less than the budgeted receipts for such period in such line item by more than five percent (5.0%), or (ii) aggregate actual receipts under the DIP Budget for any of four week rolling period are less than the aggregate budgeted receipts for such four week rolling period by more than ten percent (10.0%), unless the DIP Lender consents in writing to such deviation;

DIP Loan Agmt. at § 6.1.

|  |  |
|---|---|
| **Remedies/ Modification of the Automatic Stay:** | Customary remedies, including modification of the automatic stay immediately upon the occurrence of an Event of Default without further action or order of the Bankruptcy Court, <u>provided however</u>, the DIP Lender shall be entitled to exercise all of its rights and remedies under the DIP Loan Documents only upon five business days' written notice to the Borrowers. |

The stay is further modified to the extent necessary to allow for the perfection of the DIP Lien.

Interim DIP Order, ¶ 10.

### III. RELIEF REQUESTED

14.    By this Motion, the Debtors seek entry of two orders: First, at an emergency hearing to be held on a date set by order of the Court, the Debtors request entry of an interim order, in substantially the form attached hereto as **<u>Exhibit B</u>** (the "**Interim Order**"), (a) authorizing the Debtors to enter into the DIP Credit Agreement and grant the DIP Lender the liens and super-priority claims described herein, (b) authorizing the Debtors  to continue use of Cash Collateral, (c) modifying the automatic stay to the extent applicable and necessary, and (d) scheduling a Final Hearing.  Second, the Debtors request entry of a final order (the "**Final Order**," and together with

the Interim Order, the "**DIP Orders**") authorizing the relief granted in the Interim Order on a permanent basis.

## IV. BASIS FOR RELIEF REQUESTED

15.     The Debtors' estates have insufficient funds to conduct a sale process to maximize value and the Debtors believe that the value of the Purchased Assets will rapidly diminish if a Sale is not quickly consummated.  Thus, the Debtors require the immediate access to the DIP Facility in order to maintain their businesses pending the closing of the Sale so as to maximize the value of the Acquired Assets for the benefit of all creditors.  The Debtors have negotiated with the DIP Lender to present this Motion on a consensual basis in order to expedite the process and achieve the highest value possible for creditors.

16.     Thus, the Debtors believe that, in their business judgment, entry into the DIP Credit Agreement is in their best interests.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds*, 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

A.      **The DIP Facility Should be Approved Under Section 364 of the Bankruptcy Code**

17.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize

the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

18.     Courts consider various factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate, including whether (1) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim; (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate under the circumstances.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed post-petition financing) (citations omitted); *see also In re Farmland Indus., Inc*., 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

19.     In addition, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise, and (b) there is "adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(d)(1); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

**1.     The Debtors Are Unable to Obtain Unsecured Credit**

20.     The Debtors urgently require financing in order to preserve and maintain their businesses during the Chapter 11 Cases through the date on which they consummate the Sale pursuant to the Sale Motion.  In addition, the Debtors have insufficient cash with which to pay administrative claims and professionals in their Chapter 11 Cases.  Given the exigent financial circumstances, the Debtors have no other source of financing aside from the DIP Lender.  The

Debtors are not aware of any other lender that would provide the DIP Loans other than the DIP Lender.  The DIP Lender is the only party that has offered to discuss and negotiate the terms of financing, and is unwilling to provide DIP Facility on an unsecured basis or without receiving a priming lien.  As such, the Debtors have determined that the DIP Facility offered by the DIP Lender is the best and only option for the critical post-petition financing.

**2.      The Transactions Under the DIP Loan Documents Are Necessary to Preserve the Estates and Is in the Best Interests of Creditors**

21.      The Debtors have insufficient cash with which to operate their businesses or to protect their assets.  Without immediate access to post-petition financing, the Debtors will be unable to maintain their businesses pending the closing of the Sale.  This would significantly impair the value of the Debtors' assets and jeopardize the Debtors' ability to sell their assets to the detriment of all creditor constituencies.  The loans under the DIP Facility will enable the Debtors to preserve the value of their assets during the chapter 11 sale process for the benefit of all creditors.  Moreover, it is vital to the success of the bidding process outlined under the Sale Motion that the Debtors obtain approval to immediately access the DIP Facility, on an interim and final basis, as contemplated by the DIP Credit Agreement.

22.      Absent approval of the relief sought herein, the Debtors face a substantial risk of irreparable damage to the value of their assets and the probability of conversion of the bankruptcy case to a case under chapter 7 without the ability to sell their assets in an orderly manner for the benefit of the Debtors' creditors.  *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates").  Accordingly, the Debtors need sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.

3.      **The Terms of the DIP Facility are Fair and Reasonable Under the Circumstances**

23.      In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

24.      Under the circumstances of this case, including the Debtors' lack of liquidity and the need for a quick disposition of the Debtors' assets, the terms of the DIP Credit Agreement are fair and reasonable. First, the terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arms' length and were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and preserving the value of the Collateral for the Sale of the assets pursuant to the Sale Motion. Second, the terms themselves are reasonable and favorable to the Debtors. There is no fee for the DIP Loan, and the DIP Lender is not seeking a lien on the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code or the proceeds thereof. Under the circumstances, the interest rate is reasonable.

25.      Furthermore, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lender to the Carve-Out for certain administrative and professional fees, including (i) fees required to be paid to the Court and to the United States Trustee, and (ii) the reasonable fees and expenses incurred by the professionals of the Debtors and the Committee as set forth above, if any, prior to a default. Carve-outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditor's committees and debtors' estates are adequately assisted by counsel and other professionals. *See In re Ames*, 115 B.R. at 38.

26.     Accordingly, the terms of the DIP Facility are fair and reasonable.

**4.      The Prepetition Secured Parties  Consent to the Priming of the Prepetition Liens and to the Use of Cash Collateral**

27.     Generally, in order for a debtor to incur post-petition debt on a senior or "priming" basis, it must provide adequate protection to the lienholder whose lien is being primed.  11 U.S.C. § 364(d)(1).  The Prepetition Secured Parties have consented to the relief requested herein, including to the priming of the Prepetition Liens and to the Debtors' continued use of Cash Collateral.  The Debtors believe that junior secured creditors are likely unsecured as a result of the value of the collateral being insufficient; accordingly, their consent is not required.

28.     Accordingly, the Debtors respectfully assert that they have satisfied the requirements of sections 364 of the Bankruptcy Code, and request that the Court enter the Interim Order approving the DIP Credit Agreement and related DIP Loan Documents to immediately preserve the Debtors' estate, and enter the Final Order to ensure that the Debtors' estate is maintained through the consummation of the Sale.

**B.      The DIP Facility was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

29.     Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith."  *See* 11 U.S.C. § 364(e).

30.     Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

31.     The terms of the DIP Facility were negotiated at arm's length and reflect the most advantageous terms available to the Debtors in light of the exigent circumstances they face.  All of the Obligations will be extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to the Obligations, other than as set forth herein and in the Interim Order. As such, the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**C.      The Automatic Stay Should Be Modified on a Limited Basis**

32.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  Stay modification provisions of this sort are customary features of debtor-in-possession financing facilities and are reasonable under the present circumstances.

33.     The Debtors further request that, upon the occurrence of an Event of Default under the DIP Credit Agreement, the automatic stay be immediately vacated to permit the DIP Lender to exercise all rights and remedies under the DIP Loan Documents or the DIP Orders, as applicable, without further action or order of the Bankruptcy Court.

**D.      Approval of the DIP Facility on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

34.     Rule 4001(c)(2) of the Bankruptcy Rules governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of

credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

FED. R. BANKR. P. 4001(c)(2).  "Immediate and irreparable harm" exists where loss of the business threatens the ability of the debtor to reorganize.  *See In re Ames*, 115 B.R. at 36 n.2.  Approval of a DIP facility on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case.  *See In re Pan Am Corp.*, 1992 WL 154200, at *1, *6 (S.D.N.Y. June 18, 1992).

35.    Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The Debtors need to obtain immediate access to liquidity under the DIP Facility in order to, among other things, continue the operation of its business, maintain relationships with customers, make payroll and capital expenditures, and satisfy other working capital and operational needs.  Thus, the credit provided under the DIP Facility will enable the Debtors to continue to operate their Businesses in an orderly and reasonable manner to preserve and enhance the value of their estate for the benefit of all parties in interest.

36.    The availability of interim funding under the DIP Credit Agreement will also provide necessary assurance of the Debtors' ability to meet their near-term obligations and encourage creditors, employees, contract counterparties and customers to continue their relationships with the Debtors through the Sale.  Failure to meet these obligations and to provide these assurances will cause creditors, customers, contract counterparties and employees to lose confidence in the Debtors, thereby causing irreparable harm to the value of the Debtors' business and assets.  In addition, the implementation of the DIP Facility will promote the consummation of the Sale of the Debtors' assets pursuant to and in accordance with the Sale Motion.

37.     Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors' assets for the benefit of all parties.  As such, the Debtors believe that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

## E.      Request for a Final Hearing

38.     Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 30 days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion.

## V. REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(H)

39.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Given the nature of the relief requested herein, the Debtors respectfully request a waiver of the 14-day stay under Bankruptcy Rule 6004(h)  so that the Interim Order on this Motion may be effective immediately.  As set forth above, the Debtors need immediate access to funding under the DIP Facility in order to prevent irreparable damage to the Debtors' Business and to preserve the value of their assets.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## VI. CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit B**, (a) authorizing the Debtors to enter into the DIP Credit Agreement and grant the DIP Lender the liens and super-priority claims described herein, (b) authorizing the Debtors to continued use of Cash Collateral, (c) modifying the automatic stay to

the extent applicable and necessary, (s) scheduling the Final Hearing pursuant to Bankruptcy Rule

4001, and (e) granting such other and further relief as the Court deems appropriate.

DATED: December 5, 2015
        Austin, Texas

                Respectfully submitted,

                TAUBE SUMMERS HARRISON TAYLOR
                 MEINZER BROWN LLP

                By:   */s/ Morris D. Weiss*
                Eric J. Taube
                State Bar No. 19679350
                Morris D. Weiss
                State Bar No. 21110850
                Christopher G. Bradley
                State Bar No. 24069407
                100 Congress Avenue, Suite 1800
                Austin, Texas 78701
                (512) 472-5997
                (512) 472-5248 (FAX)
                etaube@taubesummers.com
                mweiss@taubesummers.com
                cbradley@taubesummers.com

                PROPOSED ATTORNEYS FOR DEBTORS

## CERTIFICATE OF SERVICE

        I hereby certify that the above and foregoing document has been served d upon all parties on the attached service list by United States First Class Mail on December 7, 2015.

                */s/ Morris D. Weiss*
                Morris D. Weiss

ALL CREDITORS FOR THE 5 CASES:
**SERVICE LIST**

1st Global Capital, LLC
1250 E. Hallandale Beach Blvd, Suite 409
Hallandale Beach, FL 33009

Advantage Sales & Marketing
PO Box 31001-1691
Pasadena, CA 91110-1691

Advantage Sales & Marketing
c/o Sonny King, CEO
18100 Von Karman, Suite 900
Irvine, CA 92612

AM RACING
24801 IH - 35
Kyle, TX 78640

American Dog Magazine
17011 Lincoln Ave, Ste. #610
Parker, CO 80134

American Express
PO Box 650448
Dallas, TX 75265-0448

Armbrust & Brown, PLLC
Attn: Kimberly S. Beckham
100 Congress Ave., Suite 1300
Austin, TX 78701

BANK OF AMERICA
PO Box 660576
Dallas, TX 75226-0576

Blue Matrix Labs, LLC
1575 IH 35 North
New Braunfels, TX 78130

Blue Rhodes, PLLC
812 San Antonio St., Ste 310
Austin, TX 78701

BRIDGEPONT CONSULTING
6300 Bridgepoint Pkwy Bldg, Ste 575
Austin, TX 78730

CapCall LLC
122 E. 42nd Street, Suite 2112
New York, NY 10168

CAPSUGEL US, LLC
412 Mt. Kemble Ave. Suite 200C
Morristown, NJ 07960

CASESTACK Inc.
3000 Ocean Park Blvd, Suite 1000
Santa Monica, CA 90405

CONLEY ROSE, P.C.
1001 McKinney, Ste, 1800
Houston, TX 77002

Continental American Corporation d/b/a P
5000 E. 29th Street North
Wichita, KS 67220

CUSTOM CREATION
1045 Reinli St
Austin, TX 78723

David L Chapman
2905 Cliff Point
Spicewood, TX 78669

DLS LOGSTIC SERVICE, LLC
11120 S Hindry Ave, Ste. A
Los Angeles, CA 90045

Duggan & Brown
1617 Old York Road
Abington, PA 19001

Dutton, Harris, & Company
PO Box 230
Midland, TX 79702

Eagle Business Credit
100 Churchill Ct
Woodstock, GA 30188

EMMIS AUSTIN RADIO
PO Box 731488
Dallas, TX 75373-1488

ENCHANTED MOMENTS
Jeffrey Kennis
344 Fence Row Dr.
Fairfield, CT 6824

FARMERS INSURANCE EXCHANGE
P.O. Box 4665
Carol Stream, IL 60197-4665

FEDEX
Po Box 660481
Dallas, TX 75266-0481

Freedom Voice Systems
169 Saxony Road, Suite 212
Encinitas, CA 92024

GLOBALPLASTIC
Jim Andrasic
34179 Golden Lantern St, Ste. 202
Dana Point, CA 92629

GS1 US, Inc.
PO Box71-3034
Columbus, OH 43271-3034

Hill Country Texas Galleria, LLC
12700 Hill Country Blvd, Suite T-100
Bee Cave, TX 78738

Hydro Toys, LLC
1575 IH 35 North
New Braunfels, TX 78130

iHeart Media Attn: Accounts Payable
P.O. Box 847117
Dallas, TX 75284

Info-Hold, Inc.
4120 Airport Rd.
Cincinnati, OH 45226

INTERNAL REVENUE SERVICE
324 25th St.
Ogden, UT 84201-0039

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

International Print & Packaging
951 Hwy 183
North Liberty Hill, TX 78642

inWorks LLC
PO Box 342
Uwchland, PA 19480

IPFS CORPORATION
PO Box 412086
Kansas City, MO 64141-2086

ITI MANUFACTURING
333 Southwestern Blvd, Ste 202
Sugar Land, TX 77478-3659

Jean Newman
11433 Mission Trace
San Antonio, TX 78230

Jeff Carpenter
1000 Liberty Park Drive #106
Austin, TX 78746

JOE VARRONE & ASSOCIATES
2305 Sheffield Square
Carrollton, TX 75007

Kastner Huggins Reddien Gravelle LLP
801 West 5th Street
Suite 105
Austin, TX 78703

Kent BML Investments, LP
12006 Pleasant Panorama View
Austin, TX 78738

Lease Finance Partners, Inc.
PO Box 20140
Wichita, KS 67208

LUNGE MARKETING, LLC
Trisha Hubbard
218 Main St #407
Kirkland, WA 98033

MCMANEMIN COMPANIES
2050 N Stemmons Frwy, Unit 124
Dallas, TX 75207

NELSON
PO Box 49195
San Jose, CA 95161-9195

Nestle Waters North America Inc.
Ready Refresh #216
6661 Dixie Highway, Suite 4
Louisville, KY 40258

NEXTWAVE, LLC
John Hinkel
9692 Pebble View Dr.
Cincinnati, OH 45252

OKLAHOMA GROCERS ASSOCIATION
PO Box 18716
Oklahoma City, OK 73154

OLD DOMINION FREIGHT LINE, INC
PO Box 841324
Dallas, TX 75284-1324

ON DECK CAPITAL
Attn: Director of Operations
901 N. Stuart Street, Suite 700
Arlington, VA 22203

ONE TOUCH POINT
Ginny's PO Box 143924
Austin, TX 78714-3924

Paradise Beverage, LLC
1575 IH 35 North
New Braunfels, TX 78130

PLUSH PRODUCTS
8755 Windfern Rd
Houston, TX 77064

Power Up Lending Group, Ltd.
111 Great Neck Road, Suite 216
Great Neck, NY 11021

Product Playground, LLC
Jeffrey Kennis
344 Fence Row
Fairfield, CT 6824

Public Storage
6726 Bee Cave Road
Austin, TX 78746

PURCHASE POWER PO
Box 371874
Pittsburgh, PA 15250-7874

PUSH MARKETING & PROMOTIONS
414 South Mill Ave, Ste. 214
Tempe, AZ 85281

RAPID PROTOTYPES
2910 S Walton Blvd Ste 8
Bentonville, AR 72712

Ron Harter
6901 E. Co. Rd. 97
Midland, TX 79706

Sanson Illustrations
1207 DUNLAVY
HOUSTON, TX 77019

SCOTT C SHELTON, P.C.
136 W. Twohig, Ste C
San Angelo, TX 78734

Scott Goodwin
13950 Distribution Way
Farmers Branch, TX 75234

Shags, LLC
1575 IH 35 North
New Braunfels, TX 78130

Sol Schwartz & Associates PC
7550 W IH 10, #1200
San Antonio, TX 78229

SOS CAPITAL
540 Madison Avenue
New York, NY 10022

STEEL BRANDING
6414 Bee Cave Rd Ste B
Austin, TX 78746

SUNBELT DISPLAYS & DIGITAL
  GRAPHICS
1000 Williams Dr., Ste. 1002
Marietta, GA 30066

Taizhou LuckySun Imp. & Exp. Co., Ltd
No. 36, Chaoji Street
Beiyang Huangyan
Taizhou, Zhejiang 318020

The Erin Griffin Group, LLC
19321 E. Clear Creek Dr
Parker, CO 80134

THE HARTFORD
PO Box 660916
Dallas, TX 75266-0916

THE NIELSEN COMPANY (US), LLC
PO Box 88956
Chicago, IL 60695

The Specialty Marketing Group, Inc.
11707 Dean Street
Huntley, IL 60142

Tony Scott Martin
101 Flint Rock Trail
Spicewood, TX 78669

Toyology Inc.
23679 Calabasas Rd
Calabasas, CA 91302

U.S. Trustee - San Antonio
Nancy Ratchford, Assist. U.S. Trustee
P.O. Box 1539
San Antonio, TX 78295

Uline
PO Box 88741
Chicago, IL 60680-1741

UNITED LABORATORIES
  MANUFACTURING, INC
PO Box 671314
Dallas, TX 75267-1314

World Global Financing Inc.
141 North East 3rd Avenue
Miami, FL 33132

# EXHIBIT A

$500,000

DEBTOR IN POSSESSION CREDIT AGREEMENT

by and among

BLUE MATRIX LABS, LLC

and

HYDRO TOYS, LLC,

each a debtor and debtor in possession, as borrowers,

PARADISE BEVERAGE, LLC,
PARADISE BEVERAGE LOGISTICS, LLC,

and

SHAGS, LLC,

each a debtor and debtor in possession, as guarantors,

and

KENT BML INVESTMENTS, LP,
as lender

Dated as of December 4, 2015

# TABLE OF CONTENTS

**Page**

1. DEFINITIONS ............................................................................................................. 1

    1.1    *Definitions* ...................................................................................... 1
    1.2    *Certain Terms* ................................................................................ 7
    1.3    *Accounting Terms* .......................................................................... 7
    1.4    *Internal Cross References* ............................................................. 7
    1.5    *Legislation.* ..................................................................................... 7

2. AMOUNT AND TERM OF THE LOAN ......................................................................... 8

    2.1    *The Loans.* ...................................................................................... 8
    2.2    *Use of Proceeds.* ............................................................................ 8
    2.3    *Repayment of Loan.* ....................................................................... 8
    2.4    *Interest.* .......................................................................................... 9
    2.5    *Payments and Computations.* ........................................................ 9
    2.6    *Illegality.* ........................................................................................ 9
    2.7    *Liens and Security Interests; Priority* .......................................... 10

3. CONDITIONS TO LENDING AND EFFECTIVENESS ..................................................... 12

    3.1    *Conditions Precedent to the Effectiveness of this Agreement and to the Initial Loan* .................................................................................... 12
    3.2    *Conditions Precedent to Each Extension of Credit* ....................... 13

4. REPRESENTATIONS AND WARRANTIES ................................................................... 14

    4.1    *Representations and Warranties of the Borrowers* ....................... 14

5. COVENANTS OF THE BORROWERS ........................................................................ 15

    5.1    *Affirmative Covenants* ................................................................... 15
    5.2    *Negative Covenants* ...................................................................... 15

6. EVENTS OF DEFAULT ............................................................................................ 16

    6.1    *Events of Default* ........................................................................... 16

7. GUARANTEE .......................................................................................................... 18

    7.1    *Guarantee.* ..................................................................................... 18
    7.2    *No Subrogation..* ............................................................................ 18
    7.3    *Amendments, Etc. with Respect to the Obligations.* ...................... 19
    7.4    *Guarantee Absolute and Unconditional.* ...................................... 19
    7.5    *Reinstatement.* ............................................................................... 20
    7.6    *Payments..* ..................................................................................... 20

8. MISCELLANEOUS ................................................................................................. 20

    8.1    *Amendments, Etc.* .......................................................................... 20
    8.2    *Headings.* ....................................................................................... 20
    8.3    *Notices, Etc.* ................................................................................... 20
    8.4    *No Waiver; Remedies.* .................................................................... 21
    8.5    *Costs, Expenses and Taxes.* ......................................................... 21
    8.6    *Binding Effect; Assignment.* .......................................................... 21

i

## TABLE OF CONTENTS
(continued)

**Page**

8.7     *Execution in Counterparts*.................................................................................. 21
8.8     *Entire Agreement; Severability of Provisions.* .................................................. 22
8.9     *Indemnification*.................................................................................................. 22
8.10    *Governing Law.* ................................................................................................. 22
8.11    *Consent to Jurisdiction*..................................................................................... 22

ii

DEBTOR IN POSSESSION CREDIT AGREEMENT, dated as of December 4, 2015, by and among BLUE MATRIX LABS, LLC, a Texas limited liability company ("*BML*"), and HYDRO TOYS, LLC, a Texas limited liability company, as debtors and debtors in possession under chapter 11 of the Bankruptcy Code (as defined below) (each, a "*Borrower*" and collectively, the "*Borrowers*"), PARADISE BEVERAGE, LLC, a Texas limited liability company, PARADISE BEVERAGE LOGISTICS, LLC, a Texas limited liability company, and SHAGS, LLC, a Texas limited liability company, each a debtor and debtor in possession under chapter 11 of the Bankruptcy Code (each, a "*Guarantor*" and collectively, the "*Guarantors*" and, collectively with the Borrowers, the "*Debtors*" and each a "*Debtor*"), and KENT BML INVESTMENTS, LP, a Texas limited partnership, as lender under chapter 11 of the Bankruptcy Code (together with its successors and permitted assigns, the "*Lender*").

RECITALS:

A.    On December 4, 2015 (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief (collectively, the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") with the United States Bankruptcy Court for the Western District of Texas (the "*Bankruptcy Court*").

B.    The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

C.    The Debtors have requested that the Lender provide a secured term loan facility to the Debtors in total principal amount of $500,000 in order to ensure ample liquidity to the Debtors as debtors in possession under the Bankruptcy Code.

D.    The Lender is willing to make available to the Debtors such postpetition loan upon the terms and subject to the conditions set forth herein.

Now, therefore, in consideration of the premises and the covenants contained herein, the parties hereto hereby agree as follows:

1.    DEFINITIONS

1.1    *Definitions*.   As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Affiliate*" means, with respect to any Person, each officer, director or general partner of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.   For purpose of this definition, "*control*" means the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of the Voting Stock of such Person or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"*Agreement*" means this Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"*Austin Courts*" has the meaning specified in *Section 8.11*.

"*Avoidance Actions*" means all causes of action arising under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"*Bankruptcy Code*" has the meaning specified in the recitals to this Agreement.

"*Bankruptcy Court*" has the meaning specified in the recitals to this Agreement.

"*Base Rate*" means a rate per annum equal to six percent (6.0%).

"*BML*" has the meaning specified in the preamble to this Agreement.

"*Borrower*" and "*Borrowers*" have the meanings specified in the preamble to this Agreement.

"*Business Day*" means a day of the year on which banks are not required or authorized to close in Austin, Texas.

"*Carve-Out*" means (a) the unpaid fees of the U.S. Trustee or the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 1930(a) and (b); and (b) all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the by the Estates from and after the Petition Date (including pursuant to section 363 of the Bankruptcy Code) (collectively, the "*Estate Professionals*") in an amount not to exceed the following amounts for each of the respective Estate Professionals, to the extent allowed by the Bankruptcy Court at any time (not including any prepetition retainer that may have been received by such professional): (i) $100,000 for Taube Summers Harrison Taylor Meinzer Brown, LLP, as counsel to the Debtors;  (ii) $50,000 for Bridgepoint Consulting and the CRO; (iii) $5,000 for Conley Rose PC, as special IP counsel to the Debtors; and (iv) $15,000 for any professionals or professional firms retained by any official committee appointed in the Chapter 11 Cases (collectively, the "*Carve-Out Amount*"); *provided*, that (w) the Lender may at any time, in its sole and absolute discretion, agree to increase the Carve-Out Amount; (x) no portion of the Carve-Out (other than the Investigation Fund (as defined and described in the DIP Orders)) shall be used, either directly or indirectly, for any services or expenses arising from or relating to the investigation, initiation, or prosecution of any action (i) contesting the validity, priority, or extent of the claims or Liens asserted by the Lender or the Liens securing the Prepetition Secured Obligations, (ii) asserting claims or causes of action of any sort whatsoever (including, without limitation, avoidance claims) against the Lender or any Person affiliated with the Lender, (iii) preventing, hindering, or delaying the Lender from enforcing any of its rights or remedies or realizing upon the assets that serve as collateral for the Obligations or (iv) seeking to modify any of the rights of the Lender provided for in the Loan Documents or the DIP Orders; (y) as long as no Default or Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and such payments shall not reduce the Carve-Out; and (z) to the extent the dollar limitation in clause (b) above is reduced as a result of payment of such fees and expenses during the continuation of an Event of Default, if such Event of Default is subsequently cured or waived, the limitation in clause (b) above shall be increased by an amount equal to the amount by which it had so been reduced.

"*Chapter 11 Cases*" has the meaning specified in the recitals to this Agreement.

2

"*Closing Date*" has the meaning specified in *Section 3.1.*

"*Collateral*" has the meaning specified in *Section 2.7(a).*

"*CRO*" means William B. Patterson, in his capacity as chief restructuring officer of each of the Loan Parties.

"*Debt*" means (a) indebtedness for borrowed money, (b) obligations evidenced by bonds, debentures, notes or other similar instruments and obligations to pay for the deferred purchase price of property or services, in each case other than obligations to make milestone, progress and similar payments, obligations under trade credit incurred in the ordinary course of business, and other credit from suppliers incurred in the ordinary course of business in connection with the goods or services supplied (whether or not evidenced by a promissory note or a credit agreement), (c) obligations as lessee under leases that have been recorded as capital leases in accordance with GAAP and the present value of all future rental payments under all synthetic leases, (d) obligations under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, obligations of others of the kinds referred to in *clauses (a)* through *(c)* above and (e) obligations of others of the kinds referred to in *clauses (a)* through *(d)* above secured by any Lien on any owned or held asset, regardless of whether such obligations have been assumed or are non-recourse.

"*Default*" means an event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

"*DIP Budget*" means the operating budget for the Borrowers annexed hereto as Exhibit A, as such DIP Budget is updated and revised from time to time subject to any such update or revision being approved by the Lender.

"*DIP Facility*" means this superpriority multiple draw term loan facility in a principal amount of up to $500,000, up to an aggregate of $250,000 of which will be made available to the Borrowers on or after the Closing Date and prior to the entry of the Final DIP Order, and up to an aggregate of $500,000 of which will be made available to the Borrowers on or after entry of the Final DIP Order and prior to the Maturity Date.

"*DIP Orders*" means both the Interim DIP Order and the Final DIP Order.

"*Discharge of Obligations*" has the meaning specified in *Section 5.1.*

"*Disposition*" means any transaction, or series of related transactions, pursuant to which any Person or any of its subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person.

"*Dollars*" and "*$*" mean the lawful currency of the United States of America.

"*Extraordinary Receipts*" means any cash received by any Loan Party not in the ordinary course of business (and not consisting of Net Cash Proceeds described in *Section 2.3(c)*),

including, without limitation, (a) proceeds of insurance, (b) condemnation awards (and payments in lieu thereof) and (c) proceeds of Avoidance Actions.

"*Event of Default*" has the meaning specified in *Section 6.1*.

"*Final DIP Order*" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure and pursuant to sections 363 and 364 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Lender, which, on a final basis, among other things, approves this Agreement, including the superpriority status, security interests and liens described herein, and the other Loan Documents, as to which no stay has been entered and that has not been reversed, modified, supplemented, vacated or overturned without the prior written consent of the Lender; *provided*, *however*, that, if such consent is obtained, "*Final DIP Order*" shall then include such supplement, reversal, and other modification.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as may be in general use by significant segments of the accounting profession, that are applicable to the circumstances as of the date of determination, applied consistently with the principles used in the preparation of the latest financial statements of the Borrowers delivered to the Lender prior to the date hereof.

"*Governmental Authority*" means any federal, state, municipal, national, supranational or other government, governmental department, commission, board, bureau, court, agency, central bank or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"*Guarantor*" and "*Guarantors*" have the meanings specified in the preamble to this Agreement.

"*Indemnitees*" has the meaning specified in *Section 8.9*.

"*Interim DIP Order*" means an order of the Bankruptcy Court entered in the Chapter 11 Cases pursuant to sections 363 and 364 of the Bankruptcy Code, substantially in the form annexed hereto as Exhibit B, which, on an interim basis, among other things, approves this Agreement, the Interim Loan Amount and the other Loan Documents.

"*Interim Loan Amount*" means the lesser of $500,000 and the amount authorized to be lent by the Lender to the Borrowers under the Interim DIP Order.

"*Kent BML*" means Kent BML Investments, LP, a Texas limited partnership.

"*Law*" means any federal, state, local, municipal, foreign, international, multinational or other constitution, statute, law, rule, regulation, ordinance, code, principle of common law or treaty.

"*Lender*" has the meaning specified in the preamble to this Agreement.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a capital lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"*Loans*" has the meaning specified in *Section 2.1*.

"*Loan Documents*" means this Agreement, any other document or instrument executed and delivered by any Loan Party to the Lender in connection with this Agreement.

"*Loan Parties*" means the Borrowers and each Guarantor.

"*Maturity Date*" means the earliest of (a) the Scheduled Maturity Date, (b) the effective date of a plan of reorganization in the Chapter 11 Cases or (c) the date of termination of the Lender's commitments and the acceleration of any outstanding extensions of credit or other Obligations under the Loan Documents.

"*Net Cash Proceeds*" means, with respect to any Disposition by or Extraordinary Receipts of any Person or any of its subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration or otherwise) by or on behalf of such Person or such subsidiary, in connection therewith after deducting therefrom only (a) the amount of any Debt secured by any Permitted Lien on any asset (other than Debt assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Debt under this Agreement), (b) reasonable and documented out-of-pocket expenses related thereto incurred by such Person or such subsidiary in connection therewith (including reasonable and documented out-of-pocket costs of collection), (c) transfer taxes paid to any taxing authorities by such Person or such subsidiary in connection therewith, and (d) income and franchise taxes to be paid in connection with such Disposition or Extraordinary Receipt (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case, to the extent, but only to the extent, that the amounts so deducted are (x) actually paid or required to be paid (and reserved for such purpose) to a Person that, except in the case of reasonable and documented out-of-pocket expenses, is not an Affiliate (other than the Lender) of such Person or any of its Subsidiaries and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"*Notice of Borrowing*" has the meaning specified in *Section 2.1(b)*.

"*Obligations*" means all loans (including the Loans), advances, debts, liabilities, obligations, covenants and duties of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, due to the Lender or to any other Indemnitee from any Loan Party and arising under any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, guaranty, indemnification, or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now or hereafter arising and however acquired, including all

interest, charges, expenses, fees (including attorneys' fees) and other amounts chargeable to any Loan Party under any Loan Document.

"*Person*" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"*Prepetition Loans*" means, collectively, the Prepetition Kent Notes and the Prepetition Chapman Note.

"*Permitted Liens*" means all of the following:

(a)     statutory liens for Taxes not yet due,

(b)     statutory liens of landlords, carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for sums not yet due,

(c)     liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security,

(d)     zoning Laws and other land use restrictions that do not materially impair the present or anticipated value or use of the encumbered asset, and

(e)     in the case of leased property, all matters, whether or not of record, affecting the title of the lessor (and any underlying lessor) that do not materially impair the present or anticipated value or use of the encumbered asset.

"*Prepetition Secured Obligations*" means any obligations arising under, or relating to, the Prepetition Loans.

"*Prepetition Secured Parties*" means the lenders under the Prepetition Loans.

"*Petition Date*" has the meaning specified in the recitals to this Agreement.

"*Prepetition Chapman Note*" means that certain Promissory Note, dated September 26, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, issued by BML and held by Dave Chapman, an individual

"*Prepetition Kent Notes*" means, collectively, (a) that certain Promissory Note, dated December 5, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, issued by BML and held by Kent BML as successor in interest to Jeffrey F. Kent, an individual, and (b) that certain Amended and Restated Promissory Note, dated August 27, 2014, as further amended, restated, amended and restated, supplemented or otherwise modified from time, issued by BML and held by Kent BML.

"*Sale Motion*" means that certain *Emergency Motion of the Debtors for (i) an Order Approving Bidding Procedures and Bidder Protections for the Sale of Certain Designated Assets; and (ii) an Order Approving the Sale of Certain Designated Assets Free and Clear of all*

*Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (m) and 365, and Granting Related Relief* filed by the Loan Parties with the Bankruptcy Court and dated as of the same date hereof.

"*Scheduled Maturity Date*" means January 31, 2016.

"*Stock*" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"*Tax*" means (a) all income taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings, or profits) and all gross receipts, estimated, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, or windfall profit taxes, unpaid property taxes, environment, alternative, or add-on minimum taxes, custom duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts and (b) any obligation to indemnify or otherwise assume or succeed to any liability described in clause (a) hereof of any other Person whether by contract or under common law doctrine of de facto merger and successor liability or otherwise.

"*Voting Stock*" means capital stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees, or other controlling Persons, of such Person (irrespective of whether, at the time, capital stock of any other class shall have or might have voting power by reason of the occurrence of any contingency).

1.2    *Certain Terms*.    In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including," the words "*to*" and "*until*" each mean "to but excluding," and the word "*through*" means "to and including." The words "*include,*" "*includes,*" and "*including*" mean, respectively, "include without limitation," "includes without limitation," and "including without limitation." The word "*or*" does refer to an exclusive choice.

1.3    *Accounting Terms*.    All accounting terms not specifically defined herein shall be construed in conformity with GAAP, and all accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in conformity with GAAP.

1.4    *Internal Cross References*.    The words "*herein*," "*hereof,*" and "*hereunder*" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, or clause in this Agreement.

1.5    *Legislation*.    Unless the context otherwise requires, references to any legislation or administrative rule or regulation include references to any amendment or modification of such legislation, rule, or regulation, to any successor legislation, rule, or regulation and to any subordinate legislation, rule, or regulation made thereunder.

2.        AMOUNT AND TERM OF THE LOAN

2.1    *The Loans*.    (a)        The Lender may, in its sole discretion and otherwise on the terms and subject to the conditions hereinafter set forth, make superpriority term loans to the Borrowers on or after the Closing Date and from time to time prior to the Maturity Date in the aggregate principal amount of up to five hundred thousand Dollars ($500,000), up to an aggregate of two hundred-fifty thousand Dollars ($250,000) of which may be made available to the Borrowers on or after the Closing Date and prior to the entry of the Final DIP Order, and up to an aggregate of $500,000 of which may be made available to the Borrowers upon entry of the Final DIP Order and prior to the Maturity Date (the "*Loans*").    All Loans outstanding under the DIP Facility shall be advanced pursuant to the DIP Budget and shall become due and payable on the Maturity Date.    Amounts repaid may not be reborrowed.

(b)        Each Loan shall be made on notice by the Borrowers to the Lender by e-mail to Jeffrey F. Kent at ▓▓▓▓▓▓▓▓▓▓▓▓, given not later than 11:00 A.M. (New York City time) two Business Days prior to the requested date of the proposed Loan.    Each such notice of borrowing (a "*Notice of Borrowing*") shall specify (i) the requested date of such Loan and (ii) the amount of such Loan.    No more than one Loan may be made each week during the term of this Agreement.

2.2    *Use of Proceeds*.    The Borrowers shall apply proceeds of the Loans to fund (a) postpetition operating expenses of the Borrowers incurred in the ordinary course of business, (b) costs and expenses of administration in accordance with the DIP Budget and as provided for in the DIP Orders and (c) working capital, capital expenditures, and other general corporate purposes of the Borrowers, in the case of each of clauses (a), (b), and (c) above, strictly in accordance with the amounts and categories set forth in the DIP Budget or as otherwise consented to by the Lender.

2.3    *Repayment of Loan; Evidence of Debt*.    (a)    The Borrowers may, at any time and from time to time, prepay the principal of the Loans, in whole or in part.    The Borrowers shall repay the Loans in full, in Dollars or immediately available funds, on the Maturity Date.

(b)        The Lender shall maintain an account evidencing all Debt of the Borrowers to the Lender resulting from the Loans, including, without limitation, the amounts of principal and interest payable and paid to the Lender or credited against the Loans from time to time under this Agreement.    The entries made in such account shall, absent manifest error and to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations recorded therein; *provided*, *however*, that the failure of the Lender to maintain such an account or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms hereof.

(c)        Immediately upon any Disposition by any Borrower or any of its subsidiaries, the Borrowers shall prepay the outstanding principal amount of the Loans in an amount equal to 100% of the Net Cash Proceeds of such Disposition.

(d)        Immediately upon the receipt by any Borrower or any of its subsidiaries of the proceeds of any issuance or incurrence of Debt (other than the Obligations), the Borrowers shall prepay the outstanding principal amount of the Loans in an amount equal to 100% of the proceeds received by such Person in connection with such issuance or incurrence of Debt.

(e)     Upon the receipt by any Borrower or any of its subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal of the Loans in an amount equal to 100% of the Net Cash Proceeds of such Extraordinary Receipts.

(f)     Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of the Loans in whole or in part, the Borrowers shall prepay the Loans in full on the date which is thirty (30) days following the entry of the Interim DIP Order in the event that the Final DIP Order shall not have been entered on or before such date.

2.4     *Interest*.

(a)     *Rate of Interest*.   The Loans and the outstanding principal balance of all other Obligations shall bear interest on the unpaid principal amount thereof from the date such Loans were made and such other Obligations are due and payable, as the case may be, until paid in full, except as otherwise provided in *Section 2.4(c) (Default Interest)* and except that such interest rate shall not exceed the maximum rate permitted by applicable law, at a rate per annum equal to the Base Rate.

(b)     *Interest Payments*.   Interest shall accrue and be payable at maturity whether by acceleration or by the occurrence of the Maturity Date.

(c)     *Default Interest*.   Notwithstanding the rates of interest specified in *Section 2.4(a) (Rate of Interest)* or elsewhere in this Agreement, effective immediately upon the occurrence of an Event of Default and for as long thereafter as such Event of Default shall be continuing, the principal balance of all Obligations shall bear interest (except that such interest rate shall not exceed the maximum rate permitted by applicable law) at a rate that is two percent (2%) per annum in excess of the Base Rate.

2.5     *Payments and Computations*.   (a)   The Borrowers shall make each payment under any Loan Document of principal of and interest on the Loans and other Obligations, without set off, counterclaim, condition or reservation of right, in immediately available Dollars, not later than 3:00 P.M. (Austin, Texas time) on the day when due to the Lender at its address referred to in *Section 8.3 (Notices, Etc.)* or such address in the United States as may be notified by the Lender to the Borrowers.

(b)     All computations of interest shall be made by the Lender on the basis of a year of 365 or 366 days, as applicable, and the actual number of days elapsed (including the first day but excluding the last day).

(c)     Whenever any payment under any Loan Document shall be otherwise required to be made on a day other than a Business Day, such payment shall be required to be made on the next succeeding Business Day, and such extension of the time shall in such case be included in the computation of payment of interest; *provided, however*, that if such extension would cause payment of interest on or principal of the Loan to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

2.6     *Illegality*.   Notwithstanding anything to the contrary contained herein, if the Lender determines in its reasonable judgment that it has become unlawful for the Lender to make, fund, or maintain the Loans, then the Lender may give the Borrowers notice thereof, at

9

which time the Borrowers shall pay or prepay the Loan (without premium or penalty), together with all accrued interest thereon and all fees and other amounts payable to the Lender under any Loan Document.

2.7  *Liens and Security Interests; Priority*.  (a)  As security for the full and timely payment and performance of all of the Obligations, each Loan Party hereby, as of the Closing Date, assigns, pledges and grants (or causes the assignment, pledge and grant in respect of any indirectly owned assets) to the Lender a security interest in and to, and Liens on, all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the Stock of each subsidiary of such Loan Party, all of the Stock of all other Persons directly owned by such Loan Party, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise, all other property, assets or interests in property or assets of such Loan Party, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of such Loan Party, and all cash and non-cash proceeds, rents, products and profits of any of collateral described above (all of the foregoing being hereafter collectively referred to as the "*Collateral*").  Notwithstanding the foregoing, Collateral shall not include any claims and causes of action of the Debtors under sections 542, 544, 545, 547, 548, 549, 550, 553(b) and 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "*Avoidance Actions*") and any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions.

(b)  The Liens and security interests in the Collateral in favor of the Lender pursuant to *Section 2.7(a)* shall be valid and perfected first priority Liens on, and security interests in, the Collateral, prior to all other Liens on, and security interests in, the Collateral, whether now existing or hereafter created, other than Permitted Liens.  Such Liens and security interests and their priority shall remain in effect until the Lender's commitments under the Loan Documents shall have been terminated and all Obligations shall have been repaid in cash in full. The Loan Parties hereby covenant, represent and warrant that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Loan Parties hereunder and under the other Loan Documents, shall, subject to the Carve-Out and the DIP Orders, at all times:

(i)  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases;

(ii)  pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all Collateral of the Loan Parties' respective estates in the Chapter 11 Cases and the proceeds thereof that is not subject to valid, perfected and non-avoidable liens as of the commencement of the Chapter 11 Cases; and

(iii)  pursuant to section 364(d)(1) of the Bankruptcy Code, and as acknowledged and agreed to by the Prepetition Secured Parties, be secured by a perfected first priority, senior priming lien on all of the Collateral of the Loan Parties' respective estates in the Chapter 11 Cases that is subject to the existing liens that secure the Prepetition Secured Obligations and all of which existing liens (the liens thereunder, the "*Primed Liens*") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the Lender, which senior priming liens in favor of the Lender shall also prime any liens

10

granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens but shall not prime liens, if any, to which the Primed Liens are subject at the time of the commencement of the Chapter 11 Cases.

(c)     Notwithstanding anything herein to the contrary, all proceeds received by Lender from the Collateral subject to the Liens granted and security interests in the Collateral in favor of the Lender pursuant to *Section 2.7(a)* or any other Loan Document shall be subject to the prior payment of the Carve-Out; *provided*, that no Person entitled to such Carve-Out shall be entitled to sell or otherwise dispose, or seek or object to the sale or other disposition, of any Collateral.

(d)     Each Loan Party agrees for itself that the Obligations shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of the Carve-Out.

(e)     The Liens and security interests in the Collateral in favor of the Lender pursuant to *Section 2.7(a)* and the administrative priority granted pursuant to *Section 2.7(d)* may be independently granted by the other Loan Documents or the DIP Orders.   This Agreement, the DIP Orders and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

(f)     The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order or the Final DIP Order, as applicable, and entry of the Interim DIP Order shall have occurred on or before the date of any Loan.   The Lender shall not be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest in the Collateral in favor of the Lender or pursuant to this Agreement, the Interim DIP Order or the Final DIP Order, as applicable, or any other Loan Document; *provided*, that the Lender shall be permitted to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office and to take any other action with respect to the Lien and security interest granted by or pursuant to this Agreement, the Interim DIP Order or the Final DIP Order, as applicable, or any other Loan Document.

(g)     The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the DIP Orders and the other Loan Documents (specifically including, without limitation, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Debt by any Borrower (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.   Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in

any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Lender against any Loan Party in respect of any Obligation;

(ii)      upon entry of the Interim DIP Order or Final DIP Order, as applicable, the Liens and security interests in the Collateral in favor of the Lender pursuant to *Section 2.7(a)*, the DIP Orders and any other Loan Documents shall have the priority set forth in *Section 2.7(b)*; and

(iii)      the Liens and security interests in the Collateral in favor of the Lender pursuant to *Section 2.7(a)*, the DIP Orders and any other Loan Documents shall continue to be valid and perfected without the necessity that the Lender file financing statements, mortgages, certificates of title, notices of Lien or other similar instruments or otherwise perfect its Lien under applicable non-bankruptcy law.

(h)      The Loan Parties shall take any other actions reasonably requested by the Lender from time to time to cause the attachment, perfection and first priority of, and the ability of the Lender to enforce, the security interest of the Lender in any and all of the Collateral, including, without limitation, (i) executing and delivering any requested security agreement, pledge agreement or mortgage, (ii) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code or other applicable law, to the extent, if any, that any Borrower's signature thereon is required therefor, (iii) causing the Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, (iv) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Lender to enforce, the security interest of the Lender in such Collateral, and (v) obtaining the consent and approval of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor or other Person obligated on Collateral, and taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant jurisdiction.

3.      CONDITIONS TO LENDING AND EFFECTIVENESS

3.1      *Conditions Precedent to the Effectiveness of this Agreement and to the Initial Loan*.   This Agreement shall be effective on the date of fulfillment of, and the obligation of the Lender to make the Loan hereunder is subject to the fulfillment (or waiver in writing by the Lender) of, all of the following conditions precedent on and as of such date (the "*Closing Date*"):

(a)      the Bankruptcy Court shall have entered the Interim DIP Order, substantially in the form annexed hereto as Exhibit B and otherwise in form and substance satisfactory to the Lender in its sole discretion, authorizing and approving, among other things, the DIP Facility, this Agreement and the transactions contemplated hereby on an interim basis, and the Interim DIP Order shall be in full force and effect;

(b)      the representations and warranties made in *Article 4 (Representations and Warranties)* shall be true and correct on and as of such date, before and after giving effect to the Loans and to the application of the proceeds therefrom, as though made on and as of such date;

12

(c)     no Default or Event of Default shall be continuing or would result from the Loans or the application of the proceeds therefrom as of such date;

(d)     the Lender shall have received all of the following on or before such date, each in form and substance satisfactory to it:

(i)     this Agreement duly executed by each of the Borrowers and the Guarantors;

(ii)     true and complete copies of the certificate of formation and the company agreement of each Loan Party and certified copies of the written consent of the duly authorized representative of each Loan Party approving all Loan Documents to be delivered on or before such date and certified copies of all documents evidencing other necessary limited liability company action and governmental approvals, if any, with respect to such Loan Documents;

(iii)     a certificate, signed by a duly authorized officer of each Borrower and dated such date, stating that the conditions set forth in *clauses (b)* and *(c)* above have been satisfied as of such date; and

(iv)     a certificate from the Borrowers, certifying the names and true signatures of the Persons authorized to sign the Loan Documents on behalf of each Borrower.

3.2     *Conditions Precedent to Each Extension of Credit.*   The Lender may, in its sole discretion, fund each Loan subject to the occurrence of the following conditions, *provided* that, prior to the entry of the Final DIP Order the aggregate principal amount of the Loans shall not exceed the Interim Loan Amount:

(a)     the representations and warranties made in *Article 4 (Representations and Warranties)* shall be true and correct on and as of such date, before and after giving effect to such Loan and to the application of the proceeds therefrom, as though made on and as of such date;

(b)     no Default or Event of Default shall be continuing or would result from such Loan or the application of the proceeds therefrom as of such date;

(c)     the making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently;

(d)     the receipt by the Lender of a certificate, signed by a duly authorized officer of each Borrower and dated such date, stating that the conditions set forth in *clauses (a)-(c)* of this Section have been satisfied as of such date;

(e)     the receipt by the Lender of a Notice of Borrowing; and

(f)     the Interim DIP Order or the Final DIP Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed without the prior written consent of the Lender.

WEIL:\95553543\1\56228.0020

4.    REPRESENTATIONS AND WARRANTIES

4.1    *Representations and Warranties of the Borrowers*.   Each Loan Party represents and warrants on the Closing Date and on the date of the making of each Loan as follows:

(a)    Such Loan Party is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of organization and has the limited liability company power and authority to own its assets and to transact the business in which it is now engaged or proposed to be engaged.

(b)    The execution, delivery, and performance by such Loan Party of the Loan Documents have been duly authorized by all necessary limited liability company actions and do not and will not (i) contravene its organizational documents, (ii) violate any provision of, or require any filing, registration, consent or approval under, any material law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award applicable to such Loan Party, (iii) result in a breach of, or constitute a default or require any consent or result in the creation of a Lien under, any material indenture, lease, instrument, or other agreement to which such Loan Party is a party or by which such Loan Party or its properties may be bound or affected other than the agreements, together with any related documents, set forth on Schedule 4.1(b) hereto.

(c)    Each of the Loan Documents has been duly executed and delivered by such Loan Party and, subject to entry of the Interim DIP Order or the Final DIP Order, as applicable, constitutes its legal, valid, and binding obligation enforceable against it in accordance with its terms subject to the Bankruptcy Code.

(d)    Except for the Interim DIP Order or the Final DIP Order, as applicable, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery, and performance by such Loan Party of the Loan Documents.

(e)    There is no pending or threatened action, proceeding, or investigation affecting such Loan Party before any court, commission, agency, or instrumentality of the federal or any state or municipal government or any agency or subdivision thereof or before any arbitration that purports to materially adversely affect the legality, validity, or enforceability of the Loan Documents.

(f)    On and after the Closing Date, (i) pursuant to section 364(d)(1) of the Bankruptcy Code and the Interim DIP Order or the Final DIP Order, as applicable, and as acknowledged and agreed to by the Prepetition Secured Parties, all Obligations constitute allowed claims of the Loan Parties in the Chapter 11 Cases, subject, as to priority only, to the Carve-Out and secured by a first priority, priming lien on and security interest in substantially all assets of the Borrowers and specifically excluding avoidance actions under chapter 5 of the Bankruptcy Code, subject only to Permitted Liens, and (ii) the Interim DIP Order or the Final DIP Order, as applicable, and the transactions contemplated hereby and thereby are in full force and effect and have not been vacated, reversed, modified, amended, or stayed without the prior written consent of the Lender.

5.      COVENANTS OF THE BORROWERS

5.1     *Affirmative Covenants*.   Until all the Obligations (other than contingent indemnification and expense reimbursement obligations with respect to which no claim has been asserted) are paid in full in immediately available funds (the "*Discharge of Obligations*"), each Loan Party shall do all of the following unless the Lender shall otherwise consent in writing:

(a)     at all times maintain its limited liability company existence and preserve and keep in full force and effect its rights, privileges, and franchises necessary or desirable to its business;

(b)     comply in all respects with all material applicable laws, rules, regulations, orders, permits, and licenses;

(c)     maintain at all times insurance in such amounts and against such risks as is common industry practice;

(d)     keep proper books of record and account in which entries in conformity with GAAP shall be made of all dealings and transactions in relation to its business and activities;

(e)     permit the Lender and its representatives, during normal business hours and with reasonable prior notice and (other than during the continuance of a Default or Event of Default) at the Lender's expense, to inspect its facilities and its books and records and to discuss its affairs, finances and accounts with its officers and employees;

(f)     on Wednesday of each week after the Closing Date, provide to the Lender a reconciliation showing actual receipts and disbursements for the preceding week against the DIP Budget.   The DIP Budget may be updated from time to time, and shall be updated at least monthly, in all cases subject to the Lender's approval.   On a regular basis upon request from the Lender, the Loan Parties shall meet with the Lender to review the DIP Budget and reconciliations provided to the Lender;

(g)     within 10 days after the end of each fiscal month of the Loan Parties, deliver to the Lender an unaudited consolidated balance sheet as at the end of such month, together with unaudited consolidated statements of operations and cash flows for such month; and

(h)     execute and deliver from time to time to the Lender all such further documents and instruments and do all such other acts and things as may be reasonably required by the Lender to enable the Lender to exercise and enforce its rights hereunder and under the other Loan Documents.

5.2     *Negative Covenants*.   Until the Discharge of Obligations, each Loan Party agrees that it will not do any of the following without the prior written consent of the Lender:

(a)     create or suffer to exist any Lien upon or with respect to any of its property, whether now owned or hereafter acquired, or assign any right to receive income, in each case to secure or provide for the payment of any Debt or other obligation of any Person, other than Permitted Liens;

(b)     suffer or permit it or any of its subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any property (including the Stock of any subsidiary of any Loan Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse), other than (a) the sale of inventory in the ordinary course of business and (b) as contemplated pursuant to the Sale Motion;

(c)     directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Debt, except for (i) the Obligations and (ii) the Debt outstanding on the date hereof; and

(d)     except as expressly contemplated hereby, engage in any transaction with any Affiliate on terms more favorable to such Affiliate than would have been obtainable in an arm's-length dealing except for transactions in the ordinary course of business that do not materially adversely affect the ability of the Loan Parties to repay the Obligations when due.

## 6.     EVENTS OF DEFAULT

6.1   *Events of Default*.   If any of the following shall occur and be continuing (each, an "*Event of Default*"):

(a)     the failure to pay interest, principal or any other amounts payable hereunder as and when due; or

(b)     any representation or warranty made by a Loan Party in any Loan Document or in any certificate agreement or statement delivered to the Lender in connection with any Loan Document shall prove to have been incorrect in any material respect when made; or

(c)     the Loan Parties shall fail to perform or observe (i) any provision of *Section* 5.2 (Negative Covenants) or (ii) any provision of *Section 5.1* or of any other Loan Document (other those described in *Section* 6.1(a), *Section* 6.1(b) or clause (i) of this *Section* 6.1(c)) for more than five (5) Business Days; or

(d)     without the consent of the Lender, any Loan Document shall, at any time after its execution and delivery, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability of any such Loan Document shall be contested by a Loan Party, or a Loan Party shall deny that the Lender has any further liability or obligation under any such Loan Document; or

(e)     (i) the Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of such Chapter 11 Cases) or converted to cases under chapter 7 of the Bankruptcy Code, (ii) any order shall be entered permitting, or a Loan Party shall file any pleading requesting any such relief, or (iii) a Loan Party shall have any obligation to make adequate protection payments, or otherwise provide adequate protection, other than as approved by the Lender; or

(f)     (i) the DIP Orders shall cease to be in full force and effect, (ii) a Loan Party shall fail to comply with the terms of the DIP Orders in any material respect, (iii) either DIP Order shall be amended, supplemented, stayed, reversed, vacated, or otherwise modified (or a Loan Party shall apply for authority to do so) without the prior written consent of the Lender or

(iv) any Obligation shall cease to be an allowed secured claim of the Loan Parties in the Chapter 11 Cases having the priority and collateral security as provided in the DIP Orders; or

(g)     the Bankruptcy Court shall enter an order appointing a receiver, examiner or trustee as set forth in section 1104 of the Bankruptcy Code, in any of the Chapter 11 Cases; or

(h)     any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party in interest executed by or on behalf of the Loan Parties) any other Person's motion to, disallow in whole or in part any claim of the Lender or its priority or collateral security in respect of the Obligations or in respect of the Prepetition Loans; or

(i)     the Interim DIP Order is not entered within 10 days from the Petition Date and the Final DIP Order is not entered within 30 Business Days from the Petition Date; or

(j)     any of the Loan Documents shall be amended or modified in a manner that is unacceptable to the Lender, or a Loan Party shall file a motion or pleading seeking such relief; or

(k)     the closing on a sale or transfer of substantially all of the assets of the Loan Parties shall not have occurred within 45 calendar days from the Petition Date;

(l)     if (i) actual disbursements under any line item of the DIP Budget for any four week rolling period exceed the budgeted disbursements for such period in such line item by more than five percent (5.0%), or (ii) aggregate actual disbursements under the DIP Budget for any four week rolling period exceed the aggregate budgeted disbursements for such four week rolling period by more than ten percent (10.0%), unless the Lender consents in writing to such deviation; or

(m)     if (i) actual receipts under any line item of the DIP Budget for any four week rolling period are less than the budgeted receipts for such period in such line item by more than five percent (5.0%), or (ii) aggregate actual receipts under the DIP Budget for any of four week rolling period are less than the aggregate budgeted receipts for such four week rolling period by more than ten percent (10.0%), unless the Lender consents in writing to such deviation;

then, and in any such event, the Lender may, by notice to the Borrowers and without the need to seek any further relief from the Bankruptcy Court, (a) declare all or part of the Obligations to be forthwith due and payable, whereupon the Obligations or such part thereof shall become and be forthwith immediately due and payable, without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrowers; (b) commence foreclosure on the Collateral and take such action, without notice or demand as it deems advisable to protect and enforce its rights against the Collateral and in and to the Collateral; and (c) subject solely to any requirement of the giving of notice under the terms of the Interim DIP Order or the Final DIP Order, as applicable, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Lender shall be entitled to exercise all of its rights and remedies under the Loan Documents and applicable law.

7. GUARANTEE

7.1 *Guarantee.*

(a) Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Lender and its successors and permitted indorsees, transferees and assigns, the prompt and complete payment and performance by the Borrowers when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

(b) Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Loan Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors.

(c) Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this *Section 7* or affecting the rights and remedies of the Lender hereunder.

(d) The guarantee contained in this *Section 7* shall remain in full force and effect until all the Obligations and the obligations of each Guarantor under the guarantee contained in this *Section 7* (other than unasserted contingent indemnification and contingent expense reimbursement obligations ) shall have been satisfied by payment in full.

(e) No payment made by the Borrowers, any of the Guarantors, any other guarantor or any other Person or received or collected by the Lender from the Borrowers, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the Obligations are paid in full (other than unasserted contingent indemnification and contingent expense reimbursement obligations).

7.2 *No Subrogation.* Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the Lender, no Guarantor shall be entitled to be subrogated to any of the rights of the Lender against the Borrowers or any other Guarantor or any collateral security or guarantee or right of offset held by the Lender for the payment of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrowers or any other Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to the Lenders by the Borrowers on account of the Obligations are paid in full. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid in full, such amount shall be held by such Guarantor in trust for Lenders, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Lender in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Lender, if required), to be applied against the Obligations, whether matured or unmatured, in such order as the Lender may determine. For the avoidance of doubt, nothing in the foregoing shall operate as a waiver of any subrogation rights.

7.3 *Amendments, Etc. with Respect to the Obligations*. To the fullest extent permitted by applicable law, each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Obligations made by the Lender may be rescinded by the Lender and any of the Obligations continued, and the Obligations, or the liability of any other Person upon them or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Lender, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection herewith or therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Lender may reasonably deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Lender for the payment of the Obligations may be sold, exchanged, waived, surrendered or released.   The Lender shall not have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the guarantee contained in this *Section 7* or any property subject thereto.

7.4 *Guarantee Absolute and Unconditional*. To the fullest extent permitted by applicable law, each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Lender upon the guarantee contained in this *Section 7* or acceptance of the guarantee contained in this *Section 7*; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this *Section 7*; and all dealings between the Borrowers and any of the Guarantors, on the one hand, and the Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this *Section 7*.   To the fullest extent permitted by applicable law, each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrowers or any of the Guarantors with respect to the Obligations.   Each Guarantor understands and agrees that the guarantee contained in this *Section 7*, to the fullest extent permitted by applicable law, shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrowers or any other Person against the Lender, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Borrowers or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrowers for the Obligations, or of such Guarantor under the guarantee contained in this *Section 7*, in bankruptcy or in any other instance.   When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrowers, any other Guarantor, or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrowers, any other Guarantor, or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrowers, any other Guarantor, or any other Person or any such collateral security, guarantee

19

or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Lender against any Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of legal proceedings.

7.5 *Reinstatement*. The guarantee contained in this *Section 7* shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Loan Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Loan Party or any substantial part of its property, or otherwise, all as though such payments had not been made.

7.6 *Payments*. Each Guarantor hereby guarantees that payments hereunder will be paid to the Lender without set-off or counterclaim in Dollars.

8.    MISCELLANEOUS

8.1 *Amendments, Etc.* No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrowers or any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

8.2 *Headings*. The headings and table of contents are included in this Agreement for convenience only and shall not in any way affect the meaning of or interpretation of this Agreement.

8.3 *Notices, Etc.* All notices and other communications provided for hereunder shall be in writing and mailed, e-mailed, or delivered, as follows:

(a)    if to the Borrowers or any Guarantors, addressed to:

Blue Matrix Labs, LLC
Attention:   William Patterson
PO Box 342677
Austin, TX 78734
E-Mail: bpatterson@bridgepointconsulting.com

with a copy to (which shall not constitute notice):

Taube Summers Harrison Taylor Meinzer Brown, LLP
Attention:   Morris D. Weiss
100 Congress Avenue, 18th Floor
Austin, TX 78701
E-mail: mweiss@taubesummers.com

(b)      If to the Lender, addressed to:

Kent BML Investments, LP
12006 Pleasant Panorama View
Austin, TX 78738
E-mail: ████████████████

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
Attention:   Gabriel F. Gregson
201 Redwood Shores Parkway
Redwood Shores, CA 94065
E-Mail: gabriel.gregson@weil.com

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party.  All such notices and communications shall be effective, if e-mailed or telecopied, when e-mailed or telecopied, or, if mailed or delivered, when actually received.

8.4     *No Waiver; Remedies*.   No failure on the part of the Lender to exercise, and no delay in exercising, any right under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.   The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

8.5     *Costs, Expenses and Taxes*.   Each of the Loan Parties agrees to pay on demand all costs and expenses, if any (including fees and expenses of counsel), in connection with (i) the negotiation, execution and delivery of this Agreement, and in connection with the other Loan Documents, (ii) the enforcement (whether through negotiations, legal proceedings or otherwise) of the Obligations and any Loan Document, including, without limitation, counsel fees and expenses in connection with the enforcement of rights under this *Section 8.5*.   In addition, each of the Loan Parties shall pay any and all stamp and other taxes payable or determined to be payable in connection with the execution and delivery of any Loan Document to be delivered hereunder and agrees to save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes.

8.6     *Binding Effect; Assignment*.   This Agreement shall be effective as of the Closing Date and shall be binding upon and inure to the benefit of the Loan Parties and the Lender and their respective successors and permitted assigns (including any trustee appointed in the Chapter 11 Case or appointed if the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code), except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of the Lender.   The Lender may assign (including for collateral purposes) all or a portion of its rights and obligations under this Agreement upon notice to the Loan Parties.

8.7     *Execution in Counterparts*.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.   One or more counterparts of this Agreement (or portions hereof) may be delivered via e-mail, with the intention that they shall have the same effect as an

original counterpart hereof (or such portions hereof). All signature pages need not be on the same counterpart.

8.8 *Entire Agreement; Severability of Provisions.* The Loan Documents contain the entire agreement of the parties hereto and supersede all prior agreements and understandings, oral and otherwise, among the parties hereto with respect to the matters contained in the Loan Documents. If any provision of this Agreement, or the application thereof to any Person or circumstance, is invalid or unenforceable or contravenes any law, regulation or document applicable to such Person, such provision or application shall be deemed ineffective *ab initio*, but the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, and the provisions of this Agreement shall be severable in any such instances.

8.9 *Indemnification.* The Borrowers agree to indemnify the Lender and its Affiliates and each of their respective stockholders, directors, officers, agents, attorneys and employees, and the successors and assigns of the foregoing (collectively, "*Indemnitees*"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against any Indemnitee in any way relating to or arising out of the Loan Documents, any related transactions (whether actual or proposed) or any action taken or omitted by the Lender under the Loan Documents; *provided, however,* that no Borrower shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the bad faith, gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final non-appealable judgment. The foregoing agreements and the agreements in *Section 8.5* shall survive the making and repayment of the Obligations.

8.10 *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the law of the State of Texas and any applicable laws of the United States of America, including the Bankruptcy Code.

8.11 *Consent to Jurisdiction.* The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of the Loan Documents and to decide any claims or disputes that may arise or result from, or be connected with, the Loan Documents, any breach or default thereunder, or the transactions contemplated therein during the pendency of the Chapter 11 Cases. Any and all claims or disputes, causes of action, suits and proceedings relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the jurisdiction of the Bankruptcy Court, *provided, however,* that, if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to the Loan Documents and the District Court for the Western District of Texas also so determines, then each of the parties agrees that all such actions or proceedings may be heard and determined in a federal court of the United States sitting in the City of Austin, County of Travis, or, if such federal court lacks jurisdiction over such action, in a court of the State of Texas sitting in the City of Austin, County of Travis (the "*Austin Courts*"). By execution and delivery of this Agreement, the Loan Parties accept for themselves and their property, generally and unconditionally, the jurisdiction of such Austin Courts and any related appellate courts, irrevocably agree to be bound by any judgment rendered thereby (other than during the pendency of the Chapter 11 Cases) in any legal or equitable action or proceeding arising out of, in connection with, or related to any Loan Document to which it is a party or the enforcement thereof, and the Loan Parties hereby

irrevocably consent to the service of process (other than during the pendency of the Chapter 11 Cases) out of any of the aforementioned courts in any such action or proceeding by mailing of copies thereof by registered mail, postage prepaid, such service to become effective three Business Days after such mailing.   Each party hereto hereby irrevocably waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any of the courts mentioned above or that any such court is an inconvenient forum.   Except during the pendency of the Chapter 11 Cases as provided above, nothing herein shall affect the Lender's right to serve process in any other manner prescribed by law or the right to bring legal or equitable actions or proceedings in other competent jurisdictions.   Any judicial proceeding by any Loan Party against the Lender involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan Document shall be brought only in a court sitting in the City of Austin, County of Travis.   EACH OF THE LOAN PARTIES AND THE LENDER HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING BROUGHT BY THE LOAN PARTIES OR THE LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BLUE MATRIX LABS, LLC,**
**as Borrower**

By: _William R. Patterson_
Name:  William R. Patterson
Title:  Chief Restructuring Officer

**HYDRO TOYS, LLC,**
**as Borrower**

By: _William R. Patterson_
Name:  William R. Patterson
Title:  Chief Restructuring Officer

**PARADISE BEVERAGE, LLC,**
**as Guarantor**

By: _William R. Patterson_
Name:  William R. Patterson
Title:  Chief Restructuring Officer

**PARADISE BEVERAGE LOGISTICS, LLC,**
**as Guarantor**

By: _William R. Patterson_
Name:  William R. Patterson
Title:  Chief Restructuring Officer

**SHAGS, LLC,**
**as Guarantor**

By: _William R. Patterson_
Name:  William R. Patterson
Title:  Chief Restructuring Officer

[SIGNATURE PAGE TO DEBTOR IN POSSESSION CREDIT AGREEMENT OF BLUE MATRIX LABS, LLC]

**KENT BML INVESTMENTS, LP,**
as the Lender

By:  Kent BML Investments GP, LLC,
     its general partner

By:  _____
     Name: Jeff Kent
     Title: Member

ACKNOWLEDGED AND AGREED TO:

**KENT BML INVESTMENTS, LP,**
as a Prepetition Secured Party

By:   Kent BML Investments GP, LLC,
its general partner

By: _____
Name:       Jeff Kent
Title:       Member

**DAVE CHAPMAN**
as a Prepetition Secured Party

By:   Dave Chapman


By: _____
Name:
Title:

[SIGNATURE PAGE TO DEBTOR IN POSSESSION CREDIT AGREEMENT OF BLUE MATRIX LABS, LLC]

**ACKNOWLEDGED AND AGREED TO:**

**KENT BML INVESTMENTS, LP,**
as a Prepetition Secured Party

By:   Kent BML Investments GP, LLC,
        its general partner

By:   _____
   Name:
   Title:

**DAVE CHAPMAN**
as a Prepetition Secured Party

By:   Dave Chapman

By:   _David L. Chapman_____
   Name:  DAVID L CHAPMAN
   Title:

**Exhibit A**

**DIP Budget**

WEIL:\95553543\1\56228.0020

**Blue Matrix Labs, LCC, et al.**
Cash Flow Forecast

| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 12/11/2015 | 12/18/2015 | 12/25/2015 | 1/1/2016 | 1/8/2016 | 1/15/2016 | 1/22/2016 | 1/29/2016 | Totals |
| **Beginning Cash Balance** | 998 | 131,213 | 84,268 | 97,052 | 158,058 | 155,233 | 124,938 | 111,118 | 998 |
| **Cash Receipts** | | | | | | | | | |
| Sales | - | - | 16,804 | - | - | - | - | 50,884 | 67,688 |
| DIP Borrowings/(Repayments) | 250,000 | - | - | 250,000 | - | - | - | - | 500,000 |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - |
| **Total Collections** | 250,000 | - | 16,804 | 250,000 | - | - | - | 50,884 | 567,688 |
| **Cash Disbursements** | | | | | | | | | |
| Payroll & Benefits | - | (10,316) | - | (10,316) | - | (10,316) | - | (10,316) | (41,266) |
| Production Costs | (2,802) | (24,400) | - | (47,904) | - | - | - | - | (75,106) |
| Freight, Logistics & Warehousing | (5,260) | - | (20) | (7,860) | - | - | (10,020) | (20,000) | (43,160) |
| Product Development | - | - | - | - | - | (10,000) | - | - | (10,000) |
| Sales Commissions | - | (750) | (200) | - | - | - | - | (1,680) | (2,630) |
| Rent | - | - | - | (2,500) | - | - | - | - | (2,500) |
| Utilities | (1,695) | - | - | (20) | (1,675) | - | - | - | (3,390) |
| IT | (542) | (1,500) | - | (542) | - | - | - | - | (2,584) |
| Taxes | - | - | - | - | - | - | - | - | - |
| Insurance | - | (26) | (2,800) | - | - | (26) | (2,800) | - | (5,652) |
| Consulting & Legal | (7,683) | (6,952) | - | (43,852) | - | (6,952) | - | (6,952) | (72,392) |
| Travel & Expenses | (803) | (2,000) | - | - | (150) | (2,000) | - | - | (4,953) |
| Miscellaneous | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (8,000) |
| Restructuring Professionals | (100,000) | - | - | (75,000) | - | - | - | (75,000) | (250,000) |
| **Total Disbursements** | (119,785) | (46,945) | (4,020) | (188,994) | (2,825) | (30,295) | (13,820) | (114,949) | (521,633) |
| **Total Cash Flow** | 130,215 | (46,945) | 12,784 | 61,006 | (2,825) | (30,295) | (13,820) | (64,065) | 46,055 |
| **Ending Cash Balance** | 131,213 | 84,268 | 97,052 | 158,058 | 155,233 | 124,938 | 111,118 | 47,053 | 47,053 |

**Exhibit B**

**Interim DIP Order**

WEIL:\95553543\1\56228.0020

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BLUE MATRIX LABS, LLC, | § | CASE NO. _____ |
| HYDRO TOYS, LLC, | § | CASE NO. _____ |
| PARADISE BEVERAGE LLC, | § | CASE NO. _____ |
| SHAGS, LLC, and | § | CASE NO. _____ |
| PARADISE BEVERAGE LOGISTICS LLC, | § | CASE NO. _____ |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | *(Joint Administration Requested)* |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER
AUTHORIZING (A) SALE OF ASSETS TO KBIDC INVESTMENTS, LLC
PURSUANT TO SECTIONS 105(a), 363(b), (f) AND (m) OF THE BANKRUPTCY
CODE AND (B) ASSUMPTION BY THE DEBTORS, AND ASSIGNMENT TO
KBIDC INVESTMENTS, LLC, OF CERTAIN EXECUTORY CONTRACTS
<u>PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE</u>**

UPON THE MOTION, dated December 4, 2015 (the "***Motion***[1]"), of Blue Matrix

Labs, LLC ("**BML**"), Hydro Toys, LLC ("**Hydro Toys**"), Paradise Beverage, LLC

("**Paradise**"), Paradise Beverage Logistics, LLC ("**Paradise Logistics**"), and Shags, LLC

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

("**Shags**" and, together with BML, Hydro Toys, Paradise and Paradise Logistics, the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order authorizing (a) the sale of substantially all of the assets of the Debtors to KBIDC Investments, LLC ("**Buyer**") and (b) the assumption and assignment to Buyer of certain executory contracts of the Debtors;

AND A HEARING HAVING BEEN HELD by the Court to consider the Motion on December [__], 2015 (the "**Hearing**"), at which time all interested parties were offered an opportunity to be heard regarding the Motion, the Asset Purchase Agreement (defined herein), and the transactions contemplated by the Asset Purchase Agreement;

AND IT APPEARING that the Court has jurisdiction over this matter;

AND IT FURTHER APPEARING that the relief requested in the Motion is in the best interests of the Debtors and their estates;

AND after consideration of objections, if any, to the Motion;

NOW, THEREFORE, upon the record set forth by the Debtors, including the Motion, the pleadings and other documents filed in the Chapter 11 Cases, including, without limitation, the Declaration of William R. Patterson [Doc. __] (the "**Patterson Declaration**"), and the record of the Hearing, and after due deliberation and sufficient cause appearing therefor, the Court hereby finds as follows:

WEIL:\95546177\9\56228.0020

# I.

## FINDINGS OF FACT[2]

A.    **Background**

      1.      On December 4, 2015, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Petition Date**").

      2.      By previous order of this Court, the Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in the Chapter 11 Cases.

      3.      Prior to the date hereof, BML was advanced funds in an aggregate outstanding principal amount of $4,284,154 pursuant to that certain (i) Promissory Note, dated September 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Chapman Promissory Note**"), issued by BML and held by Dave Chapman ("**Chapman**"), (ii) Promissory Note, dated December 5, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Initial Kent Promissory Note**"), issued by the Company and held by Kent BML Investments, LP, a Texas limited partnership ("**Kent BML Investments**" and, together with Chapman, the "**Lenders**") as successor in interest to Jeffrey F. Kent, and (iii) Amended and Restated Promissory Note, dated August 27, 2014 (as further amended, restated, amended and restated, supplemented or otherwise modified from time, the "**Additional Kent Promissory Note**" and,

---

[2] Any finding set forth under the heading "Findings of Fact" that may also be considered, in whole or in part, to constitute a conclusion of law shall be deemed set forth under the heading "Conclusions of Law" as if set forth in full therein.  All findings and conclusions of law announced by the Bankruptcy Court at the Hearing in relation to the Motion are hereby incorporated to the extent not inconsistent herewith.

WEIL:\95546177\9\56228.0020

together with the Chapman Promissory Note and the Initial Kent Promissory Note, the

"**Promissory Notes**"), issued by the Company and held by Kent BML Investments.

      4.      On December 4, 2015, the Debtors and Buyer entered into that certain

Asset Purchase Agreement under which Buyer agreed to purchase substantially all of the assets

the Debtors and to assume certain cure related costs and other liabilities, subject to Bankruptcy

Court approval (the "**Asset Purchase Agreement**").

      5.      In connection with the execution of the Asset Purchase Agreement and the

transaction contemplated herein, and solely to the extent required, the Debtors consented to the

assignment or transfer of the interests of the Lenders under the Promissory Notes and related

security documents and interests to Buyer and agreed that, to the extent necessary, Buyer and its

respective affiliates shall not be prohibited assignees or transferees thereunder.  Kent BML

Investments has also agreed to provide the Debtors with a $500,000 principal amount debtor in

possession credit facility pursuant to that certain Debtor in Possession Credit Agreement dated as

of December 4, 2015 between the Debtors and Kent BML Investments,  as lender (the "**DIP

Lender**").

## B.      The Auction Process

      6.      Prior to commencing these Chapter 11 Cases, Bridgepoint Consulting,

LLC ("**Bridgepoint**") and BML's board of managers determined that the value of the Debtors'

estates and the potential recovery for the Debtors' creditors would be maximized if the Debtors'

businesses could be sold as a going concern.

      7.      On October 1, 2015, the Debtors retained Global Toy Experts ("**GTE**"), a

boutique investment bank that specializes in the toy industry, in an effort to market Hydro Toys.

Such retention was timed to coincide with Fall Toy Preview held October 5-8, 2015, an event

that is hosted annually in Dallas, Texas by the Toy Industry Association, Inc. GTE agreed to

show the assets to up to ten (10) companies for a 30 day process but would be entitled to

compensation, "tail" protection, if any entities introduced by GTE to Hydro Toys during the

referenced marketing period subsequently purchased Hydro Toys or its assets. GTE, based on its

long industry knowledge, reviewed a proprietary list of forty-five (45) potentially interested

parties and reduced such list to eight (8) parties it concluded were the most likely buyers.

Several of such parties signed non-disclosure agreements and conducted due diligence on the

available assets. Two of such parties expressed a high degree of interest in the assets and

continued conducting diligence until shortly before the Petition Date. As of the Petition Date, no

viable offers had been submitted. Subject to Bankruptcy Court approval, the Debtors retained

Steve Velte of GTE to continue marketing the assets of Hydro Toys and the other Debtors in the

hope of locating a bidder prepared to offer a "higher and better" bid.

      8.     After extensive, arm's length, good faith negotiations among the Buyer,

the Debtors, and their respective advisers, the Debtors and Buyer executed the Asset Purchase

Agreement. A copy of the Asset Purchase Agreement is annexed to the Motion as **Exhibit A**.

Any capitalized term used but not defined in this order shall have the meaning ascribed to such

term in the Asset Purchase Agreement. Pursuant and subject to the terms and conditions of the

Asset Purchase Agreement, Buyer has agreed to purchase the "**Acquired Assets**" from the

Debtors. In the event of any inconsistency or conflict between the summary of the provisions of

the Asset Purchase Agreement set forth herein and the terms of the Asset Purchase Agreement,

the Asset Purchase Agreement controls.

      9.     As part of the Debtors' efforts to realize the highest and best value for

their business, on December [__], 2015, the Debtors obtained an order of the Court that

5

established bidding procedures for a sale of the Debtors' businesses (the "**Auction**") and

scheduled various dates relating to the Auction (the "**Bidding Procedures Order**"), including,

without limitation, _____, 2015, as the deadline for the submission of initial bids by

interested bidders; _____, 2015, as the date for the Auction; and _____, 2015, as the

date on which the Court would hold a hearing to approve the successful bidder selected at the

Auction (the "**Successful Bidder**").

   10. The Debtors, through GTE, adequately marketed the transaction

contemplated by the Asset Purchase Agreement to all potential purchasers in accordance with the

Bidding Procedures Order.  The sale and marketing process afforded all potential bidders a full,

fair, and reasonable opportunity to submit a higher or otherwise better offer to purchase the

Acquired Assets and participate in the Auction.

   11. On _____, 2015, the Auction was conducted.  At the conclusion of the

Auction, the Debtors selected Buyer as the Successful Bidder.

   12. The Auction was conducted fairly and in good faith, without collusion,

and in accordance with the Bidding Procedures Order.  Buyer is the Successful Bidder for the

Acquired Assets in accordance with the Bidding Procedures Order.  The Debtors' determination

that the offer reflected in the Asset Purchase Agreement constitutes the highest and best offer for

the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

Buyer has complied in all respects with the Bidding Procedures Order and any other applicable

order of the Bankruptcy Court in negotiating and entering into the Asset Purchase Agreement.

**C.** **<u>Sale Hearing</u>**

   13. The Bankruptcy Court conducted the Hearing on _____, 2015, at which

time the Bankruptcy Court considered the Motion, the evidence and testimony presented, and the

statements and argument of counsel in support of the Motion, the Asset Purchase Agreement, and the transactions contemplated by the Asset Purchase Agreement.

14.     Objections, if any, to the Motion were either overruled by the Bankruptcy Court or were withdrawn as a result of an agreement between the objecting party and the Debtors.

## D.     Sound Business Purpose

15.     The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for consummation of the transaction contemplated by the Asset Purchase Agreement outside of the ordinary course of business and in accordance with the requirements of section 363(b) of the Bankruptcy Code.  The value of the Debtors' businesses is not likely to increase if the Debtors continue to operate their businesses during the pendency of the Chapter 11 Cases.  Indeed, the value of the Debtors' estates is likely to decrease the longer the time spent before consummating the transfer of the Acquired Assets.  Pursuant to the Asset Purchase Agreement, Buyer has agreed that the Debtors' estates may retain cash in an amount equal to the aggregate amount of accrued and unpaid fees and expenses owed by the Debtors on account of services provided to the Debtors after the Petition Date, but prior to the Closing, by (A) Taube Summers Harrison Taylor Meinzer Brown, LLP, (B) Bridgepoint Consulting, LLC, and (C) Conley Rose, P.C.  The value of the Debtors' estates will be maximized through a sale of the Acquired Assets on a going concern basis rather than through a piecemeal liquidation or a potentially delayed sale pursuant to a plan of reorganization.

16.     Given the substantial amount of secured debt owed to the DIP Lender and under the Promissory Notes, the Debtors' continuing need for working capital, and the importance of retaining employees to the continued success of the Debtors' businesses, the sale

7

of the Acquired Assets is the best means of obtaining a recovery for creditors in the Chapter 11 Cases.

17.     Approval of the Asset Purchase Agreement pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code also is necessary in order to preserve the value of the Debtors' businesses.  The Debtors have determined, in their reasonable business judgment, that the Acquired Assets will have the greatest value if promptly sold.  It is also important that the transactions contemplated by the Asset Purchase Agreement be consummated as expeditiously as possible so as to avoid any potential loss of the Debtors' relationships that may be caused by uncertainty about the future of the Debtors' business.  In addition, in order to enable the Debtors to perform their obligations under the Asset Purchase Agreement, the Debtors seek to proceed to a Closing under the Asset Purchase Agreement promptly so as to avoid problems that may arise with employee attrition.

18.     As a result, the proposed sale to Buyer pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code upon the terms and conditions set forth in the Asset Purchase Agreement is the optimal vehicle for creating value for the benefit of the Debtors' estates.  The transactions contemplated by the Asset Purchase Agreement maximize the value of the Acquired Assets because the Acquired Assets are being sold as part of a going concern, and the continuity and remaining goodwill value associated with the Acquired Assets are being preserved to the extent possible.  The relief requested in the Motion and set forth in this order is in the best interests of the Debtors and their respective estates.

19.     Time is of the essence in closing the transaction contemplated by the Asset Purchase Agreement.  Accordingly, to maximize the value of the Acquired Assets on a going

WEIL:\95546177\9\56228.0020

concern basis, it is essential that the consummation of the transaction occur within the time constraints set forth in the Asset Purchase Agreement.

### E.   Fair Purchase Price

20.     The total consideration to be provided by Buyer under the Asset Purchase Agreement is the highest and best offer received by the Debtors and constitutes fair value, fair, full, and adequate consideration, reasonably equivalent value, and reasonable market value for the Acquired Assets for purposes of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the other laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

21.     The terms of the Asset Purchase Agreement and the transactions contemplated therein are fair and reasonable under the circumstances of the Debtors' businesses and their Chapter 11 Cases.

### F.   Notice of the Motion

22.     Written notice (the "**Notice**") of the Motion and the Hearing was provided via facsimile, overnight delivery, and/or hand delivery, to the following parties: (i) the Office of the United States Trustee for the Western District of Texas, San Antonio Division, (ii) counsel for any official or unofficial committee, (iii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iv) counsel to Buyer, Kent BML Investments, and the DIP Lender; (v) Chapman; (vi) any other parties that may have asserted an interest in the Debtors' assets; (vii) the Debtors' landlords; (viii) all affected federal, state, and local regulatory and taxing authorities; (ix) the Office of the United States Attorney for each state in which the Debtors operate; (x) the Office of the Attorney General for each state in which the Debtors operate; (xi) all potential buyers previously identified

WEIL:\95546177\9\56228.0020

or solicited by the Debtors or their advisors and any additional parties who have previously

expressed an interest to the Debtors or their advisors to acquire the Debtors' assets; (xii) contract

counterparties listed on the Assumed Contract Schedule; and (xiii) all other known parties-in-

interest in these bankruptcy cases (including any party who has entered an appearance and

request for service of papers pursuant to Fed. R. Bankr. P. 2002).

23.     The Notice was adequate and sufficient under the circumstances, and the

Debtors complied with the various applicable requirements of the Bankruptcy Code, the

Bankruptcy Rules, and the procedural due process requirements of the United States Constitution

in providing notice of the Motion and the relief requested therein.

**G.      Good Faith of Buyer**

24.     Buyer is purchasing the Acquired Assets and has entered into the Asset

Purchase Agreement at arm's length and in good faith.  Accordingly, Buyer is a "good faith

purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and Buyer is,

therefore, entitled to the protections of such provision.  The good faith of Buyer is evidenced by,

among other things, the following facts:

a.     The sale process conducted by the Debtors, including, without limitation,

the marketing of the Debtors assets by GTE both prior to, and after, the

Petition Date, and conducting the Auction pursuant to the bidding

procedures set forth in the Bidding Procedures Order, was at arm's length,

non-collusive, in good faith, and substantively and procedurally fair to all

parties.  The Debtors offered all other bidders an opportunity to match or

top the bid submitted by Buyer, and all other bidders declined to do so.

10

The Debtors evaluated each Qualifying Bid prior to selecting Buyer as the Successful Bidder.

b.    All payments to be made by Buyer in connection with the Asset Purchase Agreement have been disclosed.

c.    Buyer has not violated the provisions of section 363(n) by any action or inaction.

d.    While Buyer has members that are equity holders of the Debtors, decisions regarding the sale of the Assets to the Buyer were made by the CRO and the Debtors' other retained professionals.

e.    The Debtors and Buyer have engaged in substantial arm's length negotiations, in good faith.  The Asset Purchase Agreement is the product of this bargaining among the parties and, in many cases, reflect substantial concessions made by Buyer in an effort to accomplish the transactions contemplated by the Asset Purchase Agreement.

25.    The sale of the Acquired Assets pursuant to the Asset Purchase Agreement, all covenants in and conditions thereto, and all relief requested in the Motion, is an integrated transaction, meaning that each component is an essential part of every other component and that the entire transaction can be consummated only if all of its components are consummated.  Accordingly, the entire transaction is subject to, and is protected by, the provisions of section 363(m) of the Bankruptcy Code.

**H.    Sale Free and Clear under Section 363(f)**

26.    The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy

11

Code.  The Debtors have all title, interest, and/or rights in the Acquired Assets required to transfer and to convey the Acquired Assets to Buyer, as required by the Asset Purchase Agreement.

27.     With the exception of (i) the liens granted to Kent BML Investments under the DIP Facility, and (ii) the liens granted to Kent BML Investments and Chapman under the Promissory Notes, no other entity has any lien or encumbrance against or interest in the Acquired Assets or claims against the Acquired Assets (other than unsecured claims asserted in the Chapter 11 Cases).  The Debtors are aware that certain other parties may assert security interests in, or liens on, certain of the Acquired Assets.

28.     The DIP Facility will be satisfied by means of a credit to the Purchase Price under the Asset Purchase Agreement, and a portion of the Promissory Notes will be satisfied by means of a credit against the Purchase Price under the Asset Purchase Agreement.  Buyer, as the sole lender under the Promissory Notes (after giving effect to the assignment of the Promissory Notes from Kent BML Investments and Chapman), has consented to the sale of the Acquired Assets under the Asset Purchase Agreement free and clear of all liens granted under the Promissory Notes.

29.     To the extent any other liens, claims, or interests exist on or in the Acquired Assets, the Debtors have proposed that any such liens, claims, interests, and encumbrances with respect to the Acquired Assets attach to the sale proceeds the Debtors receive for the sale of the Acquired Assets.  Those liens will attach in the same order of priority, with the same validity, force, and effect that such creditor had prior to such sale, and subject to any claims and defenses the Debtors may possess with respect thereto.  The interests of the holders of such liens and encumbrances are being adequately protected pursuant to the provisions of this order.

WEIL:\95546177\9\56228.0020

30.     Accordingly, the Debtors have satisfied the standard set forth in section 363(f) of the Bankruptcy Code for selling the Acquired Assets free and clear of all liens, claims, interests, and encumbrances.

**I.      No Successor Liability**

31.     With the sole exception of the Assumed Liabilities, as expressly set forth in the Asset Purchase Agreement, Buyer is not expressly or impliedly agreeing under the terms and conditions of the Asset Purchase Agreement to assume any of the debts of the Debtors.

32.     The transaction does not amount to a consolidation, merger, or *de facto* merger of Buyer and the Debtors.

33.     Buyer is not merely a continuation of the Debtors.

34.     Buyer and the Debtors are not entering into the Asset Purchase Agreement fraudulently or in order to escape liability for the Debtors' obligations.

**J.      Assumption and Assignment of the Contracts**

35.     The Debtors are required, as a condition to the obligation of Buyer to close, to assume the Asset Purchase Agreement and assume and assign to Buyer the "**Assumed Contracts**," and the schedule of all the "**Contracts**" that may be Assumed Contracts will be attached to the Motion (the "**Assumed Contracts Schedule**").

36.     At or before the Closing, Buyer may elect to exclude any Contract as an Assumed Contract (in which case it shall become an "**Excluded Contract**") by providing to the Debtors written notice of its election to exclude such Contract.  On or before the Closing, Buyer may elect to treat each such Contract as an Excluded Contract or as a "**Designated Contract**."  If such Contract is a Designated Contract, then Buyer may proceed to Closing and determine whether to treat the Designated Contract as an Assumed Contract or an Excluded Contract within

13

two (2) Business Days after resolution of such objection (whether by the Court's order or by agreement of Buyer and the Contract counterparty).

37.     Except as set forth on the Assumed Contracts Schedule, no defaults exist under any of the Assumed Contracts, and no amounts are due to the counterparties thereunder on account of any facts occurring prior to the deadline to object to the assumption or assignment of the counterparty's Contract or the amount of Cure Costs arising prior to Closing under such Contract.  Therefore, the Debtors are not required to pay any Cure Costs in connection with the assumption of any of the Assumed Contracts other than as set forth on the Assumed Contracts Schedule.  Buyer has agreed to pay any Cure Costs required to be paid under any Assumed Contracts directly subject to the terms and conditions set forth in Section 5.8 of the Asset Purchase Agreement.

38.     Assumption of the Asset Purchase Agreement and the assumption and assignment of the Assumed Contracts to Buyer, effective as of the Closing Date, are supported by sound business reasons and is in the best interests of the Debtors' estates.  Accordingly, the assumption of the Asset Purchase Agreement and the assumption and assignment of the Assumed Contracts are approved by the Court.

39.     Subject to the right of Buyer to treat any Contract on the Assumed Contracts Schedule as an Excluded Contract or a Designated Contract on or before the Closing Date, the assumption and assignment of the Assumed Contracts under this order will become effective upon the Closing Date of the transaction without any further action on the part of any party.

40.     The Debtors have provided adequate assurance that Buyer will be able to perform its obligations under the Assumed Contracts from and after the date the Contracts are

assigned to Buyer.  Buyer is financially viable and has experience in the industry in which the Debtors operate their businesses.

### K.    No Fraudulent Intent

41.    The Asset Purchase Agreement was not entered into, and the transaction contemplated by the Asset Purchase Agreement will not be consummated, for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors for purposes of the Bankruptcy Code, any other laws of the United States, and the laws of any state, territory, or possession thereof, or the District of Columbia.  Neither the Debtors nor Buyer are entering into the Asset Purchase Agreement or consummating the transactions contemplated by the Asset Purchase Agreement with any fraudulent or otherwise improper purpose.

### L.    Sale Order Required by Buyer

42.    Entry of this order approving the Asset Purchase Agreement is a requirement of the Asset Purchase Agreement and such requirement is an appropriate condition precedent to Buyer's consummation of the transactions contemplated by the Asset Purchase Agreement.

### M.    Limited Liability Company Authority

43.    Subject to entry of this order, (i) the Debtors have full limited liability company power and authority to perform all of their obligations under the Asset Purchase Agreement, and the Debtors' prior execution and delivery of, and performance of obligations under the Asset Purchase Agreement is hereby ratified, (ii) the Debtors have all of the limited liability company power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) the Debtors have taken all limited liability company actions necessary to authorize, approve, execute, and deliver the Asset Purchase Agreement and

15

to consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, authorizing the CRO to authorize, approve, execute, and deliver the Asset Purchase Agreement on behalf of the Debtors.

## II.

## CONCLUSIONS OF LAW[3]

### A.    Jurisdiction, Final Order, and Statutory Predicates

44.    The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District and in the Court is proper under 28 U.S.C. §§ 1408 and 1409.

45.    The statutory authorization for the relief granted herein is found in sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the applicable Local Bankruptcy Rules.

### B.    Section 363 Sale

46.    The proposed sale of the Acquired Assets to Buyer pursuant to the Asset Purchase Agreement constitutes a sale of property of the Debtors' respective estates outside the ordinary course of business within the meaning of section 363(b) of the Bankruptcy Code.

47.    For good and valid reasons, the Court may authorize and approve a sale of assets of a chapter 11 debtor pursuant to section 363(b) of the Bankruptcy Code without the necessity of following the procedures and making the findings required for the confirmation of a

---

[3] Any conclusion of law set forth under the heading "Conclusions of Law" that may also be considered, in whole or in part, to constitute a finding of fact shall be deemed set forth under the heading "Findings of Fact" as if set forth in full therein.  All findings and conclusions of law announced by the Bankruptcy Court at the Hearing in relation to the Motion are hereby incorporated to the extent not inconsistent herewith.

plan of reorganization or liquidation.  Such legitimate and compelling reasons exist in this case.

Under the circumstances of the Chapter 11 Cases, the sale of the Acquired Assets to Buyer

pursuant to sections 105(a) and 363(b) and (f) of the Bankruptcy Code is both justified and

appropriate.

48.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession

is authorized to sell property of its estate free and clear of any liens, claims, interests, and

encumbrances if any of the following requirements is satisfied: (a) applicable non-bankruptcy

law permits the sale of such property free and clear of such interest (section 363(f)(1)); (b) the

entity holding the alleged lien, claim, interest, or encumbrance consents (section 363(f)(2));

(c) such interest is a lien, and the price at which such property is to be sold is greater than the

aggregate value of all liens on such property (section 363(f)(3)); (d) such lien, claim, interest, or

encumbrance is subject to a *bona fide* dispute (section 363(f)(4)); or (e) such entity could be

compelled, in a legal or equitable proceeding, to accept a money satisfaction of such lien, claim,

interest, or encumbrance (section 363(f)(5)).

49.     For the following reasons, the provisions of section 363(f) of the

Bankruptcy Code have been satisfied:

a.     Kent BML Investments and Chapman, as prepetition lenders under the

Promissory Notes, and Kent BML Investments, as the DIP Lender, have

consented to the sale.

b.     The Debtors are aware that certain other parties may assert security

interests in, or liens on, certain of the Acquired Assets.

c.     Other secured parties (if any) could be compelled to accept a money

satisfaction of their liens, claims, interests, or encumbrances.

17

50.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the

Acquired Assets will be transferred to Buyer free and clear of all mortgages, security interests,

conditional sale and/or title retention agreements, pledges, liens, judgments, demands,

encumbrances, easements, restrictions, constructive or resulting trusts, or charges of any kind or

nature, including, but not limited to, any restriction on the use, voting, transfer, receipt of

income, or other exercise of any attributes of ownership (the foregoing collectively referred to as

"**Liens**" herein) and all debts arising in any way in connection with any acts of the Debtors,

claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands,

guarantees, options, rights, contractual commitments, restrictions, interests, and matters of any

kind and nature, arising prior to the Closing Date or relating to acts occurring prior to the Closing

Date, and whether imposed by agreement, understanding, law, equity, or otherwise (the

foregoing collectively referred to as "**Claims**" herein) with all such Liens and Claims to attach to

the proceeds of the sale of the Acquired Assets in the order of their priority, with the validity,

force, and effect that they now have as against the Acquired Assets, subject to the rights, claims,

defenses, and objections, if any, of the Debtors and all interested parties with respect to such

Liens and Claims and with the net proceeds from the transaction to be available for the benefit of

the Debtors' estates; *provided*, *however*, that Buyer shall remain liable for only the Assumed

Liabilities and the obligations under the Assumed Contracts, as provided in the Asset Purchase

Agreement.

51.     The sale of the Acquired Assets to Buyer free and clear of any and all

Liens and Claims upon the terms and conditions set forth in the Asset Purchase Agreement is in

the best interest of the Debtors and their respective estates.

18

52.     Given the circumstances of the Chapter 11 Cases, including, without limitation, the Debtors' liquidity needs, the reasonable opportunity afforded other parties to make competing bids or offers for all or a portion of the Debtors' business, and the adequacy and fair value of the consideration being paid by Buyer under the Asset Purchase Agreement, the proposed sale of the Acquired Assets to Buyer constitutes a reasonable and sound exercise of the Debtors' business judgment and is hereby approved in all respects.

## C.     Assumption and Assignment of the Contracts under Section 365

53.     Section 365(a) of the Bankruptcy Code provides that "the [debtor in possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  It is in the best interests of the Debtors and their respective estates to assume the Asset Purchase Agreement and assume and assign the Assumed Contracts to Buyers effective on the Closing Date, in accordance with the terms and conditions of the Asset Purchase Agreement, and the Debtors have exercised sound business judgment in deciding to assume the Asset Purchase Agreement and the Assumed Contracts.

54.     Section 365(b) of the Bankruptcy Code requires a debtor in possession to cure any default and provide adequate assurance of future performance in order to assume an unexpired lease or executory contract under which a default has occurred.  Buyer will promptly pay any Cure Costs under any Assumed Contracts, and, therefore, this requirement has been satisfied.  The Debtors' assumption and assignment of the Assumed Contracts to Buyer will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code.  The transaction contemplated by the Asset Purchase Agreement will provide significant benefits to the Debtors' estates.  Buyer cannot obtain these benefits without the assumption and assignment of the Assumed Contracts, which are a material part of the Acquired Assets.

WEIL:\95546177\9\56228.0020

Accordingly, assuming the Asset Purchase Agreement and the Assumed Contracts is in the sound exercise of the Debtors' business judgment.

55. Pursuant to section 365(f) of the Bankruptcy Code, a debtor in possession may assign an unexpired lease or executory contract only if such lease or contract is assumed by the debtor in possession, and the proposed assignee provides "adequate assurance of future performance" of the obligations arising under such lease or contract from and after the date of the assignment.

56. Pursuant to this order, the Debtors' assumption of the Asset Purchase Agreement and the Assumed Contracts, effective as of the Closing Date, is approved. Moreover, the Debtors have demonstrated that Buyer has the resources to perform the obligations under the Assumed Contracts. Accordingly, the requirements for assignment of the Assumed Contracts to Buyer under section 365(f) of the Bankruptcy Code have been satisfied.

## D. Retention of Jurisdiction

57. It is necessary and appropriate for the Court to retain jurisdiction to, *inter alia*, interpret and enforce the terms and provisions of this order, the Asset Purchase Agreement, and to adjudicate, if necessary, any and all disputes concerning the assumption and assignment of the Assumed Contracts and any alleged right, title, or property interest, including ownership claims, relating to the Acquired Assets and the proceeds thereof, as well as the extent, validity, perfection, and priority of any alleged Lien or Claim relating to the Debtors and/or the Acquired Assets.

## E. No Successor Liability

58. Buyer, its affiliates, officers, directors, members, partners, and principals and any of their respective representatives, successors, or assigns shall not be deemed, as a result

20

of the consummation of the transaction contemplated by the Asset Purchase Agreement or

otherwise, (i) to be a legal successor, or otherwise be deemed a successor, to the Debtors or the

Debtors' estates, (ii) to have, *de facto* or otherwise, merged or consolidated with or into any of

the Debtors or any of the Debtors' estates, (iii) to be an alter ego, a continuation or substantial

continuation of any of the Debtors or any enterprise of any of the Debtors, or (iv) to be liable for

any claim based on successor liability, transferee liability, derivative liability, vicarious liability,

or any similar theories under applicable state or federal law, or otherwise.  Buyer shall not

assume, or be deemed to assume, or in any way be responsible for any liability or obligation of

any of the Debtors and/or their respective estates.  The so-called "bulk sales," "bulk transfer," or

other similar laws shall be waived in all necessary jurisdictions, including those relating to taxes.

Nothing in this order or the Asset Purchase Agreement shall require Buyer to (a) continue or

maintain in effect, or assume any liability in respect of any employee, collective bargaining

agreement, pension, welfare, fringe benefit, or any other benefit plan, trust arrangement, or other

agreements to which the Debtors are a party or have any responsibility therefor including,

without limitation, medical, welfare, and pension benefits payable after retirement or other

termination of employment or (b) assume any responsibility as a fiduciary, plan sponsor, or

otherwise for making any contribution to, or in respect of the funding, investment, or

administration of any employee benefit plan, arrangement, or agreement (including, without

limitation, pension plans) or the termination of or withdrawal from any such plan, arrangement,

or agreement.  Except as expressly set forth in the Asset Purchase Agreement with respect to

Assumed Liabilities, the transfer of the Acquired Assets to Buyer pursuant to the Asset Purchase

Agreement shall not result in Buyer or any of its affiliates, officers, directors, members, partners,

or principals or any of their respective representatives, successors, or assigns, or the Acquired

Assets having any liability or responsibility whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly (x) any interest against the Debtors or against an insider of the Debtors or (y) the Debtors except as expressly set forth in the Asset Purchase Agreement.

### ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:

(1)  The relief requested in the Motion is granted and approved in all respects.

(2)  The transaction contemplated by the Asset Purchase Agreement, including, without limitation, the assumption of the Asset Purchase Agreement and the assumption and assignment of the Assumed Contracts, is hereby approved in all respects.

(3)  The Debtors have provided adequate notice in the form of the Cure Notice to counterparties on the Assumed Contract Schedule of the assumption and assignment to Buyer of such counterparty's Contract, the proposed Cure Cost for such Contract, and the deadline to object to the assumption of such counterparty's Contract or Cure Cost.  To the extent a counterparty has not provided written notice of any objection to the treatment of such counterparty's contract prior to the deadline set forth in the Cure Notice,  such counterparty is deemed to have assented to such matters and is forever barred, estopped and enjoined from asserting such objection against the Debtors or Buyer.

(4)  The assumption and assignment of the Assumed Contracts will not be effectuated if the Closing Date under the Asset Purchase Agreement does not occur and the Asset Purchase Agreement is terminated.  If Buyer elects to treat a Contract as an Excluded Contract, or later elects to treat a Designated Contract as an Excluded Contract, the

22

assumption and assignment of such Contract will not be effectuated, and the Debtors, at a later date, may use its business judgment to determine whether to assume or reject the Contract at such time.

(5)  The Debtors are hereby authorized and directed to sell the Acquired Assets to Buyer upon and subject to the terms and conditions set forth in the Asset Purchase Agreement, the provisions of which are incorporated herein by reference as if set forth in full herein.

(6)  Each of the Debtors is hereby authorized and directed to perform, consummate, and implement the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, and to take any and all further actions as may be necessary or appropriate to the performance of its obligations as contemplated by the Asset Purchase Agreement or this order.

(7)  Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the closing of the transaction contemplated by the Asset Purchase Agreement, the Acquired Assets shall be transferred, sold, and delivered to Buyer free and clear of all Liens, Claims, interests, and encumbrances other than the Assumed Liabilities and the obligations arising under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date pursuant to the express terms of the Asset Purchase Agreement.  All Liens, Claims, interests, and encumbrances shall attach to the sale proceeds in the order of their priority, with the same validity, force, and effect that they now have as against the Acquired Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all

23

interested parties with respect to such Liens and Claims, and the net proceeds from the transaction shall be available for the benefit of the Debtors' estates.

(8)  As a result of the transaction contemplated by the Asset Purchase Agreement, Buyer will not be a successor to any of the Debtors by reason of any theory of law or equity, and Buyer will have no liability, except as otherwise provided in the Asset Purchase Agreement, for any obligation, Claim, or Lien of any of the Debtors as a result of any application of successor liability theories.

(9)  Without limiting the generality of the immediately preceding paragraph, but except as otherwise provided in the Asset Purchase Agreement with respect to the Assumed Liabilities and the obligations under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date, Buyer is not, pursuant to the Asset Purchase Agreement or otherwise, assuming, nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise for, any of the following Claims, Liens, liabilities, debts, or obligations: any liabilities, debts, or obligations of the Debtors or any liabilities, debts, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operations or use of the Acquired Assets, including, without limitation, under the Contracts, prior to the Closing Date, or any liabilities calculable by reference to the Debtors or their assets or operations, or relating to continuing conditions existing at or prior to the Closing Date, which liabilities, debts, and obligations, as against Buyer, are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, or obligations has delivered to Buyer a release thereof.  Without limiting the generality of the foregoing, Buyer shall not be liable or responsible, as a successor or otherwise, for the Debtors' Claims, Liens, liabilities,

24

debts, or obligations, whether calculable by reference to the Debtors or their operations or under or in connection with (i) any employment or labor agreements; (ii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, obligations that might otherwise arise or pursuant to (a) the Employee Retirement, Income, Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Age Discrimination and Employee Act of 1967, (e) the Federal Rehabilitation Act of 1973, the National Labor Relations Act, or (g) the Consolidated Omnibus Budget Reconciliation Act of 1985; (iv) worker's compensation, occupational disease, or unemployment or temporary disability insurance Claims, (v) environmental liabilities, debts, Claims, or obligations arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*; (vi) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (viii) any litigation; and (ix) any products liability or similar Claims, whether pursuant to any state or federal laws or otherwise.[4]

---

[4] The recitation in this paragraph (9) of this order of any specific agreements, plans, laws, ordinances, or statutes is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, or obligations referred to herein.

25

(10)  Except as expressly provided in the Asset Purchase Agreement with respect to the Assumed Liabilities and the obligations under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date, no person or entity, including, without limitation, any federal, state, or local governmental agency, department, or instrumentality, shall assert by suit or otherwise against Buyer or its successors in interest any Claim or Lien that they had, have, or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets or the Debtors' operations or use of the Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations.

(11)  The terms and provisions of the Asset Purchase Agreement and all collateral documents, together with the terms and provisions of this order, shall be binding in all respects upon the Debtors, their estates, their creditors, and all parties in interest, including any and all successors and assigns (including, without limitation, any trustee appointed under the Bankruptcy Code).

(12)  Except as provided in the Asset Purchase Agreement and except with respect to the obligations arising under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date, all entities holding Liens, Claims, interests, or encumbrances of any kind and nature, including, without limitation, vendors, suppliers, employees, and landlords, be, and they hereby are, barred from asserting such Liens, Claims, interests, and encumbrances against Buyer and/or the Acquired Assets, all entities holding Liens, Claims, interests, or encumbrances of any kind and nature are ordered to release the Acquired Assets to Buyer and to assert their Liens, Claims, interests,

26

or encumbrances against the proceeds from the transaction contemplated by the Asset

Purchase Agreement.

(13)  This order is and shall be effective as a determination that, (a) upon

Closing, all Liens, Claims, interests, and encumbrances existing as to the Acquired Assets

have been and hereby are adjudged and declared to be unconditionally released as to the

Acquired Assets, and (b) the conveyances described herein have been made free and clear of

all such Liens, Claims, interests, and encumbrances, which Liens, Claims, interests, and

encumbrances shall attach to the proceeds to the same extent and with the same priority as

they attached to the Acquired Assets.

(14)  This order shall be binding upon and govern the acts of all entities,

including, without limitation, all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, and local officials, and all other

persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register, or otherwise record or release any documents or

instruments, or who may be required to report or insure any title or state of title in or to any

of the Acquired Assets.

(15)  All Liens, Claims, interests, and encumbrances of record shall, upon

Closing, be removed and stricken as against the Acquired Assets, and all the entities

described in the immediately preceding paragraph of this order are authorized and

specifically directed to (a) strike all recorded Liens, Claims, interests, or encumbrances

against the Acquired Assets from their records, official and otherwise, and (b) accept for

filing or recording all instruments made or delivered by or to any of the Debtors and all

27

deeds or other documents relating to the conveyance of the Acquired Assets to Buyer, and the Court specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

(16) If any person or entity that has filed statements or other documents or agreements evidencing Liens, Claims, interests, or encumbrances on, or interests in, the Acquired Assets shall not have delivered to Debtors prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, interests, or encumbrances that the person or entity has or may assert with respect to the Acquired Assets, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Acquired Assets and shall incur no liability for acting in this limited capacity.

(17) Pursuant to sections 365(a) and (f) of the Bankruptcy Code, the Debtors' assumption of, and assignment to Borrower, of the Assumed Contracts, effective as of the Closing Date, is hereby approved.

(18) The assumption and assignment of the Assumed Contracts to Buyer shall automatically be effective on the Closing Date without the need for the execution of any further documents, subject to Buyer's right at or before Closing to designate Assumed Contracts to be Excluded Contracts or Designated Contracts.

(19) The Debtors are hereby authorized (a) to take such corporate action as may be necessary to implement the provisions of the Asset Purchase Agreement and any other document executed by the Debtors in connection therewith and (b) to execute and file

28

any necessary document with any appropriate secretary of state.  This order shall constitute all approvals and consents, if any, required by the laws of any state necessary to file, record, and accept such documents.

(20)  Nothing contained in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, any order of confirmation confirming any plan of reorganization (or liquidation), or any other order of any type or kind entered in the Chapter 11 Cases or any related proceeding, including any subsequent chapter 7 case, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this order.

(21)  The Debtors are authorized and directed to execute, acknowledge, and deliver such deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer and to take such other actions as may be reasonably necessary to perform the terms and provisions of the Asset Purchase Agreement and all other agreements related thereto, and the Debtors shall take any other action that reasonably may be requested by Buyer for the purpose of assigning, transferring, granting, conveying, and confirming to Buyer or reducing to possession any or all of the Acquired Assets (any such action not expressly contemplated by the Asset Purchase Agreement to be taken by the Debtors at the sole cost and expense of Buyer).

(22)  The Court retains jurisdiction to:

(a)     interpret, implement, and enforce the terms and provisions of this order, the Asset Purchase Agreement and any other agreement executed in connection therewith;

WEIL:\95546177\9\56228.0020

(b)     protect Buyer, or any of the Acquired Assets, against any Liens, Claims,

interests, and encumbrances;

(c)     resolve any disputes arising under or related to the Asset Purchase

Agreement, the transaction, or Buyer's peaceful use and enjoyment of

the Acquired Assets, whether or not a plan of reorganization (or

liquidation) has been confirmed in the Chapter 11 Cases and irrespective

of the provisions of any such plan or order confirming any such plan;

(d)     adjudicate all issues concerning all Liens, Claims, interests, and

encumbrances and any other interest in and to the Acquired Assets,

including the extent, validity, enforceability, priority, and nature of all

such Liens, Claims, interests, and encumbrances and any other interests;

(e)     adjudicate any and all issues and/or disputes relating to the Debtors'

right, title, or interest in the Acquired Assets and the proceeds thereof,

the Motion, and the Asset Purchase Agreement; and

(f)     adjudicate any and all remaining issues concerning the Debtors' right

and authority to assume and assign the Assumed Contracts to Buyer,

resolve any objections to Cure Costs, and determine Buyer's rights and

obligations with respect to such assignment and the existence of any

default under any Assumed Contract.

(23)  No bulk sales law or any similar law of any state or other jurisdiction

shall apply in any way to the transaction contemplated by the Asset Purchase Agreement.

(24)  The failure specifically to include any particular provisions of the Asset

Purchase Agreement in this order shall not diminish or impair the efficacy of such

30

provision, it being the intent of the Court that the Asset Purchase Agreement and each and

every provision, term, and condition thereof be authorized and approved in its entirety.

# # #

Prepared and Entry Requested By:

Eric J. Taube
Morris D. Weiss
Christopher Bradley
TAUBE SUMMERS HARRISON
  TAYLOR MEINZER BROWN LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
Telephone:  (512) 472-5997
Facsimile: (512) 472-5248
etaube@taubesummers.com
mweiss@taubesummers.com
cbradley@taubesummers.com

PROPOSED ATTORNEYS FOR DEBTORS

## Schedule 4.1(b)

The following agreements, and any documents related thereto shall not be considered by the Lender with respect to the representations and warranties of the Loan Parties, as of the Closing Date, set forth in *Section 4.1(b)(iii)* of the Agreement:

1. Merchant Agreement, dated September 1, 2015, between CapCall, LLC and Blue Matrix Labs, LLC.

2. Revenue Based Factoring Agreement, dated August 17, 2015, between World Global Financing Inc. and Blue Matrix Labs, LLC.

3. Security Agreement and Guaranty made by Blue Matrix Labs, LLC in favor of World Global Financing Inc.

4. Business Loan and Security Agreement, dated June 29, 2015, between On Deck Capital, Inc. and Blue Matrix Labs, LLC.

5. Purchase and Sale Agreement (ACH), dated June 29, 2015, between S.O.S. Capital, Inc. and Blue Matrix Labs, LLC.

6. Security Agreement, made by Blue Matrix Labs, LLC and Kendall Dean D. Harter in favor of S.O.S. Capital, Inc.

7. Master Purchase and Sale Agreement, dated March 2, 2015, between Eagle Business Credit, LLC and Blue Matrix Labs, LLC.

8. Corporate Guaranty, made as of March 3, 2015, between Paradise Beverage, LLC and Eagle Business Credit, LLC.

9. Corporate Guaranty, made as of March 3, 2015, between Shags, LLC and Eagle Business Credit, LLC.

10. Corporate Guaranty, made as of March 3, 2015, between Hydro Toys, LLC and Eagle Business Credit, LLC.

11. Revenue Based Factoring Agreement, dated September 4, 2015, among PowerUp Lending Group, Ltd., Blue Matrix Labs, LLC, as Merchant, Kendall D. Harter, as Guarantor, Shags, LLC, as Guarantor, and Hydro Toys, LLC, as Guarantor.

12. Security Agreement and Guaranty, dated September 4, 2015, among PowerUp Lending Group, Ltd., Blue Matrix Labs, LLC, as Merchant, Kendall D. Harter, as Guarantor, Shags, LLC, as Guarantor, and Hydro Toys, LLC, as Guarantor.

13. Merchant Agreement, dated September 3, 2015, between 1 Global Capital, LLC and Blue Matrix Labs Inc.

14. Security Agreement, made by Blue Matrix Labs Inc., as Merchant, and Kendall Harter, as Guarantor, in favor of 1 Global Capital, LLC.

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BLUE MATRIX LABS, LLC, | § | CASE NO. 15-52977 |
| HYDRO TOYS, LLC, | § | CASE NO. 15-52978 |
| PARADISE BEVERAGE, LLC, | § | CASE NO. 15-52980 |
| SHAGS, LLC, and | § | CASE NO. 15-52981 |
| PARADISE BEVERAGE LOGISTICS, LLC, | § | CASE NO. 15-52979 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | *(Joint Administration Requested)* |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; AND (IV) SCHEDULING A FINAL HEARING**

Upon the motion, dated December 4, 2015 (the "**Motion**"), of Blue Matrix Labs, LLC

("**BML**"), Hydro Toys, LLC ("**Hydro Toys**"), Paradise Beverage, LLC ("**Paradise Beverage**"),

Shags, LLC ("**Shags**"), and Paradise Beverage Logistics, LLC ("**Paradise Beverage Logistics**"),

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the

"**Debtors**"), pursuant to sections 105(a), 361, 362, 363, and 364 of title 11 of the United States

Code (the "**Bankruptcy Code**"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), for the entry of an interim order (the "**Interim Order**") and a final

order (the "**Final Order**") authorizing the Debtors to:

i.　　obtain secured, superpriority postpetition financing in an aggregate amount up to Five Hundred Thousand Dollars ($500,000) (the "**DIP Facility**"), pursuant to section 364 of the Bankruptcy Code by entering into a secured debtor-in-possession credit agreement, in substantially the form attached to the Motion as Exhibit B, as the same may be amended, supplemented or otherwise modified from time to time in accordance with its terms (the "**DIP Credit Agreement**"),[1] and any related loan and security documents (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**") between and among BML and Hydro Toys, as Borrowers, Paradise Beverage, Paradise Beverage Logistics, and Shags, as Guarantors, and Kent BML Investments, LP, as Lender (the "**DIP Lender**"), on the terms and subject to the conditions set forth therein;

ii.　　execute, deliver, and enter into the DIP Loan Documents and perform such other and further acts as may be necessary, required, or desirable in connection therewith;

iii.　　grant mortgages, security interests, superpriority administrative expense claims (including a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code), and liens to the DIP Lender, pursuant to section 364(d) of the Bankruptcy Code, subject in each case to the Carve-Out (as defined and described below) and subordinate only to the Permitted Liens, to secure amounts owing under the DIP Loan Documents;

iv.　　use the proceeds of the DIP Facility to fund (a) postpetition operating expenses of the Debtors incurred in the ordinary course of business, (b) costs and expenses of administration in accordance with the DIP Budget attached hereto as **Exhibit A** and as provided in this Interim DIP Order and (c) working capital, capital expenditures, and other general corporate purposes of the Debtors, in the case of each of clauses (a), (b), and (c) above, strictly in accordance with the amounts and categories set forth in the DIP Budget or as otherwise consented to by the DIP Lender;

v.　　use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("**Cash Collateral**");  and

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the DIP Credit Agreement.

vi.    grant adequate protection to the following parties (collectively, the "**Prepetition Secured Parties**") for the Debtors' use of their Cash Collateral and the granting of priming liens to secure the DIP Facility in the form of replacement liens on the Debtors' property, subordinate to the DIP Liens (as defined below): (i) Kent BML Investments, LP, as (a) successor in interest to Jeffrey F. Kent under that certain Promissory Note of BML, dated December 5, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Initial Kent Promissory Note**"), and (b) lender under that certain Amended and Restated Promissory Note of BML, dated August 27, 2014, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Additional Kent Promissory Note**, and together with the Initial Kent Promissory Note, collectively, the "**Prepetition Kent Notes**"), and (ii) David Chapman, as lender under that certain Promissory Note, dated September 26, 2013, as amended, restated, amended and restated, supplemented or otherwise modified from time to time (the "**Chapman Promissory Note**" and together with the Prepetition Kent Notes, the "**Prepetition Loans**" and any obligations arising under, or relating to, the Prepetition Loans, the "**Prepetition Secured Obligations**");

and the Court having considered the Motion and the DIP Credit Agreement and, in accordance with Bankruptcy Rules 4001(b) and 4001(c), requisite notice of the Motion having been provided by overnight delivery, facsimile, or e-mail on December 4, 2015 to (i) the Office of the United States Trustee for the Western District of Texas, San Antonio Division (ii) counsel for any official or unofficial committees; (iii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iv) counsel to Buyer. Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.; (v) Chapman, (vi) any other parties who have filed UCC-1 against the Debtor, (vii) all affected federal, state, and local regulatory and taxing authorities; (viii) the Office of the United States Attorney for the State of Texas; (ix) the Office of the Attorney General for the State of Texas; and (x) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of

papers pursuant to Fed. R. Bankr. P. 2002); and a hearing to consider the interim relief requested in the Motion having been held by the Court on December ___, 2015 (the "**Interim Hearing**"); and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors pending a final hearing on the Motion (the "**Final Hearing**") and that such interim relief is fair and reasonable, in the best interest of the Debtors' estates, and is essential for the continued operation of the Debtors' business; and upon consideration of the *Declaration of William R. Patterson in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief* (the "**Patterson Declaration**") and such other evidence presented or proffered at the Interim Hearing; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED AS FOLLOWS:**

A.     On December 4, 2015 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

B.     The Debtors continue to manage and operate their business and property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 105, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 4001(c).  Venue of the Chapter 11 Cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      No official committee of unsecured creditors (the "**Committee**") has yet been appointed in any of the Chapter 11 Cases.

E.      The notice given by the Debtors of the Motion and the Interim Hearing was the best available under the circumstances, constitutes due and sufficient notice thereof, and complies with Bankruptcy Rules 4001(b) and 4001(c).

F.      As of the Petition Date, the Debtors were indebted and liable to the Prepetition Secured Parties under the Prepetition Loans.  Subject to paragraph 25 of this Interim Order, the Debtors have represented that the Prepetition Loans (i) constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) are not subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) are secured by valid, binding, perfected, enforceable, first-priority and second-priority liens and security interests over substantially all of the assets of the Debtors (the "**Prepetition Liens**").  The Debtors have waived any right to challenge the Prepetition Loans and the Prepetition Liens on any grounds, including those set forth above.  The Prepetition Secured Parties have agreed to subordinate the Prepetition Liens to those granted pursuant to, and in connection with, the DIP Credit Agreement, the other DIP Loan Documents and the DIP Orders.

G.      The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  The Debtors have an immediate need to use Cash Collateral and to obtain the financing under the DIP Facility in order to permit, among other things, the orderly continuation of the operation of their business.  The Debtors' access to sufficient working capital and the incurrence of new indebtedness are vital to preserve and

maintain the Debtors' going concern values.  If the Debtors do not obtain authorization to use Cash Collateral and borrow under the DIP Credit Agreement, the Debtors will suffer immediate and irreparable harm.  Consummation of the DIP Credit Facility in accordance with this Interim Order and the DIP Loan Documents is, therefore, in the best interest of the Debtors' estates and good cause has been shown for the entry of this Interim Order.

H.      The Debtors are unable to obtain sufficient financing on more favorable terms from sources other than the DIP Lender under the DIP Loan Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain adequate secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Lender, subject to the Carve-Out, the DIP Liens under the terms and conditions set forth in this Interim Order and in the DIP Loan Documents.

I.      The DIP Lender has indicated a willingness to provide the Debtors with financing on an interim basis, but solely on the terms and conditions set forth in this Interim Order, the DIP Credit Agreement and the other DIP Loan Documents.  After considering all of its alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of this Interim Order, the DIP Loan Agreements, and the other DIP Loan Documents represents the best financing currently available to the Debtors.  The terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

J.      The DIP Facility has been negotiated in good faith and at arms' length between the Debtors and the DIP Lender, all parties have been represented by counsel in connection with

such negotiations, and the terms of the DIP Facility are fair and reasonable under the circumstances, are enforceable in accordance with their terms, and have been entered into in good faith. Accordingly, all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Loan Documents, including without limitation, (i) all loans made to the Debtors pursuant to the DIP Credit Agreement, and (ii) any Obligations (all of the foregoing collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:**

1. <u>Approval of Motion.</u> The Motion is granted on an interim basis, as set forth herein.

2. <u>Authorization of the DIP Facility and the DIP Loan Documents</u>. The Debtors are hereby authorized to execute and deliver the DIP Loan Documents and the Loan Parties are authorized to guarantee all of the Borrowers outstanding obligations under the DIP Credit Agreement. The Debtors are hereby authorized to (a) borrow money pursuant to the DIP Credit Agreement on an interim basis in the amount of Two Hundred-Fifty Thousand Dollars ($250,000) and (b) use the proceeds of the DIP Credit Facility in accordance with the terms of this Interim Order and the DIP Loan Documents.

3.      The terms, conditions, and covenants of the DIP Credit Agreement and the other DIP Loan Documents are hereby approved on an interim basis through the date of the Final Hearing.

4.      In furtherance of the foregoing, and without further approval of this Court, each of the Debtors is authorized and empowered to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees and expenses reasonably required or necessary for the Debtors' performance of the DIP Obligations under the DIP Loan Documents, including, without limitation, (i) the execution, delivery, and performance of the DIP Credit Agreement and the other DIP Loan Documents and any exhibits attached thereto, (ii) the execution, delivery and performance of the guarantees by the Loan Parties of the obligations of the Borrowers under the DIP Loan Documents, and (iii) the performance of all other acts required under or in connection with the DIP Loan Documents.

5.      Upon execution and delivery of each DIP Loan Document, each DIP Loan Document shall constitute a valid and binding obligation of the Debtors, enforceable against each Debtor party thereto in accordance with its terms.  No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 362 or 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.      <u>Use of Cash Collateral and Proceeds</u>.  Immediately following the signing of this Interim Order and until entry of the Final Order, the Debtors shall use the Cash Collateral and the proceeds from the DIP Facility in accordance with the DIP Loan Documents and this Interim

Order to fund (a) postpetition operating expenses of the Debtors incurred in the ordinary course

of business, (b) costs and expenses of administration in accordance with the DIP Budget and as

provided in this Interim Order and (c) working capital, capital expenditures, and other general

corporate purposes of the Debtors, in the case of each of clauses (a), (b), and (c) above, strictly in

accordance with the amounts and categories set forth in the DIP Budget, attached hereto as

**Exhibit A**, or as otherwise consented to by the DIP Lender.

       7.    <u>Conformity with the DIP Budget</u>.  Subject to and in accordance with the terms of

the DIP Credit Agreement, all loans made to the Debtors pursuant to the DIP Credit Agreement

shall be utilized solely in accordance with the DIP Budget.  On the Wednesday of each week

during the term of the DIP Credit Agreement, commencing the week of December 14, 2015, the

Debtors shall provide to the DIP Lender a reconciliation showing actual receipts and

disbursements for the preceding week compared with the DIP Budget.  If (a) actual

disbursements under any line item of the DIP Budget for any four week rolling period exceed the

budgeted disbursements for such period in such line item by more than five percent (5.0%), or

(b) aggregate actual disbursements under the DIP Budget for any of four week rolling period

exceed the aggregate budgeted disbursements for such four week rolling period by more than ten

percent (10.0%), then either of the same shall constitute an Event of Default under the DIP

Credit Agreement unless the DIP Lender consents in writing to such deviation.  In addition, if (i)

actual receipts under any line item of the DIP Budget for any four week rolling period are less

than the budgeted receipts for such period in such line item by more than five percent (5.0%), or

(ii) aggregate actual receipts under the DIP Budget for any four week rolling period are less than

the aggregate budgeted receipts for such four week rolling period by more than ten percent

(10.0%), then either of the same shall constitute an Event of Default under the DIP Loan Agreement unless the Lender consents in writing to such deviation.

8. <u>Grant of DIP Liens</u>. As security for the DIP Obligations, effective and perfected upon the signing of this Interim Order and without the necessity of the execution or recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens are hereby granted to the DIP Lender (all such liens and security interests granted to the DIP Lender pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**"):

     i. <u>Priming Lien on All of the Debtors' Encumbered Property</u>. Pursuant to section 364(d) of the Bankruptcy Code, and with the consent and agreement of the Prepetition Secured Parties, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon or pledge of (subject to the Carve-Out) all pre- and postpetition encumbered property of the Debtors, whether existing on the Petition Date or thereafter acquired, in each case to the extent subject only to the Permitted Liens.

     ii. <u>First Lien on All of the Debtors' Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest and lien upon or pledge of all unencumbered property and assets of the Debtors, whether existing on the Petition Date or thereafter acquired.

9. <u>Protection of the DIP Lender's Rights</u>. Upon entry of the Final Order, the DIP Lender shall not be subject to (a) the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or (b) an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the DIP Lender with respect to proceeds, product, offspring, or profits of any of the DIP Collateral. Subject only to and upon the entry of the Final

Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or the Prepetition Secured Parties upon, the DIP Collateral or the Prepetition Collateral (as defined below).

10.     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon five (5) Business Days' written notice to the Debtors, counsel to any Committee formed, and the U.S. Trustee of the occurrence of an Event of Default, all rights and remedies, including, without limitation, against the DIP Collateral, without the need for obtaining a further order of this Court. Notwithstanding the foregoing, the Debtors may continue to use cash in accordance with the DIP Budget until five (5) Business Days after notice of the occurrence of an Event of Default from the DIP Lender to the Debtors, counsel to any Committee formed, and the U.S. Trustee.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by the Debtors in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors may not seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in this Interim Order or the DIP Loan Documents.

11.     Perfection of DIP Liens.  The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, guarantees, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.  Whether or not the DIP Lender shall, in its sole discretion, choose to file such financing statements, trademark

11

filings, copyright filings, mortgages, guarantees, notices of lien or similar instruments or otherwise confirm perfection of the liens, mortgages, and security interests granted to it hereunder, such liens, mortgages, and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, or subordination, at the time and as of the date of the signing of this Interim Order, and no further notice, filing, or other act shall be required to effect such perfection.  Upon the request of the DIP Lender, without any further consent of any party, the Debtors are authorized to take, execute, and deliver such instruments to enable the DIP Lender to further validate, perfect, preserve, and enforce the DIP Liens.  If the DIP Lender, in its sole discretion, chooses to file such mortgages, financing statements, guarantees, notices of liens and security interests and other similar documents, all such mortgages, financing statements or similar instruments shall be deemed to have been filed or recorded as of the date of the signing of this Interim Order.  The rights granted under this paragraph are subject to any restrictions on such rights contained in the DIP Credit Agreement.

12.     A certified copy of this Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

13.     Any provision of any lease or other license, contract, or other agreement that requires the consent or approval of one or more landlords or other parties or the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with

respect to the transactions granting postpetition liens, in such leasehold interest or the proceeds

of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance

with the terms of the DIP Credit Agreement or this Interim Order.

14.     <u>DIP Lenders' Superpriority Claims</u>.  In addition to the liens and security interests

granted to the DIP Lender pursuant to this Interim Order, and subject only to the Carve-Out, in

accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP

Obligations hereby constitute allowed superpriority administrative expense claims (the "**DIP**

**Superpriority Claims**") with priority over any and all administrative expenses of the Debtors,

whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections

105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113,

1114 or any other provisions of the Bankruptcy Code (whether incurred in the Chapter 11 Cases

or any conversion thereof to a case under chapter 7 of the Bankruptcy Code or any other

proceeding relating hereto or thereto).  The DIP Superpriority Claims shall be payable from and

have recourse to all pre- and postpetition accounts, inventory, goods, contract rights, instruments,

documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general

intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations,

machinery and equipment, real property, fixtures, leases, all of the Stock of each subsidiary of

the Debtors, all of the Stock of all other Persons directly owned by the Debtors, money,

investment property, deposit accounts, all commercial tort claims and all causes of action arising

under the Bankruptcy Code or otherwise, all other property, assets or interests in property or

assets of the Debtors, of any kind or nature whatsoever, real or personal, now existing or

hereafter acquired or created, including all property of the "estate" (within the meaning of the

Bankruptcy Code) of the Debtors, and all cash and non-cash proceeds, rents, products and profits

of any of collateral described above (all of the foregoing being hereafter collectively referred to as the "**DIP Collateral**"), subject only to the payment of the Carve-Out to the extent specifically provided for herein. Notwithstanding the foregoing, DIP Collateral shall not include any claims and causes of action of the Debtors under sections 542, 544, 545, 547, 548, 549, 550, 553(b) and 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") and any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions.

15. For purposes hereof, the "**Carve-Out**" means (i) the unpaid fees of the U.S. Trustee or the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 1930(a) and (b); and (ii) all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Estates from and after the Petition Date (including pursuant to section 363 of the Bankruptcy Code) (collectively, the "**Estate Professionals**") in an amount not to exceed the following amounts for each of the respective Estate Professionals, to the extent allowed by the Bankruptcy Court at any time (not including any prepetition retainer that may have been received by such professional): (i) $100,000 for Taube Summers Harrison Taylor Meinzer Brown LLP, as counsel to the Debtors; (ii) $50,000 for Bridgepoint and the CRO; (iii) $5,000 for Conley Rose PC, as special IP counsel to the Debtors; and (iv) $15,000 for any professionals or professional firms retained by any Committee appointed in the Chapter 11 Cases (collectively, the "**Carve-Out Amount**"); *provided*, *however*, that (w) the DIP Lender may at any time, in its sole and absolute discretion, agree to increase the Carve-Out Amount; (x) no portion of the Carve-Out (other than the Investigation Fund (as defined and described in Paragraph 25 below)) shall be used, either directly or indirectly, for any services or expenses arising from or relating to the investigation, initiation, or prosecution of any action (a) contesting

14

the validity, priority, or extent of the claims or Liens asserted by the DIP Lender or the Liens securing the Prepetition Loans, (b) asserting claims or causes of action of any sort whatsoever (including, without limitation, avoidance claims) against the DIP Lender or any Person affiliated with the DIP Lender, (c) preventing, hindering, or delaying the DIP Lender from enforcing any of its rights or remedies or realizing upon the assets that serve as collateral for the Obligations, or (d) seeking to modify any of the rights of the DIP Lender provided for in the DIP Loan Documents or under this Interim Order or the Final Order; (y) as long as no Default or Event of Default shall have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and such payments shall not reduce the Carve-Out; and (z) to the extent the dollar limitation in clause (ii) above is reduced as a result of payment of such fees and expenses during the continuation of an Event of Default, if such Event of Default is subsequently cured or waived, the limitation in clause (ii) above shall be increased by an amount equal to the amount by which it had so been reduced.

16.     Adequate Protection for Prepetition Secured Parties.  As adequate protection for the interest of the Prepetition Secured Parties in the Debtors' encumbered property on account of the granting of the DIP Liens, subordination to the Carve-Out, and the Debtors' use of Cash Collateral, the Prepetition Secured Parties shall receive adequate protection, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, in the form of replacement security interests and Liens in the DIP Collateral which shall be junior only to the Carve-Out, the DIP Credit Facility, and the Permitted Liens.  The Debtors are aware that certain parties to factoring and other lending agreements entered into by the Debtors prior to the Petition Date may assert security interests in, or liens on, certain of the Acquired Assets.  As the value of the collateral

security is less than the amount outstanding to the Prepetition Secured Parties, the entire claims of such parties to factoring and other lending agreements should be considered unsecured and such claimants are not entitled to receive adequate protection of their interests.

17.    <u>Preservation of Rights Granted Under the Interim Order</u>.  No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order shall be granted or allowed while any portion of the DIP Credit Facility (or any refinancing thereof) or the DIP Obligations remains outstanding.

18.    If an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Superpriority Claims and DIP Liens granted to the DIP Lender pursuant to this Interim Order shall continue in full force and effect and shall maintain their priming status as provided in this Interim Order, as applicable, until all related DIP Obligations shall have been paid and satisfied in full (and that such DIP Superpriority Claims and DIP Liens, shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claims and DIP Liens referred to in (i) above.

19.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacation shall not affect (i) the validity of any DIP Obligations, including, without limitation, any guarantees, incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification, or vacation or (ii) the validity or enforceability of any lien or priming status authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP

Obligations.   Notwithstanding any such reversal, stay, modification, or vacation, any DIP

Obligations, including, without limitation, any guarantees, incurred by the Debtors to the DIP

Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of

such reversal, stay, modification, or vacation shall be governed in all respects by the original

provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies,

privileges, and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and

pursuant to the DIP Loan Documents with respect to all DIP Obligations.

20.     Except as expressly provided in this Interim Order or in the DIP Loan Documents,

the DIP Liens, the DIP Superpriority Claims and all other rights and remedies of the DIP Lender

granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, and

shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the

Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating

the joint administration of these Chapter 11 Cases or by any other act or omission or (ii) the entry

of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to

section 1141(d)(4) of the Bankruptcy Code, the Debtors having waived any discharge as to any

remaining DIP Obligations.  The terms and provisions of this Interim Order and the DIP Loan

Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11

Cases cease to be jointly administered, or in any superseding chapter 7 cases under the

Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims and all other rights and

remedies of the DIP Lender granted by the provisions of this Interim Order and the DIP Loan

Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid

in full.

21.     <u>Limitation on Use of DIP Facility Proceeds and DIP Collateral</u>.  Except with respect to the Investigation Fund (as defined below), notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, DIP Collateral or the Carve-Out may be used to (i) object, contest, or raise any defense to, the validity, perfection, priority, extent, or enforceability of any amount due under the DIP Loan Documents or the Prepetition Loans, or the liens or claims granted under this Interim Order, the DIP Loan Documents, or the Prepetition Liens, (ii) assert any claims or defenses or causes of action against the DIP Lender, the Prepetition Secured Parties, or any of their respective agents, affiliates, representatives, attorneys, or advisors, (iii) prevent, hinder, or otherwise delay the DIP Lender's assertion, enforcement, or realization on the DIP Collateral in accordance with the DIP Loan Documents or this Interim Order, or (iv) seek to modify any of the rights granted to the DIP Lender hereunder or under the DIP Loan Documents, in each of the foregoing cases without such parties' prior written consent.

22.     <u>Failure to Seek Relief</u>.  The DIP Lender's failure to seek relief or otherwise exercise its rights and remedies under the DIP Loan Documents or this Interim Order shall not constitute a waiver of any of its rights and remedies hereunder, thereunder or otherwise.

23.     <u>Amendments to the DIP Credit Facility</u>.  The DIP Credit Agreement or any other DIP Loan Documents may from time to time be amended by the parties thereto without further order of this Court, in each case, in such form as the Debtors and the DIP Lender may agree; *provided*, *however*, that notice of any modification or amendment shall be filed with the Court and provided to the Committee, the U.S. Trustee, and any other party requesting notice in the Chapter 11 Cases, each of which will have seven (7) days from the date of such notice within

which to object in writing; and *provided further*, that, if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of the Court.

24.    <u>Order Governs</u>.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Loan Documents, the provisions of this Interim Order shall govern.

25.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Lender, the Committee, if one is appointed, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Debtors and their respective successors and assigns.  Unless a party in interest has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 21) constituting a Challenge (as defined below) by the earlier of (i) the date that is the earlier of (x) the date of entry of an order of this Court approving the sale of a substantial portion of the collateral securing the Prepetition Liens (the "**Prepetition Collateral**") and (y) the date that is forty-five (45) days after the Petition Date, and (ii) if such a Challenge is brought, the date of a final judgment on such Challenge or, in each case, such later date (x) as has been agreed to, in writing, by the Prepetition Secured Parties in their sole discretion or (y) as has been ordered by the Court (the "**Challenge Period**"), (i) challenging the validity, enforceability, priority or extent of the Prepetition Loans or the Prepetition Secured Parties' liens on the Prepetition Collateral or (ii) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (clauses (i) and (ii), collectively, a "**Challenge**") against the Prepetition

Secured Parties or their representatives, attorneys or advisors in connection with matters related to the Prepetition Loans, the Prepetition Collateral, and there is a final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter; *provided* that, as to the Debtors, all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date, and *provided further*, that the Committee may use up to $10,000 (the "**Investigation Fund**") from the Carve-Out to investigate the liens and claims against the Prepetition Secured Parties under the Prepetition Loans, but may not use the Investigation Fund to initiate, assert, join, commence, support, or prosecute any actions or discovery with respect thereto.  If no such adversary proceeding or contested matter is timely filed, (a) the Prepetition Loans and all related Prepetition Loan Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases, (b) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, and (c) the Prepetition Loan Obligations, the Prepetition Liens, and the Prepetition Secured Parties shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for any of the Debtors).  If any such adversary proceeding or contested matter is timely filed, the stipulations, findings, and admissions contained in this Interim Order relating to the Prepetition Loans and the Prepetition Liens shall nonetheless remain binding and preclusive on any Committee and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter.  Nothing in this Interim Order vests

or confers on any Person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Loans or the Prepetition Loan Obligations.

26. <u>Survival of Interim Order</u>. The terms and conditions of this Interim Order and the agreements referenced herein and any actions taken pursuant thereto shall survive (and shall not be discharged by) the filing of any subsequent case or proceedings for any of the Debtors or the entry of any order in the case of any of the Debtors confirming a consensual plan or any other plan of reorganization, dismissing any such case, converting any such case to any other chapter under the Bankruptcy Code, withdrawing the reference of any such case from this Court or abstaining from handling any such case.

27. <u>Final Hearing</u>. The Final Hearing is scheduled for December __, 2015 at __:__ _.m. before this Court.

28. <u>Objections</u>. The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (i) proposed counsel to the Debtors, Taube Summers Harrison Taylor Meinzer Brown LLP, 100 Congress Avenue, 18th Floor, Austin, Texas 78701, (Attn: Morris D. Weiss); (ii) counsel to the Kent BML and the DIP Lender, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Brian S. Rosen and Matthew P. Goren); (iii) Chapman; (iv) the Office of the U.S. Trustee, 615 E. Houston Street, Suite 533, San Antonio, Texas 78205, (v) any other parties that may have

asserted an interest in the Debtors' assets, and (vi) proposed counsel to any Committee appointed, in each case so as to be received no later than seven (7) days before the hearing date for the Final Hearing, set forth above.

29.     <u>Findings and Conclusions</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable upon all parties in interest for all purposes immediately upon execution thereof.

###

Prepared by:

TAUBE SUMMERS HARRISON TAYLOR
  MEINZER BROWN LLP

Eric J. Taube
State Bar No. 19679350
Morris D. Weiss
State Bar No. 21110850
Christopher G. Bradley
State Bar No. 24069407
100 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 472-5997
(512) 472-5248 (FAX)
etaube@taubesummers.com
mweiss@taubesummers.com
cbradley@taubesummers.com

PROPOSED ATTORNEYS FOR DEBTORS

# EXHIBIT A

**Blue Matrix Labs, LCC, et al.**
Cash Flow Forecast

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
|---|---|---|---|---|---|---|---|---|---|
| Week #: | | | | | | | | | |
| Week Ending: | 12/11/2015 | 12/18/2015 | 12/25/2015 | 1/1/2016 | 1/8/2016 | 1/15/2016 | 1/22/2016 | 1/29/2016 | Totals |
| **Beginning Cash Balance** | 998 | 131,213 | 84,268 | 97,052 | 158,058 | 155,233 | 124,938 | 111,118 | 998 |
| | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | |
| Sales | - | - | 16,804 | - | - | - | - | 50,884 | 67,688 |
| DIP Borrowings/(Repayments) | 250,000 | - | - | 250,000 | - | - | - | - | 500,000 |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - |
| **Total Collections** | 250,000 | - | 16,804 | 250,000 | - | - | - | 50,884 | 567,688 |
| | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | |
| Payroll & Benefits | - | (10,316) | - | (10,316) | - | (10,316) | - | (10,316) | (41,266) |
| Production Costs | (2,802) | (24,400) | - | (47,904) | - | - | - | - | (75,106) |
| Freight, Logistics & Warehousing | (5,260) | - | (20) | (7,860) | - | - | (10,020) | (20,000) | (43,160) |
| Product Development | - | - | - | - | - | (10,000) | - | - | (10,000) |
| Sales Commissions | - | (750) | (200) | - | - | - | - | (1,680) | (2,630) |
| Rent | - | - | - | (2,500) | - | - | - | - | (2,500) |
| Utilities | (1,695) | - | - | (20) | (1,675) | - | - | - | (3,390) |
| IT | (542) | (1,500) | - | (542) | - | - | - | - | (2,584) |
| Taxes | - | - | - | - | - | - | - | - | - |
| Insurance | - | (26) | (2,800) | - | - | (26) | (2,800) | - | (5,652) |
| Consulting & Legal | (7,683) | (6,952) | - | (43,852) | - | (6,952) | - | (6,952) | (72,392) |
| Travel & Expenses | (803) | (2,000) | - | - | (150) | (2,000) | - | - | (4,953) |
| Miscellaneous | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (8,000) |
| Restructuring Professionals | (100,000) | - | - | (75,000) | - | - | - | (75,000) | (250,000) |
| **Total Disbursements** | (119,785) | (46,945) | (4,020) | (188,994) | (2,825) | (30,295) | (13,820) | (114,949) | (521,633) |
| | | | | | | | | | |
| **Total Cash Flow** | 130,215 | (46,945) | 12,784 | 61,006 | (2,825) | (30,295) | (13,820) | (64,065) | 46,055 |
| | | | | | | | | | |
| **Ending Cash Balance** | 131,213 | 84,268 | 97,052 | 158,058 | 155,233 | 124,938 | 111,118 | 47,053 | 47,053 |