UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BLUE MATRIX LABS, LLC, | § | CASE NO. 15-52977 |
| HYDRO TOYS, LLC, | § | CASE NO. 15-52978 |
| PARADISE BEVERAGE, LLC, | § | CASE NO. 15-52980 |
| SHAGS, LLC, and | § | CASE NO. 15-52981 |
| PARADISE BEVERAGE LOGISTICS, LLC, | § | CASE NO. 15-52979 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | *(Joint Administration Requested)* |

**EMERGENCY MOTION OF THE DEBTORS FOR
(I) AN ORDER APPROVING BIDDING PROCEDURES
AND BIDDER PROTECTIONS FOR THE SALE OF
CERTAIN DESIGNATED ASSETS; AND (II) AN ORDER
APPROVING THE SALE OF CERTAIN DESIGNATED ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT
TO 11 U.S.C. §§ 105, 363(b), (f), (m), AND 365, AND GRANTING RELATED RELIEF**

**A Motion to Expedite Has Been Filed**

COME NOW Blue Matrix Labs, LLC ("**Blue Matrix**"), Hydro Toys, LLC ("**Hydro Toys**"), Paradise Beverage, LLC ("**Paradise Beverage**"), Paradise Beverage Logistics, LLC ("**Paradise Logistics**"), and Shags, LLC ("**Shags**" and, collectively, the "**Debtors**"), debtors and debtors in possession in the above-captioned cases, and file this motion (the "**Motion**"), pursuant to sections 105, 363, and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of (i) an order approving bidding procedures and bidder protections for the sale (the "**Sale**") of substantially all of the assets of the Debtors, including their intellectual property (the "**Acquired Assets**" or the "**Assets**"), and (ii) an order

(a) authorizing the sale of the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), (m), and 365 of the Bankruptcy Code, (b) to the extent necessary, authorizing the Debtors to assume and assign executory contracts under section 365 of the Bankruptcy Code, and (c) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## I. JURISDICTION AND VENUE

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b).

2.     The statutory predicates for the relief sought include sections 105, 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, and 6006 of the Bankruptcy Rules.

## II. BACKGROUND

### A.     Procedural Background

3.     On December 4, 2015 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No prior request for the relief requested in this Motion has been made.

4.     No request has been made for the appointment of a trustee or examiner, and a creditors' committee (a "**Committee**") has not been appointed in this case.  In addition, no known creditors' committee existed prior to the Petition Date.

### B.     The Debtors' Businesses

5.     The Debtors develop innovative products across a spectrum of industries and operate through three subsidiaries: (a) Hydro Toys, (b) Paradise Beverage, and (c) Shags.

6.      Hydro Toys designs and produces unique water toys, including Hydro Toys® and the award-winning ZORBZ® water balloon line – a self-sealing water balloon.  Paradise Beverage manufactured Pirate Energy® shots, which is no longer in production, but has remaining inventory that it is in the process of marketing. Shags designs and produces the SHAGS® brands, products consisting of innovative bean bag furniture and home accessories including dog beds, pillows, rugs and bath mats. Blue Matrix has developed and owns rights to iWich, an innovative kitchen device that is in advanced development stage.   Each of these businesses have been capital constrained and are competing against much better capitalized entities.

7.      A full description of the businesses of the Debtors and the events leading up to the filing of the voluntary petitions by the Debtors is provided in the Declaration of William R. Patterson [Doc. 3] (the "**Patterson Declaration**"), which has been filed contemporaneously herewith.  On November 6, 2015, the Debtors retained Bridgepoint Consulting ("**Bridgepoint**") to provide certain financial advisory services to the Debtors and to have Mr. Patterson, a principal of Bridgepoint, to serve as the Debtors' Chief Restructuring Officer ("**CRO**").  Also prior to the Petition Date, the Debtors retained Global Toy Experts ("**GTE**"), a boutique investment bank that specializes in the toy industry, in an effort to market Hydro. Contemporaneously herewith, the Debtors have filed a motion to retain Steve Velte of GTE to continue marketing the assets of Hydro and the other Debtors in the hope of locating a bidder prepared to offer a "higher and better" bid.

8.      The Debtors' course of business leading up to the bankruptcy, and in particular their efforts to market Hydro Toys (the most valuable of Blue Matrix's subsidiaries), demonstrates that, to maximize the business opportunity for the Debtors, such efforts will require

significantly more capital than the Debtors will be able to raise.  Notably, the business of Hydro Toys is seasonal with a Spring selling season.  In order to fulfill pending orders for the Spring, the Debtors must immediately move forward with contract manufacturing that their proposed debtor-in-possession lender is only willing to fund as debtor-in-possession financing in connection with a sale.  Accordingly, the Debtors wish to arrange for a sale of the Assets at the price that is most advantageous to their bankruptcy estates.

9.      To that end, the Debtors have negotiated a DIP loan with one of their prepetition senior secured creditors, Kent BML Investments, LP ("**Kent BML Investments**").  Kent BML Investments and another of the Debtors' prepetition senior secured creditors  have agreed to join together to form KBIDC Investments, LLC  (the "**Buyer**") to serve as a stalking horse bidder for the Assets.  The Buyer has agreed to conduct due diligence concerning the Assets and, if the proposed due diligence period is completed successfully, to serve as stalking-horse bidder for an auction for the Assets, per the terms reflected in the Asset Purchase Agreement (the "**APA**[1]") attached as __**Exhibit A**__ to this Motion.  The proposed stalking-horse bid is a credit bid in the amount of $2,000,000, an amount which represents a forgiveness of (a) the DIP Loan that has been presented to this Court for approval by separate motion and (b) a portion of the pre-petition secured debt owed to the senior secured lenders.

10.     In addition, in the event that the Buyer opts not to proceed at the end of their due diligence period, and, if the Debtors believe that the auction could go forward without the Buyer, the Debtors will advise the Court, and request that the Court approve revised sale procedures, ideally involving a back-up stalking horse bidder.  If the Buyer decides not to proceed to closing and the Debtors believe that no other Qualified Bids are likely to be forthcoming, the auction and

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the APA.

proposed sale may be cancelled, and the Debtors will return to this Court to propose some other sale process or disposition of the case as may be appropriate.

11.     Accordingly, the Debtors request that the Court enter a bidding procedures order as soon as possible, and a sale order after the Court has held a Sale Hearing.

### III. RELIEF REQUESTED

12.     By this Motion, the Debtors seek entry of two orders:

13.     *First*, at an expedited hearing to be held on a date set by order of the Court, the Debtors request entry of an order, in substantially the form attached hereto as **Exhibit B** (the "**Sale Procedures Order**"), among other things, (a) approving the Debtors' proposed procedures for submitting and considering competing bids for the Acquired Assets, including the proposed form and manner of notice and the related dates and deadlines (the "**Sale Procedures**"), and (b) approving the Debtors' proposed Bid Protections (as defined below) for the Buyer as the stalking horse bidder.

14.     *Second*, the Debtors request the entry of an order in substantially the form attached hereto as **Exhibit C** (the "**Sale Order**"), (a) authorizing the Sale of the Acquired Assets to the Buyer as stalking horse bidder, or to a higher and better bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code; (b) to the extent necessary, authorizing the Debtors to assume and assign executory contracts pursuant to section 365 of the Bankruptcy Code; and (c) granting related relief.

15.     The relief requested may be further specified as follows.

### A.     The APA

16.     On December 4, 2015, the Debtors and Buyer executed the APA, which specifies the proposed terms for due diligence, sale procedures, stalking horse bidder protections, and the

proposed transaction.   The principal terms of the APA are summarized and highlighted as follows:[2]

| Transaction | The Buyer will acquire designated Assets of the Debtors ("**Seller**"). |
|---|---|
| **Purchase Price** | The total consideration to be paid by Buyer under the APA (the "**Purchase Price**") consists of $2,000,000  in the form of a credit bid of the secured amounts owing to Buyer (a) under its prepetition secured debt and (b) under its DIP loan. |
| **Acquired Assets** | The Acquired Assets are set forth for in section 1.1 of <u>Exhibit A</u> hereto and  include an assignment of all licenses (to the extent assignable) and nondisclosure or inventions assignment agreements owned by Seller that relate to any of the Assets  or are otherwise necessary or useful to make, have made, practice, use, import or sell any of the technology embodied in the other Assets.  All of the Acquired Assets transferred to Buyer will be free and clear of any liens, claims and encumbrances and any such liens, claims or encumbrances will attach to the proceeds of the sale.  Any assets not specifically transferred and assigned to Buyer, and any liabilities relating thereto, shall remain the property of Seller. |
| **Excluded Assets** | The Excluded Assets shall include all  of Sellers' right, title and interest in and to:<br><br>(i)      all Leases for real property not set forth on the Assumed Contracts Schedule (the "<u>Excluded Leases</u>");<br><br>(ii)     all Contracts not set forth on the Assumed Contracts Schedule or, if set forth on the Assumed Contracts Schedule, that Buyer elects by written notice to Sellers in accordance with <u>Section 5.8</u> of the APA to remove from the Assumed Contracts Schedule (together with the Excluded Leases and the Rejected Contracts, the "<u>Excluded Contracts</u>");<br><br>(iii)    cash in an amount equal to the aggregate amount of accrued and unpaid fees and expenses owed by Sellers on account of services provided to the Sellers after the Petition Date, but prior to the Closing, by (A) Taube Summers Harrison Taylor Meinzer Brown LLP, (B) Bridgepoint Consulting, LLC and (C) Conley Rose, P.C.;<br><br>(iv)     all avoidance or preference actions under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy |

---

[2] To the extent there is any inconsistency between the description in this Motion and the terms of the APA, the APA shall control.

| | |
|---|---|
| | Code for the benefit of any Seller under the Bankruptcy Code;<br><br>(v)    all rights of the Sellers under the APA and any Ancillary Agreement;<br><br>(vi)    all assets (whether in trust or otherwise) with respect to any Benefit Plan of the Sellers; and<br><br>(vii)    any assets that Buyer elects to treat as Excluded Assets on or prior to Closing. |
| **Closing** | The Transaction will close at a date as soon as possible after the approval of the Transaction by the Bankruptcy Court, subject to satisfaction of all closing conditions and receipt of Bankruptcy Court approval of the Transaction, but in no event later than forty-five (45) days from the Petition Date. |
| **Deposit** | A good-faith deposit of 10% of the Purchase Price will be provided by any bidder aside from the Buyer. |
| **Due Diligence and Cure Notice** | The Buyer will have a twenty-one (21) day due diligence period (the "**Due Diligence Period**") beginning upon the date of service of this Motion.<br><br>If, at the end of the Due Diligence Period, the Buyer opts not to proceed, then the Debtors will promptly provide notice to the Court and all potential bidders, and will seek revised approval for sale procedures if serious potential bidders have stepped forward; otherwise, the Debtors will seek to modify this sale process and propose to the Court some other means of proceeding. |
| **Relationship between Buyer and Debtors** | Kent BML Investments, a principal of the Buyer, owns approximately 32% of the LLC units of Blue Matrix. The transaction was negotiated between the CRO (and his professionals) and the Buyer in good faith. The Debtors will have no relationship or connection with the Buyer after the consummation of the sale. |
| **Notice Timing** | Notice of the hearing on the motion to approve the motion to sell will be provided as is necessary under the circumstances. |
| **Cure Amount and Notice** | Concurrently with the filing of this Motion, the Sellers shall provide written notice, in form and substance acceptable to Buyer, to each of the counterparties to the Contracts listed on the Assumed Contracts Schedule that, at the option of Buyer, the Sellers may assume and assign to Buyer such counterparty's Contract, notifying each such counterparty of the proposed Cure Costs for such Contract (each such notice, a "**Cure Notice**").  Each Cure Notice shall inform the |

|  | counterparty that, if such counterparty objects to the assumption or assignment of its Contract or the amount of the Cure Costs arising prior to the Closing under such Contract, such counterparty must provide written notice of such objection to the Sellers and Buyer within 20 calendar days after the Petition Date. |
|---|---|

17.     The terms and conditions of the proposed transaction are set forth in the APA, and reference should be made to the APA for additional terms.

**B.     Proposed Bidding Procedures**

18.     The Debtors request approval of the following procedures for submitting and considering bids for the Sale of the Acquired Assets, including the related dates and deadlines described below:

(a)     **Participation Requirements**.  Parties interested in making a competing bid for the purchase of some or all of the Acquired Assets (each, a "**Potential Bidder**") will be required to execute a confidentiality agreement in form and substance acceptable to the Debtors prior to gaining access to the due diligence materials.

(b)     **Due Diligence**.  Potential Bidders will have a twenty-one (21) day due diligence period beginning upon the date of the service of this Motion, during which time Potential Bidders may seek due diligence access or additional information as may be reasonably requested by the Potential Bidder and that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances.

(c)     **Submission of Bids**.  In order to qualify as a Qualified Bid (as defined below) for the Acquired Assets, a Potential Bidder must timely submit a written bid that satisfies the following criteria:

i.     The bid must exceed the Purchase Price by at least $25,000 plus, if the stalking-horse bidder is the Buyer, an amount sufficient to fund the Bid Protections (defined below) of $75,000;

ii.     The bid must be accompanied by a cash deposit (in the form of either a cashier's check or wire transfer) in an amount equal to ten (10%) percent of the aggregate value of such bid (each, a "**Good Faith Deposit**").  Regardless of method of payment, all Good Faith Deposits must be remitted to Debtors' counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Eric J. Taube, Esq. and Morris D. Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701;

   iii. The bid must be accompanied by an executed APA in substantially the form of the APA and a blackline showing any modifications the bidder is proposing, and that:

     a. indicates which of the Acquired Assets such bidder proposes to acquire pursuant to the APA; and

     b. does not contain any conditions to closing which are not contained in the APA (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the APA;

   iv. The bid must include a reference from a financial institution demonstrating that the Potential Bidder (or the entity that will furnish the funding required to consummate and perform under the APA) has sufficient available funds to close the transaction; and

   v. The bid must contain a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the APA and the consummation of the transactions contemplated thereby.

   vi. The bid must be delivered to the following parties: (i) the Debtors, c/o William Patterson, CRO for the Debtors, 6300 Bridgepoint Parkway, Building One, Suite 575, Austin, Texas 78730; (ii) the Debtor's counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Morris D. Weiss, Esq. and Christopher G. Bradley, 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153-0119, Attn: Brian S. Rosen, Esq. and Matthew Goren, Esq.

   (d) **Qualification of Bid**.  After a Potential Bidder has delivered a bid, the Debtors, in consultation with any official Committee (if one has been appointed), will determine whether (i) the Potential Bidder has demonstrated the financial capacity to consummate the purchase of the Acquired Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise timely satisfied the requirements described above.  If so, the Debtors shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**," and will promptly notify such bidder and the Buyer of this determination.

   (e) **Deadline for Submission of Bids**.  The deadline for submitting any and all Qualified Bids shall be no later than December 28, 2015 at 5:00 p.m. (prevailing Central time), or such other date as is established by the Court (the "**Bid Deadline**").

   (f) **Auction**.  In the event that Qualified Bids are received, the Debtors will conduct an auction (the "**Auction**") to determine the highest or best bid for the Acquired

Assets on December 30, 2015, or such other date as may be established by the Court, at the law offices of the Debtors' counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, 100 Congress Ave., 18th Floor, Austin, Texas 78701, beginning at 10:00 a.m. (prevailing Central time). The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

(g) **Auction Procedures**. Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction. At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids, provided that Qualified Bidders concurrently increase their Good Faith Deposit to represent 10% of their most recent bid. The bidding at the Auction shall start and continue in increments of at least $25,000. The Buyer shall have the right, but not the obligation, to participate in the Auction, and shall be a Qualified Bidder entitled to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude when no further bids are received. During each round of bidding, each participating bidder will have a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of the other party making the then highest or best bid. The Debtors may conduct the Auction in the manner they determine will maximize the value of the Acquired Assets. If there is no Qualified Bid from a party other than the Buyer, the Auction will be cancelled and the Buyer will be declared the Successful Bidder (defined below). The Auction will be transcribed or videotaped. Each bidder is expected to confirm at the auction that it has not engaged in any collusion with respect to the bidding or the sale. Bids will not be considered after the Auction in closed.

(h) **Determination of Successful Bidder**. At the conclusion of the Auction, the highest or best bid, as determined by the Debtors (in consultation with any Committee, if one has been appointed) consistent with these Bidding Procedures, shall be designated as the "**Successful Bidder**." The Debtors may designate the next highest or best bidder for the Acquired Assets at the Auction as the "**Backup Bidder**." However, a bidder may decline Backup Bidder status and have no obligation to close a transaction, and the Debtors may, in their sole business judgment, continue that same process to obtain a Backup Bidder from among other Qualified Bidders.

(i) **Sale Hearing**. In the event that the Successful Bidder is a party other than the Buyer, or an objection is timely filed to this Motion by the Sale Objection Deadline (as defined below), the Court will hold a hearing to approve the Sale of the Acquired Assets to the Successful Bidder (the "**Sale Hearing**") on or before January 4, 2016, or such other date as is established by the Court. Any Sale Hearing shall be an evidentiary hearing and parties shall be prepared to present their evidence in support of or in opposition to the proposed Sale at the Sale Hearing. If the Successful Bidder fails to consummate the purchase of the Acquired Assets, the Backup Bidder will automatically be deemed the Successful Bidder.

(j) **Closing**. Closing shall take place promptly after the entry of the Sale Order, but in any event no later than (a) on the first (1st) business day following the day that is fourteen (14) days after the entry of the Sale Order and after the Sale Order has become a Final Order, and (b) forty-five (45) calendar days from the Petition Date, or at

such other time or place as Buyer and Seller may agree in writing.  No amendment, modification, or alteration of the terms or provisions of the APA shall be binding unless the same shall be in writing and duly executed by Buyer and Blue Matrix on behalf of the Sellers, except that any of the terms or provisions of the APA may be waived in writing at any time by the party that is entitled to the benefits of such waived terms or provisions.

(k)  **Return of Good Faith Deposit**.  The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Debtors' counsel and shall not become property of the Debtors' estates.  Upon the closing of the Sale, the Good Faith Deposit of any Qualified Bidders that are not the Successful Bidder will be returned.

(l)  **Reservation of Rights**.  The Debtors reserve the right, in consultation with their professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

## C.  Proposed Notice Procedures

19.  Not later than three (3) calendar days after the entry of the Sale Procedures Order, the Debtors will cause a notice of the Sale (the "**Sale Notice**"), to be sent by first-class mail postage prepaid, or by another method reasonably calculated to provide notice, to (i) the Office of the United States Trustee for the Western District of Texas, San Antonio Division (ii) counsel for any official or unofficial committees; (iii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iv) counsel to Buyer. Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.; (v) Chapman, (vi) any other parties who have filed UCC-1 against the Debtor, (vii) all affected federal, state, and local regulatory and taxing authorities; (viii) the Office of the United States Attorney for the State of Texas; (ix) the Office of the Attorney General for the State of Texas; (x) all parties identified by GTE as potentially interested in the assets of the Debtors; (xi) contract counterparties listed on the Assumed Contract Schedule; and (xii) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002).

20.     The Debtors request that the Court set a deadline of December 31, 2015 at 5:00 p.m. (prevailing Central time) (the "**Sale Objection Deadline**") as the deadline for any objection to the relief requested in this Motion to be filed with the Court and delivered to the following parties:    (i) the Debtors, c/o William Patterson, CRO for the Debtors, 6300 Bridgepoint Parkway, Building One, Suite 575, Austin, Texas 78730; (ii) the Debtors' counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Morris D. Weiss, Esq. and Christopher G. Bradley, 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York  10153-0119, Attn: Brian S. Rosen, Esq. and Matthew Goren, Esq.

21.     The Debtors request that the Court deem this notice and opportunity to object to be sufficient for all purposes.

**D.     Proposed Stalking Horse Bid Protections**

22.     The Debtors also request that the Court approve the agreement regarding the payment of expense reimbursements in an amount of $75,000 (the "**Bid Protections**"), which is to be paid to the Buyer, in accordance with the APA, if the Bankruptcy Court approves the Sale of any or all of the Acquired Assets to an entity other than the Buyer; *provided that*, if Buyer opts not to proceed as stalking horse bidder after its Due Diligence Period, and the Court approves a sale to some other party, the Buyer shall not be entitled to any Bid Protections.

23.     The requested Bid Protections were negotiated by the parties in good faith and at arm's length, primarily through counsel, with significant give-and-take.  The Buyer has incurred substantial expenses in negotiating the purchase of the Acquired Assets, and such negotiations and the Buyer's offer for the Acquired Assets is intended to  maximize the value to be obtained from the Acquired Assets for the benefit of all creditors.  The Buyer has agreed to a fair and open Auction process that increases the chance of the maximization of value for the estate.  As such,

the Debtors have determined, in their business judgment, that the Bid Protections is reasonable under the circumstances.

## IV.  BASIS FOR RELIEF REQUESTED

### A.    The Bidding Procedures are Appropriate and in the Best Interests of the Debtors' Estates and Their Creditors

24.    The dominant goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R, 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc*., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)), *appeal dismissed*, 3 F.d 49 (2d Cir. 1993).

25.    As a result, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates."); *Integrated Res.*, 147 B.R. at 659.

26.    The Debtors believe it is in the best interests of their estates to commence a bidding procedure immediately, as the Debtors have limited funding and resources to proceed with a long sale process.  Hydro has the greatest value and is highly dependent on the Spring

selling season.  If Hydro is unable to fulfill its pending Spring orders then its value will be substantially diminished.  The Bidding Procedures proposed herein allow for an expedited sale of the Debtors' assets that is necessitated by their circumstances.  The Debtors also believe that the proposed Bidding Procedures should promote active bidding from seriously interested parties, and will provide a framework for an orderly and fair sale process that will encourage participation by financially capable bidders or will confirm that the Buyer's bid is the best and highest bid for the Acquired Assets.  The proposed Bidding Procedures contain terms typical for a process through which a sale of this nature is consummated and should increase the likelihood that the Debtors will receive the greatest possible consideration for the Acquired Assets.  The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner, balancing the Debtors' desire to maximize recovery for the benefit of the estates, with the need to move quickly to avoid any further deterioration in value.  *See In re Texas Rangers Baseball Partners,* 431 B.R. 706  (Bankr. N.D. Tex. 2010) (approving shortened time frame of less than three weeks between issuance of bidding procedures order by the Bankruptcy Court and auction sale of assets to preserve the value of the Acquired Assets). Moreover, the prepetition efforts by GTE further demonstrates the reasonableness of the Bidding Procedures.

**B.    The Notice Procedures are Appropriate**

27.    Under Bankruptcy Rule 2002, the Debtors are required to notify their creditors of any proposed sale of their assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the Sale and the deadline for filing any objections related thereto.  The Debtors' proposed notice procedures, including the Sale Notice, include adequate information to (a) enable interested parties to bid on the Acquired Assets pursuant to the Sale Procedures Order, and (b) inform parties-in-interest of the Sale Hearing and the Sale Objection

Deadline.  As such, the Debtors believe that the notice to be provided by the mailing of the Sale

Notice constitutes good and adequate notice and fully complies with Bankruptcy Rule 2002.

**C.  The Bid Protections Are Appropriate and in the
Best Interests of the Debtors' Estates and Their Creditors**

28.  In general, bid protections encourage a potential purchaser to invest the requisite

time, money and effort to negotiate with a debtor and perform the necessary due diligence

attendant to the acquisition of a debtors' assets, despite the inherent risks and uncertainties of the

chapter 11 process.  Typically, bidding incentives are judged under a business judgment

standard, which proscribes judicial second-guessing of the actions of a corporation's board of

directors taken in good faith and in the exercise of honest judgment.  *See e.g.*, *In re 995 Fifth*

*Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that bidding incentives may

"be legitimately necessary to convince a white knight to enter the bidding by providing some

form of compensation for the risks it is undertaking" (internal quotation marks and citation

omitted)).  In the instant case, and based upon the relationship of the parties, the bidding

incentives were reviewed and endorsed by Bridgepoint and the Debtors' CRO.  To receive

administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding

incentive must provide some post-petition benefit to the estate.  *Calpine Corp. v. O'Brien Envtl.*

*Energy, Inc*., 181 F.3d 527, 535 (3d Cir. 1999) (identifying at least two instances in which

bidding incentives may provide benefit to the estate: first, benefit may be found if "assurance of

a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise

would not have been made and without which bidding would have been limited"; second, where

the availability of bidding incentives induces a bidder to research the value of the debtor and

submit a bid that serves as a minimum or floor bid on which other bidders can rely).

29.     Courts typically approve Bid Protections such as those requested here, in chapter 11 bankruptcy sales.  *See, e.g., In re Lincolnshire Campus, LLC*, 2010 WL 5269706, at *1 (Bankr. N.D. Tex. July 23, 2010) (approving breakup fee and expense reimbursement under section 503(b) of the Bankruptcy Code in the context of a sale of substantially all of the debtor's assets under section 363 of the Bankruptcy Code); *In re Texas Rangers Baseball Partners*, 431 B.R. at 715 (same); *In re APP Plus*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (approving break-up fee in connection with sale of substantially all of the debtors' assets pursuant to 11 U.S.C. § 363(b)); *In re Kmart*, Case No. 02-B-02474 (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders).

30.     The Debtors believe that the Bid Protections are fair and reasonable, an exercise of their sound business judgment, and that they provide a benefit to the Debtors' estates. Specifically, the Buyer has engaged in extensive analysis and due diligence of the Debtors' assets, and has incurred significant expenses in negotiating the purchase of the Acquired Assets. As a result of the Buyer's efforts, the Debtors have secured a stalking horse bidder for their assets, with a minimum price for the Acquired Assets that is fair, reasonable, and on which other bidders can rely.  In light of the costs undertaken by the Buyer, the Bid Protections serve as an inducement for the Buyer to conduct the costly due diligence necessary to provide a competitive floor bid, and will compensate the Buyer for its risk in the event that it is not the Successful Bidder.

31.     Moreover, if the Bid Protections are triggered, it will be the result of the Debtors securing a higher and better offer for the Acquired Assets, which will benefit the Debtors' creditors.  Consequently, the payment of the Bid Protections will not diminish the Debtors' estates because they will only be payable if the Debtors consummate a sale that provides

consideration that is greater than the Purchase Price by an amount sufficient to pay the Bid Protections.

32.     The Debtors' agreement to pay the Bid Protections is the product of good faith, arm's-length negotiations between the Debtors and Buyer.  The Bid Protections are fair and reasonable in amount, and are reasonably intended to compensate the Buyer for the risk of being used as a stalking horse bidder and ultimately being outbid for the Acquired Assets.  Thus, the payment of the Bid Protections is a sound exercise of the Debtors' business judgment and will provide the a post-petition benefit to the Debtors' estate.

**D.     The Sale of the Acquired Assets Pursuant to the Purchase Agreement is Authorized by Section 363(b) of the Bankruptcy Code**

33.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(l).  Section 105 provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

34.     A sale of a debtor's assets is authorized under section 363 of the Bankruptcy Code if there is a business justification for the sale.  *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper)*), 933 F.2d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986).  Among the factors in determining whether there is sufficient business justification for the sale, the bankruptcy court:

> should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the

estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis–a–vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Cont'l Air Lines, Inc.*, 780 F.2d at 1226 (*quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*), 722 F.2d 1063, 1071 (2d Cir. 1983)). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litig. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A. 2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed sale must make a showing of "bad faith, self-interest, or gross negligence." *Integrated Res.*, 147 B.R. at 656.

35.     Moreover, the Bankruptcy Court has authority under section 105(a) of the Bankruptcy Code to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code. The Fifth Circuit has acknowledged that section 105 confers broad powers on bankruptcy courts:

[Section] 105 [is] an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is

appropriate or necessary in aid of the exercise of their jurisdiction .
. . .

*See Davis v. Davis (In re Davis)*, 170 F.3d 475, 492 (5th Cir 1999) (citation omitted).  While the

Debtors realize that section 105(a) of the Bankruptcy Code "may only be used to carry out the

provisions of Title 11," the underlying premise of chapter 11 is the continued and uninterrupted

operation of the debtor in possession to the greatest extent possible.  *In re CoServ, L.L.C.*, 273

B.R. 487, 494 n.9 (Bankr. N.D. Tex. 2002).  Thus, the Debtors' requested relief is consistent

with the "furtherance of the provisions of the Bankruptcy Code."  *Id.*.

36.     The Debtors have proposed the sale of the Acquired Assets after thorough

consideration of all viable alternatives, and has concluded that the Sale is supported by a number

of sound business reasons.  Without the Sale, the Debtors do not see any possibility that they

could sufficiently raise capital and engage in the necessary preparations and development that

would be necessarily to utilize the Assets profitably.  Hence, the Debtors have determined, in

their considered business judgment, that a Sale of the Acquired Assets as requested herein

provides the best and most efficient means for the Debtors to maximize the value of their estate,

and avoid further deterioration in value.

37.     As a result of the Debtors' efforts to date, the Debtors believe that the Buyer's

offer is reasonable, constitutes fair and reasonable consideration for the Acquired Assets, and

will maximize value.  The APA does not impermissibly restructure the rights of the Debtors'

creditors.

38.     Notwithstanding these determinations, however, the Debtors have also proposed a

competitive bidding process in order to confirm that the Buyer's offer is the best and highest

offer for the Acquired Assets.

39.    Based on the foregoing, the sale of the Acquired Assets is justified by sound business reasons and is in the best interests of the Debtors and their estates.  Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtors request approval of the sale to the Buyer as set forth herein.

**E.    The Sale of the Acquired Assets Free and Clear of Liens, Claims, and Interests is Authorized Under Section 363(f) of the Bankruptcy Code**

40.    The Debtors also request that the Court authorize the Sale of the Acquired Assets to free and clear of any and all liens, claims, charges, encumbrances and interests (collectively, the "**Interests**"), which may be asserted or otherwise exist, with any such Interests to attach to the proceeds of the Sale of the Acquired Assets, subject to the rights and defenses of the Debtors, if any, with respect thereto.

41.    Section 363 of the Bankruptcy Code provides that a debtor may sell property of the estate free and clear of any other entity's interest in such property if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Acquired Assets;

(4)    such interest is in a bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

42.    While the term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code, courts have held that the scope of section 363(f) of the Bankruptcy Code is not limited to *in rem* interests.  *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir.

1996); *Folger Adam Sec. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000) (citing 3 COLLIER ON BANKRUPTCY 363.06[1]). Thus, a debtor can "sell its assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

43.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale of the Acquired Assets free and clear of all Interests, except with respect to any Interests that are Assumed Liabilities or Permitted Liens under the APA. *See Citicom Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

44.     The Debtors believe that each Interest that is not an Assumed Liability or Permitted Lien satisfies at least one of the five conditions in section 363(f) of the Bankruptcy Code. In particular, the proposed Sale Order will provide for all Interests to attach to the proceeds from the Sale of the Acquired Assets in the order of their priority and with the same validity, priority, force and effect which such Interests now have against the Acquired Assets, subject to the rights, claims, defenses, and other objections, if any, of the Debtors and parties in interest with respect to such Interests. The Debtors are aware that certain other parties may assert security interests in, or liens on, certain of the Acquired Assets. However, as described in the Patterson Declaration, the Debtors do not believe any such interests to be valid or properly perfected as of the Petition Date. The Debtors accordingly request authority to convey the Acquired Assets pursuant to the requested Sale Procedures, free and clear of all such Interests, other than Permitted Liens and the Assumed Liabilities.

**F.      The Buyer is a Good Faith Purchaser and is Entitled to the Full Protections of Section 363(m) of the Bankruptcy Code**

45.      The potential stalking horse, the Buyer, is a good faith purchaser, entitled to the protections of section 363 of the Bankruptcy Code.   Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

46.      While the Bankruptcy Code does not define "good faith," courts have held that there must be a showing of fraud or collusion between the purchaser and the debtor to demonstrate a lack of good faith.  *Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (same); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (same).  Courts generally determine that parties have acted in good faith with respect to a proposed sale if the purchase price is adequate and reasonable and the terms of the sale are disclosed fully.  *See In re Abbotts Dairies*, 788 at 149-50.

47.      Here, the APA was negotiated at arm's length, the Buyer has acted in good faith at all times, and the agreements are not tainted by self-dealing, collusion or manipulation.   The Purchase Price is fair and reasonable, and the terms of the Sale have been fully disclosed and are

subject to an active process to determine if a higher or better bid exists. In addition, the terms of

the APA, including the Expense Reimbursement and other bidding incentives, have been

reviewed and approved by Bridgepoint and the Debtors' CRO. Accordingly, the Debtors request

that the Court make a finding that the Buyer is a good faith purchaser entitled to the protections

of section 363(m) of the Bankruptcy Code.

### G.  The Court Should Approve the Assumption and Assignment of Contracts Under Section 365 of the Bankruptcy Code

48.     In connection with the approval of the Sale to the Buyer, the Debtors also request

approval of the assumption and assignment of contracts to the Buyer as necessary to effectuate

the transfer of the Acquired Assets.

49.     Section 365 of the Bankruptcy Code permits a debtor to assign an executory

contract or unexpired lease if "(A)    the [debtor] assumes such contract or lease in accordance

with the provisions of this section; and (B) adequate assurance of future performance by the

assignee of such contract or lease is provided, whether or not there has been a default in such

contract or lease." 11 U.S.C. § 365(f)(2). Section 365(a) of the Bankruptcy Code authorizes a

debtor to assume an executory contract or unexpired lease, and section 365(b)(1), in turn,

codifies the requirements for such assumption, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

     (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Texas Health Enters., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).

  50. It is well established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422-26 (Bankr. N.D. Tex. 2009); *Richmond Leasing Co. v. Capital Bank, N.A. (In re Richmond Leasing Co.)*, 762 F.2d 1303, 1309 (5th Cir. 1985); *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990). Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate.

  51. The assumption and assignment of any contracts necessary to the transfer of the Acquired Assets satisfies the requirements of section 365 of the Bankruptcy Code. First, to the extent that there is any default under any of the assumed contracts, the APA provides that any such defaults will be cured as part of the transaction. Second, any buyer will be required to demonstrate sufficient ability to continue performance under each of the assumed contracts. To the extent necessary (or requested by any party in interest), the Buyer or any other Successful Bidder will demonstrate that adequate assurance of future performance is present.

52.     In accordance with the APA, the Debtors intend to provide contract counterparties with a Cure Notice notifying each counterparty of the proposed Cure Cost and informing such counterparty that, if the counterparty objects to the assumption or assignment of its Contract or the amount of the Cure Costs arising prior to the Closing under such Contract, such counterparty must provide written notice of such objection to the Sellers and the Buyer within 20 calendar days after the Petition Date. Pursuant to the APA, if a contract counterparty timely objects to the assumption or assignment or the amount of the Cure Costs payable with respect to such Contract, the Debtors will request that the Bankruptcy Court hear and determine such objection on an expedited basis. If such objection has not been resolved prior to the Closing (whether by an order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty), the Buyer may elect, in its sole and absolute discretion, to (i) treat such Contract as an Excluded Contract, (ii) defer the Closing until the resolution of such objection (by order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty), or (iii) temporarily treat the Contract as an Excluded Contract (a "**Designated Contract**"), proceed to Closing, and determine whether to treat the Designated Contract as an Assumed Contract or an Excluded Contract within two Business Days after resolution of such objection (whether by an order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty). Thus, the requirements for assumption and assignment under section 365 of the Bankruptcy Code are satisfied.

53.     The assumption and assignment of the assumed contracts is an integral part of the Sale. The Sale of the Acquired Assets to the Buyer will provide significant benefit to the Debtors' estates and allow the Debtors, in their business judgment, to maximize the value of the Acquired Assets for the benefit of their estates. Thus, the assumption and assignment of any contracts necessary to the transfer of the Acquired Assets is a sound exercise of the Debtors'

business judgment.  Accordingly, the Debtors request that the assumption and assignment be approved, notwithstanding any anti-assignment provisions therein.

## V. REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(H)

54.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).

55.     The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rule 6004(h) is inapplicable and waived, so that they may proceed as expeditiously as possible with the Sale.  As described above, the Debtors believe that, absent a prompt sale, the value of the Acquired Assets will decline in value to the detriment of their creditors.  Therefore, it is imperative that the Sale Order be effective immediately to permit the Sale to close without any further delay.

## VI. CONCLUSION

**WHEREFORE**, the Debtors respectively requests that the Court (i) enter an order approving the Bidding Procedures and Bid Protections; and (ii) enter an order (a) authorizing the Sale of the Acquired Assets to the Buyer or another Successful Bidder free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), (m), and 365 of the Bankruptcy Code; (b) to the extent necessary, authorizing the Debtors to assume and assign executory contracts; and (c) granting such other and further relief to the Debtors as the Court may deem proper.

DATED:  December 5, 2015
        Austin, Texas

                      Respectfully Submitted,

                      TAUBE SUMMERS HARRISON TAYLOR
                      MEINZER BROWN

                      */s/ Morris D. Weiss*
                      Eric J. Taube
                      State Bar No. 19679350
                      Morris D. Weiss
                      State Bar No. 21110850
                      Christopher G. Bradley
                      State Bar No. 24069407
                      100 Congress Avenue, Suite 1800
                      Austin, Texas 78701
                      (512) 472-5997
                      (512) 472-5248 (FAX)
                      etaube@taubesummers.com
                      mweiss@taubesummers.com
                      cbradley@taubesummers.com

                      PROPOSED ATTORNEYS FOR DEBTORS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served on the parties on the attached Service List by depositing same in the United States First Class Mail on the 7th day of December, 2015.


_____ /s/ *Morris D. Weiss* _____
Morris D. Weiss

ALL CREDITORS FOR THE 5 CASES:
**SERVICE LIST**

1st Global Capital, LLC
1250 E. Hallandale Beach Blvd, Suite 409
Hallandale Beach, FL 33009

Advantage Sales & Marketing
PO Box 31001-1691
Pasadena, CA 91110-1691

Advantage Sales & Marketing
c/o Sonny King, CEO
18100 Von Karman, Suite 900
Irvine, CA 92612

AM RACING
24801 IH - 35
Kyle, TX 78640

American Dog Magazine
17011 Lincoln Ave, Ste. #610
Parker, CO 80134

American Express
PO Box 650448
Dallas, TX 75265-0448

Armbrust & Brown, PLLC
Attn:  Kimberly S. Beckham
100 Congress Ave., Suite 1300
Austin, TX 78701

BANK OF AMERICA
PO Box 660576
Dallas, TX 75226-0576

Blue Matrix Labs, LLC
1575 IH 35 North
New Braunfels, TX 78130

Blue Rhodes, PLLC
812 San Antonio St., Ste 310
Austin, TX 78701

BRIDGEPONT CONSULTING
6300 Bridgepoint Pkwy Bldg, Ste 575
Austin, TX 78730

CapCall LLC
122 E. 42nd Street, Suite 2112
New York, NY 10168

CAPSUGEL US, LLC
412 Mt. Kemble Ave. Suite 200C
Morristown, NJ 07960

CASESTACK Inc.
3000 Ocean Park Blvd, Suite 1000
Santa Monica, CA 90405

CONLEY ROSE, P.C.
1001 McKinney, Ste, 1800
Houston, TX 77002

Continental American Corporation d/b/a P
5000 E. 29th Street North
Wichita, KS 67220

CUSTOM CREATION
1045 Reinli St
Austin, TX 78723

David L Chapman
2905 Cliff Point
Spicewood, TX 78669

DLS LOGSTIC SERVICE, LLC
11120 S Hindry Ave, Ste. A
Los Angeles, CA 90045

Duggan & Brown
1617 Old York Road
Abington, PA 19001

Dutton, Harris, & Company
PO Box 230
Midland, TX 79702

Eagle Business Credit
100 Churchill Ct
Woodstock, GA 30188

EMMIS AUSTIN RADIO
PO Box 731488
Dallas, TX 75373-1488

ENCHANTED MOMENTS
Jeffrey Kennis
344 Fence Row Dr.
Fairfield, CT 6824

FARMERS INSURANCE EXCHANGE
P.O. Box 4665
Carol Stream, IL 60197-4665

FEDEX
Po Box 660481
Dallas, TX 75266-0481

Freedom Voice Systems
169 Saxony Road, Suite 212
Encinitas, CA 92024

GLOBALPLASTIC
Jim Andrasic
34179 Golden Lantern St, Ste. 202
Dana Point, CA 92629

GS1 US, Inc.
PO Box71-3034
Columbus, OH 43271-3034

Hill Country Texas Galleria, LLC
12700 Hill Country Blvd, Suite T-100
Bee Cave, TX 78738

Hydro Toys, LLC
1575 IH 35 North
New Braunfels, TX 78130

iHeart Media Attn: Accounts Payable
P.O. Box 847117
Dallas, TX 75284

Info-Hold, Inc.
4120 Airport Rd.
Cincinnati, OH 45226

INTERNAL REVENUE SERVICE
324 25th St.
Ogden, UT 84201-0039

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

International Print & Packaging
951 Hwy 183
North Liberty Hill, TX 78642

inWorks LLC
PO Box 342
Uwchland, PA 19480

IPFS CORPORATION
PO Box 412086
Kansas City, MO 64141-2086

ITI MANUFACTURING
333 Southwestern Blvd, Ste 202
Sugar Land, TX 77478-3659

Jean Newman
11433 Mission Trace
San Antonio, TX 78230

Jeff Carpenter
1000 Liberty Park Drive #106
Austin, TX 78746

JOE VARRONE & ASSOCIATES
2305 Sheffield Square
Carrollton, TX 75007

Kastner Huggins Reddien Gravelle LLP
801 West 5th Street
Suite 105
Austin, TX 78703

Kent BML Investments, LP
12006 Pleasant Panorama View
Austin, TX 78738

Lease Finance Partners, Inc.
PO Box 20140
Wichita, KS 67208

LUNGE MARKETING, LLC
Trisha Hubbard
218 Main St #407
Kirkland, WA 98033

MCMANEMIN COMPANIES
2050 N Stemmons Frwy, Unit 124
Dallas, TX 75207

NELSON
PO Box 49195
San Jose, CA 95161-9195

Nestle Waters North America Inc.
Ready Refresh #216
6661 Dixie Highway, Suite 4
Louisville, KY 40258

NEXTWAVE, LLC
John Hinkel
9692 Pebble View Dr.
Cincinnati, OH 45252

OKLAHOMA GROCERS ASSOCIATION
PO Box 18716
Oklahoma City, OK 73154

OLD DOMINION FREIGHT LINE, INC
PO Box 841324
Dallas, TX 75284-1324

ON DECK CAPITAL
Attn: Director of Operations
901 N. Stuart Street, Suite 700
Arlington, VA 22203

ONE TOUCH POINT
Ginny's PO Box 143924
Austin, TX 78714-3924

Paradise Beverage, LLC
1575 IH 35 North
New Braunfels, TX 78130

PLUSH PRODUCTS
8755 Windfern Rd
Houston, TX 77064

Power Up Lending Group, Ltd.
111 Great Neck Road, Suite 216
Great Neck, NY 11021

Product Playground, LLC
Jeffrey Kennis
344 Fence Row
Fairfield, CT 6824

Public Storage
6726 Bee Cave Road
Austin, TX 78746

PURCHASE POWER PO
Box 371874
Pittsburgh, PA 15250-7874

PUSH MARKETING & PROMOTIONS
414 South Mill Ave, Ste. 214
Tempe, AZ 85281

RAPID PROTOTYPES
2910 S Walton Blvd Ste 8
Bentonville, AR 72712

Ron Harter
6901 E. Co. Rd. 97
Midland, TX 79706

Sanson Illustrations
1207 DUNLAVY
HOUSTON, TX 77019

SCOTT C SHELTON, P.C.
136 W. Twohig, Ste C
San Angelo, TX 78734

Scott Goodwin
13950 Distribution Way
Farmers Branch, TX 75234

Shags, LLC
1575 IH 35 North
New Braunfels, TX 78130

Sol Schwartz & Associates PC
7550 W IH 10, #1200
San Antonio, TX 78229

SOS CAPITAL
540 Madison Avenue
New York, NY 10022

STEEL BRANDING
6414 Bee Cave Rd Ste B
Austin, TX 78746

SUNBELT DISPLAYS & DIGITAL
  GRAPHICS
1000 Williams Dr., Ste. 1002
Marietta, GA 30066

Taizhou LuckySun Imp. & Exp. Co., Ltd
No. 36, Chaoji Street
Beiyang Huangyan
Taizhou, Zhejiang 318020

The Erin Griffin Group, LLC
19321 E. Clear Creek Dr
Parker, CO 80134

THE HARTFORD
PO Box 660916
Dallas, TX 75266-0916

THE NIELSEN COMPANY (US), LLC
PO Box 88956
Chicago, IL 60695

The Specialty Marketing Group, Inc.
11707 Dean Street
Huntley, IL 60142

Tony Scott Martin
101 Flint Rock Trail
Spicewood, TX 78669

Toyology Inc.
23679 Calabasas Rd
Calabasas, CA 91302

U.S. Trustee - San Antonio
Nancy Ratchford, Assist. U.S. Trustee
P.O. Box 1539
San Antonio, TX 78295

Uline
PO Box 88741
Chicago, IL 60680-1741

UNITED LABORATORIES
  MANUFACTURING, INC
PO Box 671314
Dallas, TX 75267-1314

World Global Financing Inc.
141 North East 3rd Avenue
Miami, FL 33132

# EXHIBIT A

ASSET PURCHASE AGREEMENT

by and among

KBIDC INVESTMENTS, LLC

and

THE SELLERS NAMED HEREIN

Dated December 4, 2015

# TABLE OF CONTENTS

**Page**

ARTICLE I        THE TRANSACTION.................................................................. 2

    1.1.   Purchase and Sale of Acquired Assets; Assumed Liabilities................................. 2

ARTICLE II       PURCHASE PRICE; CLOSING ................................................ 5

    2.1.   Purchase Price; Payment................................................................. 5

    2.2.   Bulk Sales Laws............................................................................ 6

    2.3.   Closing Date................................................................................. 6

    2.4.   Closing Deliveries......................................................................... 6

ARTICLE III      REPRESENTATIONS AND WARRANTIES OF BUYER ........................... 7

    3.1.   Organization................................................................................. 7

    3.2.   Authority..................................................................................... 7

    3.3.   No Conflict.................................................................................. 7

    3.4.   Consents..................................................................................... 7

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLERS....................... 8

    4.1.   Due Diligence Materials ................................................................. 8

    4.2.   Litigation..................................................................................... 8

    4.3.   Obligations Under the Promissory Notes .......................................... 8

    4.4.   Assumed Contracts Schedule........................................................... 8

ARTICLE V        COVENANTS .......................................................................... 9

    5.1.   Access........................................................................................ 9

    5.2.   Commercially Reasonable Efforts .................................................... 9

    5.3.   Notification.................................................................................. 9

    5.4.   No Inconsistent Action .................................................................. 10

    5.5.   Further Assurances........................................................................ 10

    5.6.   Specific Enforcement of Covenants.................................................. 11

    5.7.   Commencement of Chapter 11 Cases and Bankruptcy Court Orders.................. 11

    5.8.   Assumption and Assignment of Assumed Contracts............................. 12

    5.9.   Sellers' Consent to Debt Purchase .................................................. 13

    5.10.  Insurance .................................................................................... 13

ARTICLE VI       CONDITIONS TO BUYER'S OBLIGATIONS....................................... 13

    6.1.   Debt Purchase .............................................................................. 13

-i-

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 6.2. | DIP Financing | 13 |
| 6.3. | Sale Order. | 13 |
| 6.4. | Assumption of Agreement | 13 |
| 6.5. | Cure Costs | 13 |
| 6.6. | Assumed Contracts | 14 |
| 6.7. | Covenants and Agreements Performed | 14 |
| 6.8. | Delivery of Agreements | 14 |
| 6.9. | Delivery of Title to Assets | 14 |
| 6.10. | No Prohibition or Proceedings | 14 |
| 6.11. | No Injunction or Statute | 14 |
| 6.12. | Material Adverse Effect | 14 |
| ARTICLE VII | CONDITIONS TO THE SELLERS' OBLIGATIONS | 14 |
| 7.1. | Sale Order. | 14 |
| 7.2. | Covenants and Agreements Performed | 14 |
| 7.3. | Delivery of Agreements | 14 |
| 7.4. | No Prohibition or Proceedings | 15 |
| 7.5. | No Injunction or Statute | 15 |
| 7.6. | Debt Purchase | 15 |
| ARTICLE VIII | TERMINATION PRIOR TO CLOSING | 15 |
| 8.1. | Termination | 15 |
| 8.2. | Effect of Termination | 16 |
| 8.3. | Effect on Obligations | 16 |
| 8.4. | Expense Reimbursement | 16 |
| ARTICLE IX | TAX MATTERS | 16 |
| 9.1. | Allocation | 16 |
| 9.2. | Transfer Taxes | 16 |
| 9.3. | Wage Reporting | 17 |
| 9.4. | Cooperation on Tax Matters | 17 |
| ARTICLE X | POST-CLOSING SUPPORT | 17 |
| 10.1. | Post-Closing Support | 17 |

-ii-

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE XI      MISCELLANEOUS ................................................................................ 17

    11.1.    Interpretive Provisions ...................................................................... 17

    11.2.    Entire Agreement .............................................................................. 18

    11.3.    Successors and Assigns ...................................................................... 18

    11.4.    Headings ............................................................................................ 18

    11.5.    Modification and Waiver ................................................................... 18

    11.6.    Expenses ............................................................................................ 18

    11.7.    Notices ............................................................................................... 18

    11.8.    Governing Law; Consent to Jurisdiction .......................................... 19

    11.9.    Public Announcements ...................................................................... 20

    11.10.  No Third Party Beneficiaries ............................................................ 20

    11.11.  Counterparts ...................................................................................... 20

ARTICLE XII     CERTAIN DEFINITIONS .......................................................................... 20

WEIL:\95541777\7\56228.0017

EXHIBITS

Exhibit A        Bidding Procedures

SCHEDULES

Schedule 1.1(a)(v)    Assumed Contracts
Schedule 4.2          Litigation
Schedule 4.3(a)       Assigned Intellectual Property
Schedule 4.3(b)       Junior Liens
Schedule 10.1         Post-Closing Support

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated December 4, 2015, is among KBIDC Investments, LLC, a Texas limited liability company ("Buyer"), Blue Matrix Labs, LLC, a Texas limited liability company (the "Company"), Hydro Toys, LLC, a Texas limited liability company ("Hydro Toys"), Paradise Beverage, LLC, a Texas limited liability company ("Paradise Beverage"), Paradise Beverage Logistics, LLC, a Texas limited liability company ("Paradise Logistics"), and SHAGS, LLC, a Texas limited liability company ("SHAGS" and, together with Hydro Toys, Paradise Beverage and Paradise Logistics, the "Subsidiaries" and, together with the Company, the "Sellers").

## RECITALS

A.      Prior to the date hereof, the Company was advanced funds pursuant to (i) that certain Promissory Note, dated September 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Chapman Promissory Note"), issued by the Company and held by Dave Chapman, an individual ("Chapman"), (ii) that certain Promissory Note, dated December 5, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Initial Kent Promissory Note"), issued by the Company and held by Kent BML Investments, LP, a Texas limited partnership ("Kent BML" and, together with Chapman, the "Lenders") as successor in interest to Jeffrey F. Kent, an individual, and (iii) that certain Amended and Restated Promissory Note, dated August 27, 2014 (as further amended, restated, amended and restated, supplemented or otherwise modified from time, the "Additional Kent Promissory Note" and, together with the Chapman Promissory Note and the Initial Kent Promissory Note, the "Promissory Notes"), issued by the Company and held by Kent BML.  As of the date hereof, $4,284,154.04 of principal and interest (excluding default interest) is due and owing under the Promissory Notes.

B.      The Company has insufficient liquidity to continue its operations and, subject to due authority, the Sellers have decided to file voluntary petitions (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Bankruptcy Court").

C.      Subject to Bankruptcy Court approval, Kent BML has agreed to provide the Company with a debtor in possession credit facility (the "DIP Financing") pursuant to that certain Debtor In Possession Credit Agreement (the "DIP Financing Agreement"), dated as of December 4, 2015, by and among the Company and Hydro Toys, as Borrowers thereunder, Paradise Beverage, Paradise Logistics and SHAGS, as Guarantors thereunder, and Kent BML, as Lender thereunder.

D.      The Manager (or similar governing body) of each Seller has determined that, based upon its due consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement, a sale, assignment, and assumption of the Acquired Assets and Assumed Liabilities pursuant to this Agreement under sections 363 and 365 of the Bankruptcy Code is in the best interests of such Seller.

E.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 363 and 365 of the Bankruptcy Code, the Sellers propose to sell and transfer, and Buyer proposes to buy and assume, certain of the assets and liabilities of the Sellers.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and upon the terms and subject to the conditions hereinafter set forth, the parties hereto, intending to be legally bound hereby, agree as follows:

ARTICLE I
THE TRANSACTION

1.1.    Purchase and Sale of Acquired Assets; Assumed Liabilities.

(a)      Purchase and Sale of Acquired Assets.  Subject to the terms and conditions hereof, at the Closing, each Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase from each Seller, all of such Seller's right, title and interest in and to all of such Seller's property and assets, real, personal or mixed, tangible and intangible, excluding only the Excluded Assets (the "Acquired Assets"), free and clear of all Encumbrances other than Permitted Encumbrances, including the following:

(i)      all cash and cash equivalents, security and like deposits, securities instruments and other investments and all bank accounts (subject to the limitations set forth in Section 1.1(b)(iii));

(ii)     all trade and other notes and accounts receivable, advance payments, deposits (including deposits on inventory), prepaid items and expenses, deferred charges, rights of offset and credits and claims for refund;

(iii)    all fixed assets and other personal property and interests therein, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and software and related documentation (including any source code or systems documentation associated therewith), stored data, communication equipment, trade fixtures and leasehold improvements;

(iv)     all rights, remedies and benefits of Sellers arising under or relating to any of the Acquired Assets or the Assumed Liabilities, including rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of equipment or inventory purchased or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

(v)      subject to Section 5.8, all rights under the Contracts listed on Schedule 1.1(a)(v) hereof (the "Assumed Contracts Schedule"), and all non disclosure agreements previously signed with prospective buyers for the Sellers' assets and business whether or not listed on Schedule 1.1(a)(v) hereof (the "NDAs"), except for any such Contracts

- 2 -

that Buyer elects to treat as Excluded Contracts at or before the Closing (together with the NDAs, the "Assumed Contracts");

(vi)     subject to Section 1.1(b), all information, files, records, correspondence, data, plans, and recorded knowledge, including customer and supplier lists, relating to the Acquired Assets and the Sellers' Business;

(vii)     telephone, email addresses, and fax numbers;

(viii)     all goodwill, choses in action, causes of action, judgments, actions, claims and rights of any kind as against others (whether by contract or otherwise) relating to any of the Acquired Assets (including the assigned Intellectual Property) or the Assumed Liabilities;

(ix)     originals of manuals, documents, correspondence, sales and credit reports, customer lists, literature, brochures, advertising or promotional material and the like;

(x)     all Intellectual Property owned (in whole or part) by the Sellers, together with all registrations and applications for the foregoing, all common law rights in the foregoing, all rights of action arising from the foregoing, including all claims for damages by reason of infringement of the foregoing and all present, past and future rights to sue and collect damages or seek injunctive relief for any such infringement;

(xi)     any Permits to the extent their transfer is permitted by applicable Law;

(xii)     all of Sellers' books and records pertaining primarily to Sellers' Business, including all books of account; provided, however, that Buyer shall preserve all books and records and similar financial and other records relating to business books and records, operating data and plans, together with all files, contracts, instruments and other documents pertaining to Sellers' Business or the Acquired Assets and Sellers shall have the right of reasonable access to and examination of such books and records, including the right to make copies thereof, for a period of two (2) years from the Closing Date upon reasonable notice to Buyer and during normal business hours;

(xiii)     all of the Sellers' rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect or any and all workers' compensation matters, claims, potential claims, purported claims and similar related items;

(xiv)     all of the Sellers' rights to receive any Tax refunds, rebates or credits, if any, the receipt of which by any of the Sellers will be promptly remitted to Buyer; and

(xv)     all insurance policies and benefits, including insurance rights and proceeds and including any accounts receivable credit insurance policy, rights and proceeds.

(b)     Excluded Assets.  Notwithstanding anything herein to the contrary, from and after the Closing, the Sellers shall retain all of their right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder,

WEIL:\95541777\7\56228.0017

and the Acquired Assets shall not include, solely the following assets and properties (such retained assets and properties being the "Excluded Assets"):

(i)     all Leases for real property not set forth on the Assumed Contracts Schedule (the "Excluded Leases");

(ii)     all Contracts not set forth on the Assumed Contracts Schedule or, if set forth on the Assumed Contracts Schedule, that Buyer elects by written notice to Sellers in accordance with Section 5.8 hereof to remove from the Assumed Contracts Schedule (together with the Excluded Leases and the Rejected Contracts, the "Excluded Contracts");

(iii)     cash in an amount equal to the aggregate amount of accrued and unpaid fees and expenses owed by Sellers on account of services provided to the Sellers after the Petition Date, but prior to the Closing, by (A) Taube Summers Harrison Taylor Meinzer Brown, LLP, (B) Bridgepoint Consulting, LLC and (C) Conley Rose, P.C.;

(iv)     all avoidance or preference actions under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code for the benefit of any Seller under the Bankruptcy Code;

(v)     all rights of the Sellers under this Agreement and any Ancillary Agreement;

(vi)     all assets (whether in trust or otherwise) with respect to any Benefit Plan of the Sellers; and

(vii)     any assets that Buyer elects to treat as Excluded Assets on or prior to Closing.

(c)     Assumed Liabilities.  Subject to the terms and conditions hereof, at the Closing, Buyer shall assume and agree to fully pay, discharge, satisfy and perform, all of the following liabilities and obligations of the Sellers (the "Assumed Liabilities"):

(i)     Cure Costs with respect to Assumed Contracts;

(ii)     liabilities and obligations arising after the Closing Date relating to or arising out of the Assumed Contracts, but excluding, for the avoidance of doubt, any and all liabilities or obligations under any Assumed Contracts of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, whether or not existing on the Closing Date, arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date other than the Cure Costs;

(iii)     liabilities and obligations arising after the Closing Date relating to or arising out of the Acquired Assets, but excluding, for the avoidance of doubt, any and all liabilities or obligations of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, whether or not existing on the Closing Date, arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or

- 4 -

operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date; and

(iv)    accounts payable relating to the Acquired Assets arising in the ordinary course of business after the Closing Date.

(d)    Excluded Liabilities.  Notwithstanding anything contained herein to the contrary, the Excluded Liabilities shall not be assumed by Buyer, but instead shall be retained, performed, paid or discharged by the Sellers.  The term "Excluded Liabilities" as used herein means any and all liabilities or obligations of any Seller or any of its affiliates of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, existing on the Closing Date, or arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date, excepting only the Assumed Liabilities, including the following:

(i)    any obligation or liability for Taxes incurred by any Seller in respect of any pre-Closing Tax period or portion thereof;

(ii)    any claim, obligation or liability in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(iii)    any Debt, including the Prepetition Advance Amount, any other amounts outstanding under the Promissory Notes and the DIP Financing;

(iv)    any fees, costs and expenses (including legal fees and accounting fees) incurred by any Seller in connection with the transactions contemplated by this Agreement or the Chapter 11 Cases, including all fees, costs and expenses incurred in connection with or by virtue of (A) the negotiation, preparation and review of this Agreement (including the exhibits and schedules hereto) and all Ancillary Agreements, (B) the preparation and submission of any filing or notice required to be made or given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any consent required to be obtained in connection with any of such transactions, and (C) the negotiation, preparation and review of the DIP Financing; and

(v)    any obligation or liability of any Seller arising out of this Agreement and any Ancillary Agreement.

## ARTICLE II
## PURCHASE PRICE; CLOSING

2.1.    Purchase Price; Payment.

(a)    The purchase price (the "Purchase Price") for the Acquired Assets is (i) $2,000,000 *plus* (ii) Cure Costs with respect to Assumed Contracts, *plus* (iii) the assumption by Buyer of the Assumed Liabilities.  The portion of the Purchase Price payable under subsection (i) hereof shall be paid by means of a credit against, first, all amounts due and owing under the DIP Financing Agreement as of the Closing Date and, second, the Prepetition Advance Amount.

- 5 -

(b)     Subject to the terms and conditions set forth in Section 5.8 hereof, Buyer shall pay and deliver an amount equal to the undisputed Cure Cost with respect each Assumed Contract to such contract counterparty by wire transfer of immediately available funds to the account of such contract counterparty provided by the Sellers in writing to Buyer, with such payment being made no later than two Business Days after the Closing Date, or if Buyer has not received wire transfer instructions with respect to an Assumed Contract counterparty within five Business Days prior to the Closing Date, by check mailed to the address listed for the Assumed Contract counterparty on Schedule 1.1(a)(v) hereto no later than two Business Days after the Closing Date.

2.2.    Bulk Sales Laws.  Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws that may apply to the sale and transfer of the Acquired Assets to Buyer.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any and all Encumbrances, other than Permitted Encumbrances, in each case pursuant to section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the date on which the Chapter 11 Cases were commenced, including any liens or claims arising out of the "bulk-transfer" Laws.

2.3.    Closing Date.  The closing of the transactions contemplated hereby (the "Closing") shall take place remotely on a date selected by Buyer that is no later than the third Business Day after all of the conditions set forth in ARTICLE VI and ARTICLE VII have been satisfied (other than those conditions that by their nature are only capable of being satisfied at the Closing, but subject to the fulfillment or waiver of such conditions at the Closing) or waived by Buyer in its sole and absolute discretion, or at such other place, time, or date as Buyer and the Sellers may agree in writing (such time and date being referred to herein as the "Closing Date"). For financial accounting and tax purposes, to the extent permitted by Law, the Closing shall be deemed to have become effective as of 12:01 a.m. (CST) on the Closing Date.

2.4.    Closing Deliveries.

(a)     Deliveries by Buyer to the Sellers.  At the Closing (or prior thereto), Buyer shall deliver or cause to be delivered the following to the Sellers, to the extent applicable with respect to Closing:

(i)     copies of resolutions duly adopted by the governing body of Buyer, authorizing and approving their performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein; and

(ii)    such other instruments and documents as the Sellers reasonably deem necessary to effect the transactions contemplated hereby.

(b)     Deliveries by the Sellers to Buyer.  At the Closing (or prior thereto), the Sellers shall deliver or cause to be delivered the following to Buyer:

(i)     all transfer documents with respect to the Acquired Assets, as may reasonably be requested by Buyer;

(ii)     a bill of sale, dated as of the date of the Closing, in form and substance satisfactory to Buyer (the "Bill of Sale");

(iii)     a duly executed certificate from the Company prepared in accordance with Treasury regulations Section 1.1445-2 and dated as of the Closing Date certifying that such Seller is not a foreign person; and

(iv)     such other instruments and documents as Buyer reasonably deems necessary to effect the transactions contemplated hereby.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Sellers as follows:

3.1.     Organization.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas, and has all requisite corporate power and authority to carry on its business as it is now being conducted, and to execute, deliver, and perform this Agreement and each Ancillary Agreement to which it is a party, and to consummate the transactions contemplated hereby and thereby.

3.2.     Authority.  The execution, delivery, and performance by Buyer of this Agreement, and each Ancillary Agreement to which Buyer is a party, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Buyer.  This Agreement has been, and each Ancillary Agreement to which Buyer is a party will be at Closing, duly and validly executed and delivered by Buyer and constitutes, or will constitute, the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its respective terms, except as such enforcement shall be limited by bankruptcy, insolvency, moratorium or similar law affecting creditors' rights generally and subject to general principles of equity.

3.3.     No Conflict.  Neither Buyer's execution and delivery of this Agreement or any Ancillary Agreements nor Buyer's consummation of the transactions contemplated herein will conflict with or result in a breach of any provision of Buyer's governing documents or any Law or Order to which Buyer is party or by which Buyer is bound.  Buyer is not party to or bound by any contract under which (a) the execution, delivery or performance by Buyer of the transactions contemplated herein will (i) constitute a default, breach or event of acceleration or (ii) amend, or give the counterparty thereto any right to amend, any material right or obligation of Buyer thereunder or (b) performance by Buyer according to the terms of this Agreement or the Ancillary Documents may be prohibited, prevented or delayed.

3.4.     Consents.  Except for the consent, approvals, authorization, exemptions or filings with Authorities in connection with the commencement of the Chapter 11 Cases and the entry of the Bid Procedures Order and the Sale Order, no consent, approval, or authorization of, or exemption by, or filing with, any Authority is required to be obtained or made by Buyer in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party.

WEIL:\95541777\7\56228.0017

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally make the following representations and warranties to Buyer with respect to itself and each other Seller, as applicable, each of which shall be true and correct as of the date of this Agreement and as of the Closing Date (except to the extent expressly relating to a specific date, in which event it shall be true and correct as of such date) and shall be unaffected by any investigation heretofore or hereafter made by or on behalf of Buyer:

4.1.  Due Diligence Materials.  All materials furnished by or on behalf of any Seller to Buyer as part of due diligence or otherwise as an inducement for Buyer to consummate the transactions contemplated herein are true and correct copies and complete in all material respects.

4.2.  Litigation.  Other than the Chapter 11 Cases, and other than as listed on Schedule 4.2 hereto, there are no lawsuits, administrative or other proceedings or investigations relating to the ownership or use of the Acquired Assets or conduct of business by Sellers or otherwise affecting the Acquired Assets or the Business pending, or, to the Sellers' knowledge, threatened against any Seller.  Other than pursuant to the Chapter 11 Cases, there are no judgments, orders or decrees of any Authority binding on any Seller that relate to the Acquired Assets or otherwise affect the Acquired Assets.  No Seller is in violation of any term of any judgment, decree, injunction or order entered by any court or Authority and outstanding against it relating to or with respect to the Business or any of the Acquired Assets.

4.3.  Obligations Under the Promissory Notes.  As of the date hereof, $4,284,154.04 of principal and interest (excluding default interest) is due and owing under the Promissory Notes (the "Prepetition Advance Amount").  Repayment of the Prepetition Advance Amount is secured by properly perfected, first and second priority liens on substantially all of the assets of the Company and all assets of the other Sellers to the extent such assets were assigned by the Company to the other Sellers (including all of the Intellectual Property listed on Schedule 4.3(a) hereto) (such assets, the "Collateral").  The Sellers acknowledge and agree that they have no defense to payment of the Prepetition Advance Amount, and such repayment obligation is not subject to any right of setoff or recoupment.  The Sellers hereby waive any right to challenge the Prepetition Advance Amount and the Promissory Notes on any grounds.  For the avoidance of doubt, any valid or asserted junior liens on the Collateral (including the liens listed on Schedule 4.3(b)) shall automatically, without further action by any party hereto or such valid or asserted junior lienholders, be deemed released upon entry of the final Sale Order.

4.4.  Assumed Contracts Schedule.  The Assumed Contracts Schedule sets forth the Sellers' best estimate of the Cure Costs for each executory contract or unexpired lease listed therein. The Sellers shall provide prompt written notice to Buyer of any material changes to the Cure Costs of which the Sellers become aware from and after the date hereof.

WEIL:\95541777\7\56228.0017

ARTICLE V
COVENANTS

5.1.     Access.  Prior to the Closing, upon reasonable notice from Buyer, the Sellers shall afford to the officers, attorneys, accountants or other authorized representatives of Buyer reasonable access during normal business hours to the employees, Acquired Assets, facilities and books and records of such Seller relating to the Acquired Assets then owned or previously owned and/or operated by such Seller so as to afford Buyer full opportunity to make such review, examination and investigation of such Acquired Assets as Buyer determines are reasonably necessary in connection with the consummation of the transactions contemplated hereby.  Buyer shall be permitted to make extracts from or to make copies of such books and records as may be reasonably necessary in connection therewith.  Prior to the Closing, the Sellers shall, and shall cause each Seller to, promptly furnish Buyer with access to such maintenance records, operating data and other information relating to the Acquired Assets then owned and/or operated by such Seller as Buyer may reasonably request.  The Sellers shall (a) promptly provide to Buyer all documents and materials relating to the proposed sale of the Acquired Assets, Assumed Contracts or any portion thereof, including (i) with respect to competing bids, copies of any (A) non-disclosure agreements entered into by the Sellers with any parties interested in purchasing some or all of the Acquired Assets and (B) competing bids (to the extent such bids are submitted in accordance with the bidding procedures approved by the Bankruptcy Court in connection with the sale) and (ii) objections to Cure Costs, and (b) otherwise cooperate with Buyer, to the extent reasonably necessary in connection with Buyer's preparation for or participation in any part of the Chapter 11 Cases in which Buyer's participation is necessary, required or reasonably appropriate.  The Sellers shall, and shall cause the other Sellers to, consult with Buyer with respect to any material written or oral communication concerning, in whole or in part, the transactions contemplated by this Agreement.

5.2.     Commercially Reasonable Efforts.  Prior to the Closing, each party hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including to (a) obtain any other consents or approvals as are necessary in connection with the consummation of the transactions contemplated hereby, (b) effect all registrations and filings as are necessary or desirable in connection with the consummation of the transactions contemplated hereby, (c) defend any lawsuits or other legal proceedings, whether judicial or administrative, whether brought by private parties or Authorities or officials, challenging this Agreement or the consummation of the transactions contemplated hereby, and (d) furnish to each other such information and assistance and to consult with each other with respect to the terms of any registration, filing, application or undertaking as may be reasonably requested in connection with the foregoing.

5.3.     Notification.

(a)     The Sellers shall promptly notify Buyer, and Buyer shall promptly notify Sellers, of any litigation, arbitration or administrative proceeding pending or, to their knowledge, threatened against any Seller or Buyer, as the case may be, that challenges or would materially affect the transactions contemplated hereby.

WEIL:\95541777\7\56228.0017

(b)     To the extent that any competing bid is submitted in accordance with the bidding procedures approved by the Bankruptcy Court in connection with the sale, the Sellers shall promptly, and in no event later than two Business Days after receipt, notify Buyer of any material correspondence related to other bidders (including any expressions of interest, submitted bids, and the terms and conditions of any bids submitted for the assets of any Seller), alleged defaults, amendments, Cure Costs, or termination of Assumed Contracts.  For the avoidance of doubt, such material correspondence shall not include communications related to the day-to-day provision of services under such Assumed Contracts.

(c)     The Sellers shall provide prompt written notice to Buyer of any change in any of the information contained in the representations and warranties and covenants made by Sellers in Article IV and V hereof, the due diligence information provided by the Sellers to Buyer, or any exhibits or schedules referred to herein or attached hereto and shall promptly furnish any information that Buyer may reasonably request in relation to such change; provided, however, that such notice shall not operate to cure any breach of the representations and warranties made by the Sellers in Article IV hereof or any exhibits or schedules referred to herein or attached hereto.

(d)     The Sellers shall promptly notify Buyer, and Buyer shall promptly notify the Sellers, of the occurrence of a Material Adverse Effect.

5.4.     No Inconsistent Action.  Neither Buyer nor any of the Sellers shall take any action that is materially inconsistent with its obligations under this Agreement, and the Sellers shall cause the other Sellers to refrain from taking any such action.

5.5.     Further Assurances.

(a)     Between the date of this Agreement and Closing, at the direction of Buyer, the Sellers will use commercially reasonable efforts to enforce their rights under the Assumed Contracts.  If, however, enforcing such rights will result in the Sellers incurring costs exceeding the DIP Budget (as such term is defined in the DIP Financing Agreement), then Sellers shall have no obligation to enforce such rights unless Buyer agrees to reimburse Sellers for reasonably incurred out-of-pocket expenses in pursuing the same.

(b)     After the Closing, each party hereto shall, at the request of any other party hereto, execute and deliver any further instruments or documents and take all such further action as the requesting party may reasonably request in order to evidence the consummation of the transactions contemplated hereby.

(c)     After the Closing, each Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that any Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Acquired Assets or relates to the Assumed Liabilities.  After the Closing, Buyer shall promptly transfer or deliver to the Sellers cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Excluded Liabilities.

- 10 -

(d)     From and after the Closing Date, Buyer and the Sellers shall furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and reasonable assistance relating to the Acquired Assets (including reasonable access to books and records and employees who have direct knowledge regarding the Acquired Assets) as is reasonably necessary for (i) the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax; (ii) winding down the Sellers' operations, and (iii) any other reasonable business purpose relating to (x) the Sellers' ownership of the Acquired Assets or the Assumed Liabilities before the Closing or (y) Buyer's ownership of the Acquired Assets or the Assumed Liabilities after the Closing.

5.6.     Specific Enforcement of Covenants.  The Sellers acknowledge that irreparable damage would occur in the event that any of the covenants and agreements of the Sellers set forth in this Agreement were not timely performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that Buyer shall be entitled to an injunction or injunctions to prevent or cure any breach of such covenants and agreements of Sellers and to enforce specifically the terms and provisions thereof, this being in addition to any other remedy to which it may be entitled at law or in equity, it being understood that the Bankruptcy Court shall have exclusive jurisdiction over such matters; provided, however, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this sentence or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

5.7.     Commencement of Chapter 11 Cases and Bankruptcy Court Orders.

(a)     No later than two Business Days after the date hereof, each of the Sellers shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

(b)     No later than three calendar days after the Petition Date, the Sellers shall file one or more motions in the Bankruptcy Court, each in form and substance satisfactory to Buyer:

(i)     seeking shortened notice for a hearing on entry of the Bid Procedures Order in accordance with the Bankruptcy Rules and the Local Rules to a date that is no later than ten calendar days after the Petition Date; and

(ii)     requesting that the Bankruptcy Court enter the Bid Procedures Order (the "Bid Procedures Motion") approving the Bidding Procedures, that include a Bid Deadline that is no later than 21 calendar days after the entry of the Bid Procedures Order;

(iii)     requesting a hearing on entry of the Sale Order to occur no later than two Business Days after the Auction is held (or two Business Days after the Bid Deadline if no Auction is held), and for the Closing to occur no later than the first Business Day following 45 calendar days after the Petition Date.

- 11 -

(c)     If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), the Sellers shall consult with Buyer regarding the status of any such actions and, at Buyer's request, diligently defend against such appeal, petition or motion and use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

(d)     The Sellers shall (i) consult with Buyer and its representatives concerning the Sale Order, (ii) reasonably consult with Buyer and its representatives concerning any other Orders of the Bankruptcy Court and the bankruptcy proceedings in connection therewith and (iii) provide Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings not less than three calendar days prior to any submission thereof to the Bankruptcy Court. The Sellers further covenant and agree that, after the Closing, the terms of any chapter 11 plan of reorganization or liquidation or any other plan, document, pleading or agreement that administers the assets of the Sellers' estates they submit to the Bankruptcy Court or any other court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Sale Order.

5.8.    <u>Assumption and Assignment of Assumed Contracts</u>.

(a)     Concurrently with the filing of the Bid Procedures Motion, the Sellers shall provide written notice, in form and substance acceptable to Buyer, to each of the counterparties to the Contracts listed on the Assumed Contracts Schedule that, at the option of Buyer, the Sellers may assume and assign to Buyer such counterparty's Contract, notifying each such counterparty of the proposed Cure Costs for such Contract (each such notice, a "<u>Counterparty Notice</u>"). Each Counterparty Notice shall inform the counterparty that, if such counterparty objects to the assumption or assignment of its Contract or the amount of the Cure Costs arising prior to the Closing under such Contract, such counterparty must provide written notice of such objection to the Sellers and Buyer within 20 calendar days after the Petition Date.

(b)     At or prior to the Closing, Buyer may elect to exclude any Contract as an Assumed Contract (in which case it shall become an Excluded Contract) by providing to the Sellers written notice of its election to exclude such Contract.

(c)     If a party to a Contract set forth on the Assumed Contracts Schedule timely objects (in accordance with the Counterparty Notice delivered to such counterparty) to the assumption or assignment or the amount of the Cure Costs payable with respect to such Contract, the Sellers shall request that the Bankruptcy Court hear and determine such objection on an expedited basis. If such objection has not been resolved prior to the Closing (whether by an order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty), Buyer may elect, in its sole and absolute discretion, one of the following options: (i) treat such Contract as an Excluded Contract, (ii) defer the Closing until the resolution of such objection (by order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty), or (iii) temporarily treat the Contract as an Excluded Contract (a "<u>Designated Contract</u>"), proceed to

- 12 -

Closing, and determine whether to treat the Designated Contract as an Assumed Contract or an Excluded Contract within two Business Days after resolution of such objection (whether by an order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty).

(d)     Without the prior written consent of Buyer, prior to Closing the Sellers shall not assume or reject any Contract.

5.9.     <u>Sellers' Consent to Debt Purchase</u>.  Solely to the extent required (including as required by applicable law), the Sellers hereby consent to the assignment or transfer of the interests of the Lenders under the Promissory Notes and related security documents and interests to Buyer and agree that, to the extent necessary, Buyer and its respective affiliates shall not be prohibited assignees or transferees thereunder.

5.10.     <u>Insurance</u>.  Sellers shall maintain in full force and effect insurance covering the Acquired Assets through the Closing Date.

ARTICLE VI<br>CONDITIONS TO BUYER'S OBLIGATIONS

The obligation of Buyer to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

6.1.     <u>Debt Purchase</u>.  Concurrently with the Closing, the Lenders shall have assigned or otherwise transferred their interests in the Promissory Notes and related security documents to Buyer pursuant to agreements in form and substance satisfactory to Buyer.

6.2.     <u>DIP Financing</u>.  Concurrently with the execution of this Agreement, and in no event later than one Business Day after the execution of this Agreement, the Company shall have entered into the DIP Financing Agreement with Buyer.  The Bankruptcy Court shall have entered orders in form and substance satisfactory to Buyer approving and authorizing the DIP Financing and use of cash collateral, and no defaults exist under such orders or the DIP Financing Agreement.

6.3.     <u>Sale Order</u>. The Bankruptcy Court has entered the final, binding and unappealable Sale Order.

6.4.     <u>Assumption of Agreement</u>.  The Bankruptcy Court has entered a final, binding and unappealable order approving the assumption of this Agreement by the Sellers, which order may be the Sale Order.

6.5.     <u>Cure Costs</u>.  The aggregate estimated Cure Costs on the date of this Agreement for all Contracts listed on the Assumed Contracts Schedule that are Assumed Contracts at Closing shall not exceed the aggregate actual Cure Costs for such Assumed Contracts at Closing by more than 25%.

6.6.     Assumed Contracts.  The Bankruptcy Court has not entered an Order determining that any Assumed Contract may not be assumed by any of the Sellers or assigned to Buyer.

6.7.     Covenants and Agreements Performed.  The Sellers shall have performed or complied with in all material respects all covenants required by this Agreement to be performed or satisfied before the Closing.

6.8.     Delivery of Agreements.  The Sellers shall have delivered all agreements (including the Ancillary Agreements) required by this Agreement to be delivered to Buyer before the Closing.

6.9.     Delivery of Title to Assets.  The Sellers shall have delivered all transfer documents, including the Bill of Sale, with respect to the Acquired Assets, as may reasonably be requested by Buyer, to place Buyer in full possession and control of the Acquired Assets at the Closing.

6.10.    No Prohibition or Proceedings.  No litigation, action, investigation, inquiry or request for information by any Authority and no legal or administrative proceeding shall have been instituted that seeks to restrict, limit, prohibit or enjoin the transactions contemplated by this Agreement.

6.11.    No Injunction or Statute.  No statute, rule, regulation, executive order, decree, injunction or other order enacted, entered, promulgated, enforced or issued by any Authority preventing consummation of the transactions contemplated by this Agreement shall be in effect on the Closing Date.

6.12.    Material Adverse Effect.  At the Closing Date, there is no, and since the date hereof, there has not been a Material Adverse Effect.

ARTICLE VII
CONDITIONS TO THE SELLERS' OBLIGATIONS

The obligations of the Sellers to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

7.1.     Sale Order. The Bankruptcy Court has entered the final, binding Sale Order

7.2.     Covenants and Agreements Performed.  Buyer shall have performed or complied with in all material respects all covenants required by this Agreement to be performed or satisfied before the Closing.

7.3.     Delivery of Agreements.  Buyer shall have delivered all agreements (including the Ancillary Agreements) required by this Agreement to be delivered to the Sellers before the Closing.

- 14 -

7.4.    <u>No Prohibition or Proceedings</u>.  No litigation, action, investigation, inquiry or request for information by any Authority and no legal or administrative proceeding shall have been instituted that seeks to restrict, limit, prohibit or enjoin the transactions contemplated by this Agreement.

7.5.    <u>No Injunction or Statute</u>.  No statute, rule, regulation, executive order, decree, injunction or other order enacted, entered, promulgated, enforced or issued by any Authority preventing consummation of the transactions contemplated by this Agreement shall be in effect on the Closing Date.

7.6.    <u>Debt Purchase</u>.  Concurrently with the Closing, the Lenders shall have assigned or otherwise transferred their interests in the Promissory Notes and related security documents to Buyer pursuant to agreements in form and substance satisfactory to Buyer.

ARTICLE VIII
<u>TERMINATION PRIOR TO CLOSING</u>

8.1.    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing upon the occurrence of any of the following:

(a)    By the mutual written consent of Buyer and the Company on behalf of the Sellers;

(b)    By Buyer if the Closing has not occurred on or prior to the date that is the earlier of (i) 45 calendar days after the Petition Date and (ii) two Business Days after entry of the Sale Order; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(b)</u> shall not be available to Buyer if Buyer's failure to perform any of Buyer's obligations under this Agreement required to be performed by it at or prior to the Closing has been the cause of, or resulted in, the failure of the Closing to occur;

(c)    By Buyer (i) if, other than with respect to deviations from any deadlines or milestones in this Agreement (and except as provided in <u>Section 8.1(b)</u> and this <u>Section 8.1 (c)</u>), the Bankruptcy Court refuses to enter the Bid Procedures Order, (ii) if no Auction is held, the Closing has not occurred on or prior to the date that is 35 calendar days after the Petition Date; and (iii) if an Auction is held, the Closing has not occurred on or prior to the date that is 45 calendar days after the Petition Date.

(d)    By Buyer if the Bid Procedures Order or the Sale Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(e)    By Buyer or the Company on behalf of the Sellers if the Sellers comply with the Bid Procedures Order and accept a Qualified Bid (as defined in the Bid Procedures Order) from a Person other than Buyer or its permitted transferee; or

(f)    By the Sellers by written notice to Buyer if there has been a material breach by Buyer of any of the covenants or agreements made by Buyer in this Agreement, and such breach (if curable) has not been cured or waived within 10 calendar days after written notice of the same.

- 15 -

If Sellers fail to perform following entry of the Sale Order and are not entitled to terminate this Agreement pursuant to Section 8.1(f) hereof, then Buyer may seek an order from the Bankruptcy Court directing specific performance of this Agreement by the Sellers.

8.2.    Effect of Termination.  Sellers agree to waive any and all claims, rights and remedies against Buyer in the event that Buyer terminates the Agreement in accordance with the terms of this Article VIII.

8.3.    Effect on Obligations.  Termination of this Agreement pursuant to Section 8.1 shall terminate all obligations of the parties hereunder, except for their obligations under Article VIII and Article XI hereof.

8.4.    Expense Reimbursement.  If this Agreement is terminated in accordance with Section 8.1(e), then the Sellers shall, no later than three (3) Business Days after the date on which closing of the Alternative Transaction occurs, credit the Expense Reimbursement against any undrawn amounts available under the DIP Financing and, to the extent there is no availability under the DIP Financing, pay Buyer the Expense Reimbursement.  The Expense Reimbursement shall constitute an administrative expense of the Sellers.  The parties to this Agreement hereby acknowledge that (a) the approval of the Expense Reimbursement is an integral part of the transactions contemplated herein, (b) in the absence of the Sellers' obligation to pay the Expense Reimbursement, Buyer would not have entered into this Agreement; (c) the entry by Buyer into this Agreement is necessary for the preservation of the Sellers' estates and is beneficial to the Sellers because, in the Sellers' business judgment, it will enhance the Sellers' ability to maximize the value of their assets for the benefit of their creditors, (d) the Expense Reimbursement is reasonable in relation to Buyer's efforts and to the magnitude of the transactions contemplated herein and Buyer's lost opportunities resulting from the time spent pursuing such transactions, and (e) the Expense Reimbursement is intended to cover any reimbursement of expenses of Buyer in the event of a termination upon the occurrence of the events set forth in Section 8.1(e).

ARTICLE IX
TAX MATTERS

9.1.    Allocation.  The Purchase Price and other relevant items (including the Assumed Liabilities) shall be allocated for purposes of this Agreement and for federal, state, local and foreign Tax purposes in accordance with a statement delivered by Buyer to the Sellers as soon as reasonably practicable after the Close Date (the "Allocation Statement").  The Allocation Statement shall be prepared by Buyer in a manner consistent with (a) the requirements of Section 1060 of the Code, and any corresponding requirements of any state, local or foreign Tax Law and (b) the principles and methodology prepared by Buyer and delivered to the Sellers no less than three Business Days prior to the Closing Date.

9.2.    Transfer Taxes.  All Taxes, including all state and local and all recording and filing fees (collectively, the "Transfer Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets or otherwise as a result of the transactions contemplated by this Agreement, and that are not exempt under section 1146(a) of the Bankruptcy Code, shall be borne by Buyer.  Buyer and the Sellers shall cooperate to (a)

- 16 -

determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transfer Taxes with any and all appropriate taxing authorities.

9.3.    <u>Wage Reporting</u>.  As of the Closing, the Sellers agree to join in any election made by Buyer regarding the procedure to be utilized with respect to wage reporting set forth in Revenue Procedure 2004-53.

9.4.    <u>Cooperation on Tax Matters</u>.  Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as is practicable, such information and assistance relating to the Sellers and the Acquired Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer and the Sellers shall retain all books and records with respect to Taxes for any period up to and including the Closing Date, pertaining to the Sellers and the Acquired Assets or the Assumed Liabilities, until the earlier of (a) seven years following the Closing Date and (b) the liquidation, dissolution or winding up of the Sellers.  At the end of such period, each party shall provide the others with at least 30 calendar days prior written notice before destroying such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.

## ARTICLE X
## POST-CLOSING SUPPORT

10.1.    <u>Post-Closing Support</u>.  At Buyer's election, Sellers shall provide Buyer with the services set forth on <u>Schedule 10.1</u> hereof until the earlier of six months after the Closing Date and the date on which Buyer notifies Sellers that such post-closing support is no longer required, and Buyer shall compensate Sellers for such services at the amount set forth in <u>Schedule 10.1</u>.

## ARTICLE XI
## MISCELLANEOUS

11.1.    <u>Interpretive Provisions</u>.

(a)    Whenever used in this Agreement, (i) "including" (or any variation thereof) means including without limitation, and (ii) any reference to gender shall include all genders.

(b)    The parties acknowledge and agree that (i) each party and its counsel have reviewed the terms and provisions of this Agreement and have contributed to its drafting, (ii) the normal rule of construction, to the effect that any ambiguities are resolved against the drafting party, shall not be employed in the interpretation of it, and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

11.2.    Entire Agreement.  This Agreement (including the certificates, schedules and exhibits attached hereto) together with the Ancillary Agreements constitute the sole understanding and agreement of the parties with respect to the subject matter hereof.

11.3.    Successors and Assigns.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; provided, however, that this Agreement may not be assigned by any Seller without the prior written consent of Buyer or be assigned by Buyer without the prior written consent of the Sellers, except that (a) Buyer may, at its election and provided it remains liable for its obligations hereunder, assign this Agreement to one or more affiliates of Buyer, and (b) Buyer or any such assignee may make a collateral assignment of its rights (but not its obligations) under this Agreement to any lender providing financing to Buyer in connection with the Closing.

11.4.    Headings.  The headings of the Articles, Sections, and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

11.5.    Modification and Waiver.  No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by Buyer and the Company on behalf of the Sellers, except that any of the terms or provisions of this Agreement may be waived in writing at any time by the party that is entitled to the benefits of such waived terms or provisions.  No single waiver of any of the provisions of this Agreement shall be deemed to or shall constitute, absent an express statement otherwise, a continuous waiver of such provision or a waiver of any other provision hereof (whether or not similar).  No delay on the part of any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

11.6.    Expenses.  Except as otherwise expressly provided herein, each of the parties hereto shall bear the expenses incurred by that party incident to this Agreement and the transactions contemplated hereby, including all fees and disbursements of counsel and accountants retained by such party, whether or not the transactions contemplated hereby shall be consummated.

11.7.    Notices.  All notices and other communications required or permitted under this Agreement (a) must be in writing, (b) will be duly given (i) when delivered personally to the recipient or sent to the recipient by email or (ii) one Business Day after being sent to the recipient by nationally recognized overnight private carrier (charges prepaid) and (c) addressed as follows (as applicable):

WEIL:\95541777\7\56228.0017

to the Sellers, to:

Blue Matrix Labs, LLC
Attention: Bill Patterson
1575 IH 35 North
New Braunfels, TX 78130
E-Mail: bpatterson@bridgepointconsulting.com

with a copy to:

Taube Summers Harrison Taylor Meinzer Brown, LLP
Attention: Morris D. Weiss
100 Congress Avenue, 19th Floor
Austin, TX 78701
E-Mail: mweiss@taubesummers.com

to Buyer to:

KBIDC Investments, LLC
Attention: Jeff Kent
15664 IH 35
Selma, TX 78154
E-Mail: ███████████████████████

with a copy to:

Weil, Gotshal & Manges LLP
Attention: Gabriel F. Gregson and Eric Schwartzman
201 Redwood Shores Parkway
Redwood Shores, CA 94065
E-Mail:  gabriel.gregson@weil.com;
          eric.schwartzman@weil.com

or at such other contact details for a party as shall be specified by like notice.

      11.8.  <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to the principles of conflicts of law thereof that would defer to the substantive laws of any other jurisdiction.  The parties agree that, during the period from the Petition Date until the date on which the Chapter 11 Cases are closed or dismissed (the "<u>Bankruptcy Period</u>"), the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any other agreement entered into in connection herewith.  The parties further agree that, after the Bankruptcy Period, any action or proceeding with respect to such controversy, claim or dispute shall be brought against any of the parties exclusively in either the United States District Court for the Western District of Texas, San Antonio Division or any state court of the state of Texas in Travis County, and each of the parties hereby consents to the personal jurisdiction of such court

and the Bankruptcy Court (and to the appropriate appellate courts) in any such action or proceeding and waives any objection, including any objection to the laying of venue or on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of such action or proceeding in such respective jurisdictions. Each party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding. Each party acknowledges and agrees that any controversy that may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury.

11.9.  <u>Public Announcements</u>.  Prior to the commencement of the Chapter 11 Cases, no Seller shall make any public statements or announcements with respect to this Agreement and the transactions contemplated herein without the prior written consent of Buyer except as may be required by law; <u>provided</u>, <u>however</u>, that the foregoing does not apply to communications made by any party hereto with respect to evaluating, documenting, or negotiating this Agreement. From the commencement of the Chapter 11 Cases until Closing, no Seller shall make any public statements, including any press releases, with respect to this Agreement and the transactions contemplated herein without the prior written consent of Buyer (which consent shall not be unreasonably withheld) except as may be required by law. If a public statement is required to be made by law, the Sellers shall consult with Buyer in advance as to the contents and timing thereof. Notwithstanding the foregoing, nothing in this paragraph is intended to limit the right of the Sellers to make appropriate filings with the Bankruptcy Court and to comply with any Orders of the Bankruptcy Court with respect to, inter alia, the marketing of the assets of the Sellers.

11.10.  <u>No Third Party Beneficiaries</u>.  This Agreement is intended and agreed to be solely for the benefit of the parties hereto and their permitted successors and assigns, and no other party shall be entitled to rely on this Agreement or accrue any benefit, claim, or right of any kind whatsoever pursuant to, under, by, or through this Agreement.

11.11.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument. Delivery of an executed signature page of this Agreement by electronic transmission shall be as effective as delivery of a manually executed counterpart thereof.

ARTICLE XII
CERTAIN DEFINITIONS

12.1.  "<u>Acquired Assets</u>" has the meaning ascribed to it in <u>Section 1.1(a)</u>.

12.2.  "<u>Additional Kent Promissory Note</u>" has the meaning ascribed to it in the Recitals to this Agreement.

12.3.  "<u>Allocation Statement</u>" has the meaning ascribed to it in <u>Section 9.1</u>.

- 20 -

12.4.   "<u>Alternative Transaction</u>" means (i) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any part of the Acquired Assets or the Sellers' Business or any rights thereto or therein by any Seller (other than the transfer thereof to Buyer or its affiliates in accordance with this Agreement) or (ii) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any portion of the equity interests in any Seller, in each case whether structured or effected (or contemplated to be structured or effected) as an agreement, a plan of reorganization, or otherwise.

12.5.   "<u>Ancillary Agreement</u>" means any agreement, exhibit, schedule, statement, document or certificate executed or delivered in accordance with, in connection with or required by this Agreement, and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Agreement.

12.6.   "<u>Assumed Contracts</u>" has the meaning ascribed to it in <u>Section 1.1(a)(v)</u>.

12.7.   "<u>Assumed Contracts Schedule</u>" has the meaning ascribed to it in <u>Section 1.1(a)(v)</u>.

12.8.   "<u>Assumed Liabilities</u>" has the meaning ascribed to it in <u>Section 1.1(c)</u>.

12.9.   "<u>Auction</u>" means the public sale of the Acquired Assets contemplated by the Bid Procedures Order.

12.10.   "<u>Authority</u>" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity, agency, court or authority (foreign, federal, state or local) exercising executive, legislative, judicial, regulatory or administrative functions of government or any arbitrator or mediator.

12.11.   "<u>Bankruptcy Code</u>" has the meaning ascribed to it in the Recitals to this Agreement.

12.12.   "<u>Bankruptcy Court</u>" has the meaning ascribed to it in the Recitals to this Agreement.

12.13.   "<u>Bankruptcy Period</u>" has the meaning ascribed to it in <u>Section 11.8</u>.

12.14.   "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedures.

12.15.   "<u>Benefit Plans</u>" means all "employee benefit plans," as defined in Section 3(3) of ERISA and all other retirement, profit sharing, bonus, stock, stock option, equity-based, profits interest, employment, change in control, health, life, disability, group insurance, savings, deferred compensation, incentive compensation, paid time off, severance, salary continuation and other fringe benefit arrangements, plans, programs, contracts, policies, or practices maintained, contributed to, or required to be contributed to by any Seller or any ERISA Affiliate for the benefit of any current or former employee, officer, director, member, partner or

independent contractor of any Seller or with respect to which any Seller or any ERISA Affiliate may have any liability.

12.16. "Bid Deadline" has the meaning ascribed to it in the Bidding Procedures.

12.17. "Bid Procedures Motion" has the meaning ascribed to it in Section 5.7(b).

12.18. "Bid Procedures Order" means the order of the Bankruptcy Court in form and substance acceptable to Buyer, (i) fixing the date, time and location of the hearing to approve consummation of the transactions contemplated by this Agreement, (ii) fixing the time, date and location of an auction, (iii) approving Buyer as the "stalking horse" bidder as part of the Auction, (iv) approving the Expense Reimbursement, (v) approving the form and manner of sale notice and bidding procedures notice, (vi) approving procedures for the assumption and, if necessary, assignment of executory contracts and unexpired leases, (vii) containing such other appropriate buyer protections as may be required by Buyer, and (viii) otherwise approving the Bidding Procedures.

12.19. "Bidding Procedures" means the bidding procedures attached as Exhibit A hereto.

12.20. "Bill of Sale" has the meaning ascribed to it in Section 2.4(b).

12.21. "Business" means the business of the Sellers, including the design, development, researching, marketing, sale, licensing, manufacturing or provision of any products or technology related to the Sellers' past, current and planned line of products.

12.22. "Business Day" means any day other than a day on which banks in the State of Texas are required or authorized to be closed.

12.23. "Buyer" has the meaning ascribed to it in the preamble to this Agreement.

12.24. "Chapman" has the meaning ascribed to it in the Recitals to this Agreement.

12.25. "Chapman Promissory Note" has the meaning ascribed to it in the Recitals to this Agreement.

12.26. "Chapter 11 Cases" has the meaning ascribed to it in the Recitals to this Agreement.

12.27. "Closing" has the meaning ascribed to it in Section 2.3.

12.28. "Closing Date" has the meaning ascribed to it in Section 2.3.

12.29. "Code" means the Internal Revenue Code of 1986, as amended.

12.30. "Company" has the meaning ascribed to it in the preamble to this Agreement.

12.31.  "Contracts" means all written or oral agreements, contracts, leases, or commitments to which any Seller is a party or by which any Seller or any of their properties or assets is bound as of the date hereof and between the date hereof and the Closing Date.

12.32.  "Counterparty Notice" has the meaning ascribed to it Section 5.8(a).

12.33.  "Cure Costs" means, with respect to an Assumed Contract, an amount in cash equal to such amount as may be agreed upon with the counterparty to such Assumed Contract; such amount to constitute satisfaction of the liabilities of the applicable Seller or Sellers arising under an Assumed Contract prior to the Closing Date, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the Closing Date.

12.34.  "Debt" means all principal, interest, premiums, penalties or other obligations related to (i) all indebtedness of any Seller for borrowed money, (ii) all obligations (contingent or otherwise) of any Seller for the deferred purchase price of property or services (including notes payable to the sellers of such property or services), (iii) all obligations of any Seller evidenced by notes, bonds, debentures or other similar instruments, (iv) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by any Seller, (v) all obligations of any Seller as lessee or lessees under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (vi) all obligations, contingent or otherwise, of any Seller under acceptance, letter of credit or similar facilities, (vii) all Debt of the type referred to in clauses (i) through (vi) above guaranteed directly or indirectly in any manner by any Seller, or in effect guaranteed directly or indirectly by any Seller through an agreement (a) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (b) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (c) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (d) otherwise to assure a creditor against loss; provided, that such Debt referred under this clause (vii) is of the type that would be reflected as debt on a balance sheet prepared in accordance with GAAP, and (viii) all accrued but unpaid interest (or interest equivalent) to the date of determination, and all prepayment premiums or penalties payable upon repayment of any items of Debt of the type referred to in clauses (i) through (vii) above.

12.35.  "Designated Contract" has the meaning ascribed to it in Section 5.8(c).

12.36.  "DIP Financing" has the meaning ascribed to it in the Recitals to this Agreement.

12.37.  "DIP Financing Agreement" has the meaning ascribed to it in the Recitals to this Agreement.

12.38.  "Encumbrances" means any charge, claims (as defined in section 101(5) of the Bankruptcy Code, including claims for successor liability under any theory of Law or equity), liability, community or other marital property interest, condition, easement,

encroachment, encumbrance, license, equitable interest, liens (as defined in section 101(37) of the Bankruptcy Code), mortgage, deed of trust, option, pledge, security interest, servitude, right of way, right of first refusal, lease, encumbrance, option, or other restriction or third party right, imperfection of title, restrictive covenant, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or any other restrictions.

12.39.  "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

12.40.  "ERISA Affiliate" means any person, entity, trade or business (whether or not incorporated) that is treated as a single employer with any Seller under Section 414 of the Code.

12.41.  "Excluded Assets" has the meaning ascribed to it in Section 1.1(b).

12.42.  "Excluded Contracts" has the meaning ascribed to it in Section 1.1(b)(ii).

12.43.  "Excluded Leases" has the meaning ascribed to it in Section 1.1(b)(i).

12.44.  "Excluded Liabilities" has the meaning ascribed to it in Section 1.1(d).

12.45.  "Expense Reimbursement" means the aggregate amount of the reasonably incurred costs and expenses paid or incurred by or on behalf of Buyer or its affiliates relating to or in connection with (i) the purchase of the Sellers' Business, including the transactions contemplated by this Agreement and any documents or agreements related hereto, (ii) the negotiation, preparation, execution or performance of agreements relating to the purchase of the Sellers' Business, including this Agreement, and certain documents or agreements related thereto, (iii) business, financial, legal, accounting, tax, and other due diligence relating to the Sellers' Business, and (iv) the diligence, analysis, negotiation, preparation, or execution of any contracts or arrangements with any current or prospective lessors, vendors, agents, or payees of the Sellers and the Sellers' Business; provided, however, that the Expense Reimbursement shall not exceed $75,000 in the aggregate.  The Expense Reimbursement shall be subject to reasonable documentation, which documentation shall, upon written request, be provided to the Sellers, the official committee of unsecured creditors appointed in the Chapter 11 Cases and the Office of the United States Trustee.

12.46.  "GAAP" means United States generally accepted accounting principles consistently applied throughout the relevant periods.

12.47.  "Hydro Toys" has the meaning ascribed to it in the preamble to this Agreement.

12.48.  "Initial Kent Promissory Note" has the meaning ascribed to it in the Recitals to this Agreement.

12.49.  "Intellectual Property" means any and all intellectual property rights and other similar proprietary rights in any jurisdiction, whether registered or unregistered, whether owned or held for use under license, including all rights and interests pertaining to or deriving

from:  (i) patents and patent applications, reexaminations, extensions and counterparts claiming priority therefrom; inventions, invention disclosures, discoveries and improvements, whether or not patentable; (ii) computer software and firmware, including data files, source code, object code and software-related specifications and documentation; (iii) works of authorship; (iv) trade secrets (including, those trade secrets defined in the Uniform Trade Secrets Act and under corresponding foreign statutory Law and common law), business, technical and know-how information, non-public information, and confidential information and rights to limit the use or disclosure thereof by any Person; (v) trademarks, trade names, service marks, certification marks, service names, brands, trade dress and logos and the goodwill associated therewith; (vi) proprietary databases and data compilations and all documentation relating to the foregoing, including manuals, memoranda and records; and (vii) domain names; including in each case any registrations of, applications to register, and renewals and extensions of, any of the foregoing with or by any Authority in any jurisdiction.

12.50. "Kent BML" has the meaning ascribed to it in the Recitals to this Agreement.

12.51.  "Law" means any federal, state, local, municipal, foreign, international, multinational or other constitution, statute, law, rule, regulation, ordinance, code, principle of common law or treaty.

12.52.  "Leases" mean all written or oral leases and subleases of real property to which any Seller is a party (as lessor, lessee, sublessee, licensee or otherwise).

12.53.  "Lenders" has the meaning ascribed to it in the Recitals to this Agreement.

12.54. "Local Rules" means the Local Court Rules of the United States Bankruptcy Court For the Western District of Texas, Effective November 1, 2014, as may be amended and supplemented from time to time by the Bankruptcy Court.

12.55.  "Material Adverse Effect" means any circumstance or event that is material and adverse to the business, properties, operations, assets, liabilities (including contingent liabilities), condition (financial or otherwise), prospects, results of operations or material Contracts of the Sellers; provided, however, the events leading up to the filing of the Chapter 11 Cases and the act and effects caused directly by the filing of the Chapter 11 Cases shall not, in and of itself, be deemed to constitute or give rise to a Material Adverse Effect.  The foregoing notwithstanding, no fact, circumstance, change or event will be deemed to be or have a Material Adverse Effect if it results from (i) changes in economic conditions that generally affect the industry in which the Sellers operate, (ii) changes in financial or operating performance because of seasonal variations, (iii) changes in applicable Laws and Orders that generally affect the industry in which the Sellers operate, (iv) acts of war, sabotage or terrorism, military actions or the escalation thereof, (v) changes in applicable accounting rules or principles, including changes in GAAP, (vi) any action required by this Agreement, or (vii) the announcement of the transactions contemplated herein.

12.56. "NDAs" shall have the meaning ascribed to it in Section 1.1(a)(v).

12.57.  "<u>Order</u>" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Authority.

12.58.  "<u>Paradise Beverage</u>" has the meaning ascribed to it in the preamble to this Agreement.

12.59.  "<u>Paradise Logistics</u>" has the meaning ascribed to it in the preamble to this Agreement.

12.60.  "<u>Permits</u>" means all governmental or other industry permits, registrations, certificates, certifications, exemptions, licenses, franchises, consents, approvals and authorizations.

12.61.  "<u>Permitted Encumbrances</u>" means (i) statutory liens for Taxes not yet due, (ii) liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, (iii) zoning Laws and other land use restrictions that do not materially impair the present or anticipate value or use of the encumbered asset, and (iv) in the case of leased property, all matters, whether or not of record, affecting the title of the lessor (and any underlying lessor) that do not materially impair the present or anticipate value or use of the encumbered asset.

12.62.  "<u>Person</u>" or "<u>person</u>" means an individual, corporation, partnership, association, limited liability company, trust, unincorporated organization, other entity or group (as group is defined in Section 13(d)(3) of the Exchange Act).

12.63.  "<u>Petition Date</u>" means the date on which the Sellers file voluntary petitions under chapter 11 of the Bankruptcy Code.

12.64.  "<u>Prepetition Advance Amount</u>" has the meaning ascribed to it in <u>Section 4.3</u>.

12.65.  "<u>Promissory Notes</u>" has the meaning ascribed to it in the Recitals to this Agreement.

12.66.  "<u>Purchase Price</u>" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

12.67.  "<u>Qualified Bid</u>" has the meaning ascribed to it in the Bidding Procedures.

12.68.  "<u>Sale Order</u>" means an order in form and substance acceptable to Buyer, among other things, (i) approving the transactions contemplated by this Agreement (free and clear of all Encumbrances pursuant to sections 363(b) and 363(f) of the Bankruptcy Code), (ii) subject to <u>Section 5.8</u> hereof, approving the assumption by the Sellers and the assignment by the Sellers to Buyer of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code, (iii) waiving the automatic stay imposed by Bankruptcy Rule 6004(h), and (iv) containing findings of fact and conclusions of law as reasonably requested by Buyer, including that Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, Buyer has demonstrated adequate assurance of future performance with respect to the Assumed Contracts,

and Buyer is not a successor to the Sellers and shall not be liable under any theory of successor liability.

12.69. "Sellers" has the meaning ascribed to it in the preamble to this Agreement.

12.70. "SHAGS" has the meaning ascribed to it in the preamble to this Agreement.

12.71. "Subsidiaries" has the meaning ascribed to it in the preamble to this Agreement.

12.72.  "Tax" means (i) all income taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings, or profits) and all gross receipts, estimated, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, or windfall profit taxes, unpaid property taxes, environment, alternative, or add-on minimum taxes, custom duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts and (ii) any obligation to indemnify or otherwise assume or succeed to any liability described in clause (i) hereof of any other Person whether by contract or under common law doctrine of de facto merger and successor liability or otherwise.

12.73.  "Tax Return" means any return, report, information return or other document (including any related or supporting information or any amended return) filed or required to be filed with any Taxing Authority or other Authority in connection with the determination, assessment, or collection of any Tax paid or payable or the administration of any laws, regulations, or administrative requirements relating to any such Tax.

12.74.  "Taxing Authority" means any Authority responsible for the collection or assessment of Tax.

12.75.  "Transfer Taxes" has the meaning ascribed to it in Section 9.2.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**BLUE MATRIX LABS, LLC**

By: _____

Name:  William R. Patterson
Title:   Chief Restructuring Officer


**HYDRO TOYS, LLC**

By: _____

Name:  William R. Patterson
Title:   Chief Restructuring Officer


**PARADISE BEVERAGE, LLC**

By: _____

Name:  William R. Patterson
Title:   Chief Restructuring Officer


**PARADISE BEVERAGE LOGISTICS, LLC**

By: _____

Name:  William R. Patterson
Title:   Chief Restructuring Officer


**SHAGS, LLC**

By: _____

Name:  William R. Patterson
Title:   Chief Restructuring Officer


**KBIDC INVESTMENTS, LLC**


By: _____

Name:  Jeff Kent
Title:   Manager


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**BLUE MATRIX LABS, LLC**

By: _____
Name:
Title:

**HYDRO TOYS, LLC**

By: _____
Name:
Title:

**PARADISE BEVERAGE, LLC**

By: _____
Name:
Title:

**PARADISE BEVERAGE LOGISTICS, LLC**

By: _____
Name:
Title:

**SHAGS, LLC**

By: _____
Name:
Title:

**KBIDC INVESTMENTS, LLC**

By: _____
Name: Jeff Kent
Title: Manager

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

## Exhibit A

Bidding Procedures

Subject to Bankruptcy Court approval, the following shall be the procedures for submitting and considering bids for the Sale of the Acquired Assets, including the related dates and deadlines described below (the "**Bidding Procedures**"):

(a)    **Participation Requirements**.  Parties interested in making a competing bid for the purchase of some or all of the Acquired Assets (each, a "**Potential Bidder**") will be required to execute a confidentiality agreement in form and substance acceptable to the Debtors prior to gaining access to the due diligence materials.

(b)    **Due Diligence**.  Potential Bidders will have a twenty-one (21) day due diligence period beginning upon the date of the service of the motion filed by the Sellers seeking approval of the Bidding Procedures, during which time Potential Bidders may seek due diligence access or additional information as may be reasonably requested by the Potential Bidder and that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances.

(c)    **Submission of Bids**.  In order to qualify as a Qualified Bid (as defined below) for the Acquired Assets, a Potential Bidder must timely submit a written bid that satisfies the following criteria:

    i.    The bid must exceed the Purchase Price by at least $25,000 plus, if the stalking-horse bidder is the Buyer, an amount sufficient to fund the Bid Protections (defined below) of $75,000;

    ii.    The bid must be accompanied by a cash deposit (in the form of either a cashier's check or wire transfer) in an amount equal to ten (10%) percent of the aggregate value of such bid (each, a "**Good Faith Deposit**").  Regardless of method of payment, all Good Faith Deposits must be remitted to Seller's counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Eric J. Taube, Esq. and Morris D. Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701;

    iii.    The bid must be accompanied by an executed asset purchase agreement in substantially the form of the Asset Purchase Agreement and a blackline showing any modifications the bidder is proposing, and that:

        a.    indicates which of the Acquired Assets such bidder proposes to acquire pursuant to the Asset Purchase Agreement; and

        b.      does not contain any conditions to closing which are not contained in the Asset Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the Asset Purchase Agreement;

        iv.     The bid must include a reference from a financial institution demonstrating that the Potential Bidder (or the entity that will furnish the funding required to consummate and perform under the Asset Purchase Agreement) has sufficient available funds to close the transaction; and

        v.      The bid must contain a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Asset Purchase Agreement and the consummation of the transactions contemplated thereby.

        vi.     The bid must be delivered to the following parties: (i) the Seller, c/o William Patterson, CRO for the Debtors, 6300 Bridgepoint Parkway, Building One, Suite 575, Austin, Texas 78730; (ii) the Seller's counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Morris D. Weiss, Esq. and Christopher G. Bradley, 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153-0119, Attn: Brian S. Rosen, Esq. and Matthew Goren, Esq.

        (d)    **Qualification of Bid**.  After a Potential Bidder has delivered a bid, the Debtors, in consultation with any official committee (if one has been appointed), will determine whether (i) the Potential Bidder has demonstrated the financial capacity to consummate the purchase of the Acquired Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise timely satisfied the requirements described above. If so, the Debtors shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**," and will promptly notify such bidder and the Buyer of this determination and file a summary notice with the Bankruptcy Court in a manner consistent with an confidentiality obligations.

        (e)    **Deadline for Submission of Bids**.  The deadline for submitting any and all Qualified Bids shall be no later than December 28, 2015 at 5:00 p.m. (prevailing Central time), or such other date as is established by the Court (the "**Bid Deadline**").

        (f)    **Auction**.  In the event that Qualified Bids are received, the Debtors will conduct an auction (the "**Auction**") to determine the highest or best bid for the Acquired Assets on December 30, 2015, or such other date as may be established by the Court, at the law offices of the Debtors' counsel, Taube Summers Harrison Taylor Meinzer Brown

LLP, 100 Congress Ave., 18th Floor, Austin, Texas 78701, beginning at 10:00 a.m. (prevailing Central time). The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

(g) **Auction Procedures**. Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction. At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids, provided that Qualified Bidders concurrently increase their Good Faith Deposit to represent 10% of their most recent bid. The bidding at the Auction shall start and continue in increments of at least $25,000. The Buyer shall have the right, but not the obligation, to participate in the Auction, and shall be a Qualified Bidder entitled to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude when no further bids are received. During each round of bidding, each participating bidder will have a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of the other party making the then highest or best bid. The Seller may conduct the Auction in the manner they determine will maximize the value of the Acquired Assets. If there is no Qualified Bid from a party other than the Buyer, the Auction will be cancelled and the Buyer will be declared the Successful Bidder (defined below). The Auction will be transcribed or videotaped. Each bidder is expected to confirm at the auction that it has not engaged in any collusion with respect to the bidding or the sale. Bids will not be considered after the Auction in closed.

(h) **Determination of Successful Bidder**. At the conclusion of the Auction, the highest or best bid, as determined by the Seller (in consultation with any Committee, if one has been appointed) consistent with these Bidding Procedures, shall be designated as the "**Successful Bidder**." The Seller may designate the next highest or best bidder for the Acquired Assets at the Auction as the "**Backup Bidder**." However, a bidder may decline Backup Bidder status and have no obligation to close a transaction, and the Debtors may, in their sole business judgment, continue that same process to obtain a Backup Bidder from among other Qualified Bidders.

(i) **Sale Hearing**. In the event that the Successful Bidder is a party other than the Buyer, or an objection is timely filed to this Motion by the Sale Objection Deadline (as defined below), the Court will hold a hearing to approve the Sale of the Acquired Assets to the Successful Bidder (the "**Sale Hearing**") on or before January 4, 2016, or such other date as is established by the Court. Any Sale Hearing shall be an evidentiary hearing and parties shall be prepared to present their evidence in support of or in opposition to the proposed Sale at the Sale Hearing. If the Successful Bidder fails to consummate the purchase of the Acquired Assets, the Backup Bidder will automatically be deemed the Successful Bidder.

(j) **Return of Good Faith Deposit**. The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Seller's counsel and shall not become property of the Debtors' estates. Upon the closing of the Sale, the Good Faith Deposit of any Qualified Bidders that are not the Successful Bidder will be returned.

(k)     **Reservation of Rights**.  The Seller reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as it may determine reasonably appropriate to maximize the value realized by the estates.

Buyer is hereby deemed a Qualified Bidder, and the bid represented by the Asset Purchase Agreement is hereby deemed to be a Qualified Bid.

Not later than three calendar days after the entry of the Sale Procedures Order, the Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid, or by another method reasonably calculated to provide notice, to (i) the Office of the United States Trustee for the Western District of Texas, San Antonio Division; (ii) counsel for any official or unofficial committees; (iii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iv) counsel to Buyer. Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.; (v) counsel to Chapman, (vi) any other parties that may have asserted an interest in the Debtors' assets, (vii) the Debtors' landlords; (viii) all affected federal, state, and local regulatory and taxing authorities; (ix) the Office of the United States Attorney for each state in which the Debtors operate; (x) the Office of the Attorney General for each state in which the Debtors operate; (xi) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors to  acquire the Debtors' assets; (xii) contract counterparties listed on the Assumed Contract Schedule; and (xiii) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002)..

Any party objecting to the Sale of the Assets, and any objections to proposed cure amounts, or to the assumption or assignment, shall be filed by the Sale Objection Deadline—provided that the cure objection deadline shall not in any event be sooner than seven days after the Cure Notice is provided—shall file with the Court its written objection and serve such objection (so as to be received) by December 31, 2015 at 5:00 p.m. (prevailing Central time) (the "**Sale Objection Deadline**") to the following parties: (i) the Seller, c/o William Patterson, CRO for the Seller, 6300 Bridgepoint Parkway, Building One, Suite 575, Austin, Texas 78730; (ii) the Seller's counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Morris D. Weiss, Esq. and Christopher G. Bradley, 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iv) counsel for the Buyer, Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.

Objections to the Sale will be heard at the Sale Hearing to be held before this Court on January 4, 2016 at 2:00 p.m. (prevailing Central time).

**Schedule 1.1(a)(v)**

Assumed Contracts[1]

| Contract | Cure Cost |
|---|---|
| Sublease Agreement, dated as of November 5, 2015, by and between Kent Motorsports LP and the Company | $4,666.67 |
| All purchase orders from customers with respect to which such purchase orders both (a) delivery has not been made by the Sellers and (b) payment has not been made by the customer, in each case, prior to the date hereof. | $0.00 |
| Air Filled Balloons Deal Memorandum, dated as of January 15, 2015, by and between Hydro Toys and Funtastic Limited | $0.00 |
| Zorbz Licensing, Manufacturing and Distribution Deal Memorandum, dated as of January 15, 2015 (as amended) | $0.00 |

---

[1] The scheduling of agreements on this Assumed Contracts Schedule does not constitute an admission that such Assumed Contract is an executory contract or unexpired lease or that the Buyers or Sellers have any liability thereunder, with the exception of the proposed cure amount listed thereon.

**Schedule 4.2**

Litigation

Power Up Lending Group, Ltd., v. Blue Matrix Labs, LLC d/b/a Blue Matrix Labs, Shags, LLC, Hydro Toys, LLC, and Kendall D. Harter

**Schedule 4.3(a)**

Assigned Intellectual Property

**Trademarks**

| | Trademark | Jurisdiction | Status | Application Number | Application Date | Registration Number | Status Date | Record Owner |
|---|---|---|---|---|---|---|---|---|
| 1. | EXPLODE AND RELOAD<br><br>EXPLODE AND RELOAD | US | REGISTERED | 86395614 | 16-SEP-2014 | 4828593 | 06-OCT-2015 | HYDRO TOYS, LLC |
| 2. | RAPID FILL RAPID FIRE<br><br>RAPID FILL, RAPID FIRE | US | REGISTERED Supplemental Register | 86395639 | 16-SEP-2014 | 4729440 | 28-APR-2015 | HYDRO TOYS, LLC |
| 3. | BE THE HERO<br><br>BE THE HERO | US | PUBLISHED (PENDING) Intent to Use | 86353251 | 31-JUL-2014 | | 23-DEC-2014 | HYDRO TOYS, LLC |
| 4. | ZORBZ<br><br>Z⊙RBS | US | REGISTERED | 86154810 | 30-DEC-2013 | 4627606 | 28-OCT-2014 | HYDRO TOYS, LLC |
| 5. | IPAK<br><br>IPAK | US | PUBLISHED (PENDING) Intent to Use | 86102736 | 28-OCT-2013 | | 25-MAR-2014 | BLUE MATRIX LABS, LLC |
| 6. | IWICH<br><br>IWICH | US | PUBLISHED (PENDING) Intent to Use | 86032024 | 08-AUG-2013 | | 15-OCT-2013 | BLUE MATRIX LABS, LLC |
| 7. | INNOVATION IN MOTION<br><br>INNOVATION IN MOTION | US | ABANDONED Intent to Use | 86032029 | 08-AUG-2013 | | 12-JAN-2015 | BLUE MATRIX LABS |
| 8. | ALIEN WARFARE | US | ABANDONED Intent to Use | 86029462 | 06-AUG-2013 | | 24-AUG-2015 | BLUE MATRIX LABS, LLC |

| | Trademark | Jurisdiction | Status | Application Number | Application Date | Registration Number | Status Date | Record Owner |
|---|---|---|---|---|---|---|---|---|
| | ALIEN WARFARE | | | | | | | |
| 9. | IPAKS <br> **IPAKS** | US | PUBLISHED (PENDING) Intent to Use | 86029465 | 06-AUG-2013 | | 08-OCT-2013 | BLUE MATRIX LABS, LLC |
| 10. | OUT OF THIS WORLD <br> OUT OF THIS WORLD | US | REGISTERED | 86028309 | 05-AUG-2013 | 4786413 | 04-AUG-2015 | HYDRO TOYS, LLC |
| 11. | GET ON IT <br> **GET ON IT** | US | REGISTERED | 85958457 | 13-JUN-2013 | 4577252 | 29-JUL-2014 | SHAGS, LLC |
| 12. | LANDING STRIP <br> LANDING STRIP | US | ABANDONED Intent to Use | 85944547 | 29-MAY-2013 | | 06-JUL-2015 | BLUE MATRIX LABS |
| 13. | BLUE BALL <br> **BLUE BALL** | US | ABANDONED Intent to Use | 85944552 | 29-MAY-2013 | | 06-JUL-2015 | BLUE MATRIX LABS |
| 14. | RELEASE YOUR INNER PIRATE <br> RELEASE YOUR INNER PIRATE | US | ABANDONED Intent to Use | 85942681 | 25-MAY-2013 | | 22-AUG-2014 | BLUE MATRIX LABS |
| 15. | THE PARTY STARTS HERE <br> THE PARTY STARTS HERE | US | REGISTERED | 85942683 | 25-MAY-2013 | 4577168 | 29-JUL-2014 | PARADISE BEVERAGE, LLC |
| 16. | PARTY LIKE A PIRATE <br> PARTY LIKE A PIRATE | US | ABANDONED Intent to Use | 85942682 | 25-MAY-2013 | | 22-AUG-2014 | BLUE MATRIX LABS |

| | Trademark | Jurisdiction | Status | Application Number | Application Date | Registration Number | Status Date | Record Owner |
|---|---|---|---|---|---|---|---|---|
| 17. | WET BEAVER<br><br>WET BEAVER | US | ABANDONED Intent to Use | 85920990 | 02-MAY-2013 | | 08-SEP-2014 | BLUE MATRIX LABS |
| 18. | PIRATE ENERGY<br><br>PIRATE ENERGY | US | REGISTERED | 85809975 | 24-DEC-2012 | 4752310 | 09-JUN-2015 | PARADISE BEVERAGE, LLC |
| 19. | BLITZED ENERGY<br><br>BLITZED ENERGY | US | ABANDONED Intent to Use | 85788906 | 28-NOV-2012 | | 21-JUL-2014 | BLUE MATRIX LABS |
| 20. | SHAGS<br><br>SHAGS | US | REGISTERED | 85408548 | 26-AUG-2011 | 4448215 | 10-DEC-2013 | SHAGS, LLC |
| 21. | ZORBZ | CHINA | REGISTERED | 16518292 | 19-MAR-2015 | | 22-SEP-2015 | BLUE MATRIXS, LLC |
| 22. | APE HANGER | US | PENDING | 86773262 | 30-SEP-2015 | | | PARADISE BEVERAGE, LLC |

**Patents**

| | Patent | Country | Status | Application Number | Application Date | Patent (Publication) Number | Patent (Publication) Date | Inventor | Owner |
|---|---|---|---|---|---|---|---|---|---|
| 1 | SELF-SEALING BALLOONS AND RELATED COMPONENTS AND METHODS OF MANUFACTURING | AU | PUBLISHED | AU20140308 672 | 22-AUG-2014 | (AU2014308672) | (26-MAY-2015) | A. SCOTT GOODWIN, KENDALL D HARTER, JON Y. YAMAMOTO | HYDRO TOYS, LLC |
| 2. | SELF-SEALING BALLOONS AND RELATED COMPONENTS AND METHODS OF MANUFACTURING | US | PUBLISHED | 13/974888 | 23-AUG-2013 | (2015056887) | (26-FEB-2015) | SCOTT A, GOODWIN, KENDALL D HARTER, JON Y. YAMAMOTO | HYDRO TOYS, LLC |
| 3. | SELF-SEALING BALLOONS AND RELATED COMPONENTS AND METHODS OF MANUFACTURING | WO | PUBLISHED | WO2014US5 23350 | 22-AUG-2014 | (WO2014US523 50) | (26-MAY-2015) | SCOTT A, GOODWIN, KENDALL D HARTER, JON Y. YAMAMOTO | HYDRO TOYS, LLC |
| 4. | SANDWICH MAKING MACHINE AND RELATED APPARATUS, SYSTEMS, AND METHODS | US | DOCKET NEW CASE – READY FOR EXAMINATION | 14/250202 | 10-APR-2014 | (2015107465) | (23-APR-2015) | SCOTT A, GOODWIN, KENDALL D HARTER, JON Y. YAMAMOTO | BLUE MATRIX LABS, LLC |
| 5. | FOODSTUFF PACKAGES AND RELATED APPARATUS, SYSTEMS, AND METHODS | US | NON FINAL ACTION MAILED | 14/304969 | 15-JUN-2014 | (2015108162) | (23-APR-2015) | SCOTT A, GOODWIN, KENDALL D HARTER, JON Y. YAMAMOTO | BLUE MATRIX LABS, LLC |
| 6. | REUSABLE BALLOON MULTI-FILL SYSTEM | US | PENDING | 62205484 | 14-AUG-2015 | | | | HYDRO TOYS, LLC |
| 7. | BALLOON MULTI-FILL SYSTEM | US | PENDING | 29537092 | 21-AUG-2015 | | | | HYDRO TOYS, LLC |

| | Patent | Country | Status | Application Number | Application Date | Patent (Publication) Number | Patent (Publication) Date | Inventor | Owner |
|---|---|---|---|---|---|---|---|---|---|
| 8. | BALLOON MULTI-FILL SYSTEM | CHINA | PENDING | 2015303586 47.7 | 16-SEP-2015 | | | | HYDRO TOYS, LLC |
| 9. | WAX INSIDE SEALING CAPSULE | US | PENDING | 62187909 | 2-JUL-2015 | | | | HYDRO TOYS, LLC |
| 10. | IPAK | US | EXPIRED | 61894247 | 22-OCT-2013 | | | | BLUE MATRIX LABS, LLC |
| 11. | IWICH | US | EXPIRED | 61894255 | 22-OCT-2013 | | | | BLUE MATRIX LABS, LLC |

## Schedule 4.3(b)

### Junior Liens

All liens granted and/or purported to be granted (if any) pursuant to and/or in connection with the following agreements:

1.  Merchant Agreement, dated September 1, 2015, between CapCall, LLC and Blue Matrix Labs, LLC.

2.  Revenue Based Factoring Agreement, dated August 17, 2015, between World Global Financing Inc. and Blue Matrix Labs, LLC.

3.  Security Agreement and Guaranty made by Blue Matrix Labs, LLC in favor of World Global Financing Inc.

4.  Business Loan and Security Agreement, dated June 29, 2015, between On Deck Capital, Inc. and Blue Matrix Labs, LLC

5.  Purchase and Sale Agreement (ACH), dated June 29, 2015, between S.O.S. Capital, Inc. and Blue Matrix Labs, LLC

6.  Security Agreement, made by Blue Matrix Labs, LLC and Kendall Dean D. Harter in favor of S.O.S. Capital, Inc.

7.  Master Purchase and Sale Agreement, dated March 2, 2015, between Eagle Business Credit, LLC and Blue Matrix Labs, LLC

8.  Corporate Guaranty, made as of March 3, 2015, between Paradise Beverage, LLC and Eagle Business Credit, LLC

9.  Corporate Guaranty, made as of March 3, 2015, between Shags, LLC and Eagle Business Credit, LLC

10. Corporate Guaranty, made as of March 3, 2015, between Hydro Toys, LLC and Eagle Business Credit, LLC

11. Revenue Based Factoring Agreement, dated September 4, 2015, among PowerUp Lending Group, Ltd., Blue Matrix Labs, LLC, as Merchant, Kendall D. Harter, as Guarantor, Shags, LLC, as Guarantor, and Hydro Toys, LLC, as Guarantor

12. Security Agreement and Guaranty, dated September 4, 2015, among PowerUp Lending Group, Ltd., Blue Matrix Labs, LLC, as Merchant, Kendall D. Harter, as Guarantor, Shags, LLC, as Guarantor, and Hydro Toys, LLC, as Guarantor

13. Merchant Agreement, dated September 3, 2015, between 1 Global Capital, LLC and Blue Matrix Labs Inc.

14.    Security Agreement, made by Blue Matrix Labs Inc., as Merchant, and Kendall Harter, as Guarantor, in favor of 1 Global Capital, LLC

**Schedule 10.1**

Post-Closing Support

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BLUE MATRIX LABS, LLC, | § | CASE NO. 15-52977 |
| HYDRO TOYS, LLC, | § | CASE NO. 15-52978 |
| PARADISE BEVERAGE, LLC, | § | CASE NO. 15-52980 |
| SHAGS, LLC, and | § | CASE NO. 15-52981 |
| PARADISE BEVERAGE LOGISTICS, LLC, | § | CASE NO. 15-52979 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | *(Joint Administration Requested)* |

**ORDER APPROVING SALE AND AUCTION PROCEDURES AND RELATED
RELIEF REGARDING THE SALE OF THE DEBTORS' ASSETS**

Upon the motion, dated December 4, 2015 (the "**Motion**"),[1] of Blue Matrix Labs, LLC,

Hydro Toys, LLC, Paradise Beverage, LLC, Paradise Beverage Logistics, LLC, and Shags, LLC

(collectively, the "**Debtors**"), debtors and debtors in possession in the above-captioned cases,

pursuant to sections 105, 363, and 365 of chapter 11 of title 11 of the United States Code (the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

"**Bankruptcy Code**"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of (i) an order approving bidding procedures and bidder protections for the sale (the "**Sale**") of substantially all assets of the Debtors (the "**Acquired Assets**" or "**Assets**"); and (ii) an order (a) authorizing the sale of the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), (m), and 365 of the Bankruptcy Code, (b) to the extent necessary, authorizing the Debtors to assume and assign executory contracts under section 365 of the Bankruptcy Code; and (c) granting related relief; and the Court having held a hearing to consider the relief requested herein on December __, 2015 (the "**Hearing**"), with the appearances of all interested parties noted in the record of the Hearing; and the Court having read and considered the Motion, objections to the Motion, if any, and arguments of any counsel appearing regarding the relief requested in the Motion at the Hearing, the Court finds and determines the following in this order (the "**Sale Procedures Order**"):

      A.      The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. § 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is core within the meaning of 28 U.S.C. § 157(b). The statutory predicates for the relief sought herein are sections 105, 363, and 365 of the Bankruptcy Code, and the procedural predicates are Rules 2002, 6004, and 6006 of the Bankruptcy Rules.

      B.      Notice of the Hearing was given to (i) the Office of the United States Trustee for the Western District of Texas, San Antonio Division (ii) counsel for any official or unofficial committees; (iii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iv) counsel to Buyer. Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.; (v) Chapman, (vi) any other parties who have filed UCC-1 against the Debtor, (vii) all affected

federal, state, and local regulatory and taxing authorities; (viii) the Office of the United States Attorney for the State of Texas; (ix) the Office of the Attorney General for the State of Texas; (x) all parties identified by GTE as potentially interested in the assets of the Debtors; (xi) contract counterparties listed on the Assumed Contract Schedule; and (xii) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002). Based on the record made by the Debtors, the Court finds that appropriate notice of the Hearing has been given.

C.     The Debtors have demonstrated a compelling and sound business justification for authorization to (i) enter into the Asset Purchase Agreement between the Debtors and KBIDC Investments, LLC  (the "**Buyer**") attached as Exhibit A to the Motion (the "**APA**") to establish a minimum bidding price for the Assets and (ii) to pay the expense reimbursement (the "**Expense Reimbursement**") under the terms and conditions set forth in the APA. The Expense Reimbursement is fair and reasonable and provides a benefit to the Debtors' estates.

D.     Payment of the Expense Reimbursement is (a) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and all parties in interest herein, (c) reasonable and appropriate and (d) a material inducement for, and condition necessary to ensure that Buyer will continue to pursue their proposed agreement to undertake any sale.

E.     The legal and factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein.  The relief granted herein is in the best interests of the Debtors, its estate, creditors, and all parties in interest.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is granted as set forth below.  All objections to the Motion that have not been settled or withdrawn are hereby overruled.

2.      The time period for notice pursuant to Bankruptcy Rule 2002(a) of a sale of certain of the Debtors' assets is hereby reduced to accommodate the sale as set forth in the Motion.

3.      The following deadlines, protections, and procedures (the "**Bidding Procedures**") are approved and established in connection with the Debtors' contemplated sale of the Purchased Assets:

<u>**Stalking Horse Bid, Asset Purchase Agreement, and Due Diligence Period**</u>

4.      The Court has considered the APA, and the Court approves the APA, including the terms summarized below regarding the stalking horse bid, bid protections, purchase agreement, and due diligence. Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the APA. To the extent there is any inconsistency between the summary of the transaction set forth in this Sales Procedures Order and the terms in the APA, the APA shall control.

| Transaction | The Buyer will acquire designated Assets of the Debtors ("**Seller**"). |
|---|---|
| **Purchase Price** | The total consideration to be paid by Buyer under the APA (the "**Purchase Price**") consists of $2,000,000 in the form of a credit bid of the secured amounts owing to Buyer (a) under its prepetition secured debt and (b) under its DIP loan. |
| **Acquired Assets** | The Acquired Assets are set forth for in section 1.1 of the APA and include an assignment of all licenses (to the extent assignable) and nondisclosure or inventions assignment agreements owned by Seller that relate to any of the Assets or are otherwise necessary or useful to make, have made, practice, use, import or sell any of the technology embodied in the other Assets. All of the Acquired Assets transferred to Buyer will be free and clear of any liens, claims and encumbrances and any such liens, claims or encumbrances will attach to the proceeds of the sale. Any assets not specifically transferred and assigned to Buyer, and any liabilities relating thereto, shall remain the property of Seller. |
| **Excluded Assets** | The Excluded Assets shall include all of Sellers' right, title and interest in and to: <br><br> (i)      all Leases for real property not set forth on the |

|  | Assumed Contracts Schedule (the "**Excluded Leases**"); |
|---|---|
|  |       (ii)     all Contracts not set forth on the Assumed Contracts Schedule or, if set forth on the Assumed Contracts Schedule, that Buyer elects by written notice to Sellers in accordance with <u>Section 5.8</u> of the APA to remove from the Assumed Contracts Schedule (together with the Excluded Leases and the Rejected Contracts, the "**Excluded Contracts**"); |
|  |       (iii)    cash in an amount equal to the aggregate amount of accrued and unpaid fees and expenses owed by Sellers on account of services provided to the Sellers after the Petition Date, but prior to the Closing, by (A) Taube Summers Harrison Taylor Meinzer Brown LLP, (B) Bridgepoint Consulting, LLC and (C) Conley Rose, P.C.; |
|  |       (iv)    all avoidance or preference actions under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code for the benefit of any Seller under the Bankruptcy Code; |
|  |       (v)    all rights of the Sellers under the APA and any Ancillary Agreement; |
|  |       (vi)    all assets (whether in trust or otherwise) with respect to any Benefit Plan of the Sellers; and |
|  |       (vii)   any assets that Buyer elects to treat as Excluded Assets on or prior to Closing. |
| **Closing** | The Transaction will close at a date as soon as possible after the approval of the Transaction by the Bankruptcy Court, subject to satisfaction of all closing conditions and receipt of Bankruptcy Court approval of the Transaction, but in no event later than forty-five (45) days from the Petition Date. |
| **Deposit** | A good-faith deposit of 10% of the Purchase Price will be provided by any bidder aside from the Buyer. |
| **Due Diligence and Cure Notice** | The Buyer will have a twenty-one (21) day due diligence period (the "**Due Diligence Period**") beginning upon the date of service of this Motion.<br><br>If, at the end of the Due Diligence Period, the Buyer opts not to proceed, then the Debtors will promptly provide notice to the Court and all potential bidders, and will seek revised approval for sale procedures if serious potential bidders have stepped forward; otherwise, the Debtors will seek to modify this sale process and propose to the Court some other means of proceeding. |

| | |
|---|---|
| **Relationship between Buyer and Debtors** | Kent BML Investments,  LP, a principal of the Buyer, owns approximately 32% of the LLC units of Blue Matrix. The transaction was negotiated between the CRO (and his professionals) and the Buyer in good faith. The Debtors will have no relationship or connection with the Buyer after the consummation of the sale. |
| **Notice Timing** | Notice of the hearing on the motion to approve the motion to sell will be provided as is necessary under the circumstances. |
| **Cure Amount and Notice** | Concurrently with the filing of the Motion, the Sellers shall provide written notice, in form and substance acceptable to Buyer, to each of the counterparties to the Contracts listed on the Assumed Contracts Schedule that, at the option of Buyer, the Sellers may assume and assign to Buyer such counterparty's Contract, notifying each such counterparty of the proposed Cure Costs for such Contract (each such notice, a "**Cure Notice**").  Each Cure Notice shall inform the counterparty that, if such counterparty objects to the assumption or assignment of its Contract or the amount of the Cure Costs arising prior to the Closing under such Contract, such counterparty must provide written notice of such objection to the Sellers and Buyer within 20 calendar days after the Petition Date. |

5.     The Court also approves the payment of the Expense Reimbursements in the amount of $75,000  (the "**Expense Reimbursement**"), which is to be paid to the Buyer, in accordance with the APA, if the Bankruptcy Court approves the Sale of any or all of the Purchased Assets to an entity other than the Buyer—*provided that* if Buyer opts not to proceed as stalking horse bidder after its Due Diligence Period, and the Court approves a sale to some other party, the Buyer shall not be entitled to any Expense Reimbursement. The Expense Reimbursement, once earned in accordance with the terms of the APA, shall be an administrative expense in the Debtors' chapter 11 cases pursuant to sections 503(b), 507(a)(1) and 507(b) of the Bankruptcy Code until paid to Buyer.

**Bidding Procedures**

6.     The Court approves the following procedures for submitting and considering bids for the Sale of the Purchased Assets, including the related dates and deadlines described below:

(a)     **Participation Requirements**.  Parties interested in making a competing bid for the purchase of some or all of the Acquired Assets (each, a "**Potential Bidder**") will be

required to execute a confidentiality agreement in form and substance acceptable to the Debtors prior to gaining access to the due diligence materials.

(b) **Due Diligence**. Potential Bidders will have a twenty-one (21) day due diligence period beginning upon the date of the service of the Motion, during which time Potential Bidders may seek due diligence access or additional information as may be reasonably requested by the Potential Bidder and that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances.

(c) **Submission of Bids**. In order to qualify as a Qualified Bid (as defined below) for the Acquired Assets, a Potential Bidder must timely submit a written bid that satisfies the following criteria:

i. The bid must exceed the Purchase Price by at least $25,000 plus, if the stalking-horse bidder is the Buyer, an amount sufficient to fund the Bid Protections (defined below) of $75,000;

ii. The bid must be accompanied by a cash deposit (in the form of either a cashier's check or wire transfer) in an amount equal to ten (10%) percent of the aggregate value of such bid (each, a "**Good Faith Deposit**"). Regardless of method of payment, all Good Faith Deposits must be remitted to Debtors' counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Eric J. Taube, Esq. and Morris D. Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701;

iii. The bid must be accompanied by an executed APA in substantially the form of the APA and a blackline showing any modifications the bidder is proposing, and that:

a. indicates which of the Acquired Assets such bidder proposes to acquire pursuant to the APA; and

b. does not contain any conditions to closing which are not contained in the APA (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the APA;

iv. The bid must include a reference from a financial institution demonstrating that the Potential Bidder (or the entity that will furnish the funding required to consummate and perform under the APA) has sufficient available funds to close the transaction; and

v. The bid must contain a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the APA and the consummation of the transactions contemplated thereby.

      vi.     The bid must be delivered to the following parties: (i) the Debtors, c/o William Patterson, CRO for the Debtors, 6300 Bridgepoint Parkway, Building One, Suite 575, Austin, Texas 78730; (ii) the Debtor's counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Morris D. Weiss, Esq. and Christopher G. Bradley, 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153-0119, Attn: Brian S. Rosen, Esq. and Matthew Goren, Esq.

      (d)    **Qualification of Bid**.  After a Potential Bidder has delivered a bid, the Debtors, in consultation with any official committee (if one has been appointed), will determine whether (i) the Potential Bidder has demonstrated the financial capacity to consummate the purchase of the Acquired Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise timely satisfied the requirements described above.  If so, the Debtors shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**," and will promptly notify such bidder and the Buyer of this determination and file a summary notice with the Bankruptcy Court in a manner consistent with an confidentiality obligations.

      (e)    **Deadline for Submission of Bids**.  The deadline for submitting any and all Qualified Bids shall be no later than December 28, 2015 at 5:00 p.m. (prevailing Central time), or such other date as is established by the Court (the "**Bid Deadline**").

      (f)    **Auction**.  In the event that Qualified Bids are received, the Debtors will conduct an auction (the "**Auction**") to determine the highest or best bid for the Acquired Assets on December 30, 2015, or such other date as may be established by the Court, at the law offices of the Debtors' counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, 100 Congress Ave., 18th Floor, Austin, Texas 78701, beginning at 10:00 a.m. (prevailing Central time).  The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

      (g)    **Auction Procedures**.  Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction.  At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids, provided that Qualified Bidders concurrently increase their Good Faith Deposit to represent 10% of their most recent bid.  The bidding at the Auction shall start and continue in increments of at least $25,000.  The Buyer shall have the right, but not the obligation, to participate in the Auction, and shall be a Qualified Bidder entitled to participate in the Auction.  The Auction shall continue in one or more rounds of bidding and shall conclude when no further bids are received.  During each round of bidding, each participating bidder will have a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of the other party making the then highest or best bid.  The Debtors may conduct the Auction in the manner they determine will maximize the value of the Acquired Assets.  If there is no Qualified Bid from a party other than the Buyer, the Auction will be cancelled and the Buyer will be declared the Successful Bidder (defined below). The Auction will be transcribed or videotaped.  Each bidder is expected to confirm at the auction that it has not engaged in any collusion with respect to the bidding or the sale.  Bids will not be considered after the Auction in closed.

(h)     **Determination of Successful Bidder**.  At the conclusion of the Auction, the highest or best bid, as determined by the Debtors (in consultation with any Committee, if one has been appointed) consistent with these Bidding Procedures, shall be designated as the "**Successful Bidder**."  The Debtors may designate the next highest or best bidder for the Acquired Assets at the Auction as the "**Backup Bidder**."  However, a bidder may decline Backup Bidder status and have no obligation to close a transaction, and the Debtors may, in their sole business judgment, continue that same process to obtain a Backup Bidder from among other Qualified Bidders.

(i)     **Sale Hearing**.  In the event that the Successful Bidder is a party other than the Buyer, or an objection is timely filed to this Motion by the Sale Objection Deadline (as defined below), the Court will hold a hearing to approve the Sale of the Acquired Assets to the Successful Bidder (the "**Sale Hearing**") on or before January 4, 2016, or such other date as is established by the Court.  Any Sale Hearing shall be an evidentiary hearing and parties shall be prepared to present their evidence in support of or in opposition to the proposed Sale at the Sale Hearing.  If the Successful Bidder fails to consummate the purchase of the Acquired Assets, the Backup Bidder will automatically be deemed the Successful Bidder.

(j)     **Return of Good Faith Deposit**.  The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Debtors' counsel and shall not become property of the Debtors' estates.  Upon the closing of the Sale, the Good Faith Deposit of any Qualified Bidders that are not the Successful Bidder will be returned.

(k)     **Reservation of Rights**.  The Debtors reserve the right, in consultation with their professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

7.     Buyer is hereby deemed a Qualified Bidder, and the bid represented by the APA is hereby deemed to be a Qualified Bid.

8.     Not later than three calendar days after the entry of the Sale Procedures Order, the Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid, or by another method reasonably calculated to provide notice, to (i) the Office of the United States Trustee for the Western District of Texas, San Antonio Division; (ii) counsel for any official or unofficial committees; (iii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iv) counsel to Buyer. Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.; (v) counsel to Chapman, (vi) any other parties that may have asserted an interest in the

Debtors' assets, (vii) the Debtors' landlords; (viii) all affected federal, state, and local regulatory and taxing authorities; (ix) the Office of the United States Attorney for each state in which the Debtors operate; (x) the Office of the Attorney General for each state in which the Debtors operate; (xi) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors to acquire the Debtors' assets; (xii) contract counterparties listed on the Assumed Contract Schedule; and (xiii) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002)..

9.     Any party objecting to the Sale of the Assets, and any objections to proposed cure amounts, or to the assumption or assignment, shall be filed by the Sale Objection Deadline— provided that the cure objection deadline shall not in any event be sooner than seven days after the Cure Notice is provided—shall file with the Court its written objection and serve such objection (so as to be received) by December 31, 2015 at 5:00 p.m. (prevailing Central time) (the "**Sale Objection Deadline**") to the following parties:  (i) the Debtors, , c/o William Patterson, CRO for the Debtors, 6300 Bridgepoint Parkway, Building One, Suite 575, Austin, Texas 78730; (ii) the Debtors' counsel, Taube Summers Harrison Taylor Meinzer Brown LLP, Attn: Morris D. Weiss, Esq. and Christopher G. Bradley, 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iv) counsel for the Buyer, Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.

10.     Objections to the Sale will be heard at the Sale Hearing to be held before this Court on January 4, 2016 at 2:00 p.m. (prevailing Central time).

11.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Sales Procedure Order.

# # #

Prepared by:

TAUBE SUMMERS HARRISON TAYLOR
  MEINZER BROWN LLP

Eric J. Taube
State Bar No. 19679350
Morris D. Weiss
State Bar No. 21110850
Christopher G. Bradley
State Bar No. 24069407
100 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 472-5997
(512) 472-5248 (FAX)
etaube@taubesummers.com
mweiss@taubesummers.com
cbradley@taubesummers.com

PROPOSED ATTORNEYS FOR DEBTORS

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| BLUE MATRIX LABS, LLC, | § | CASE NO. 15-52977 |
| HYDRO TOYS, LLC, | § | CASE NO. 15-52978 |
| PARADISE BEVERAGE, LLC, | § | CASE NO. 15-52980 |
| SHAGS, LLC, and | § | CASE NO. 15-52981 |
| PARADISE BEVERAGE LOGISTICS, LLC, | § | CASE NO. 15-52979 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | *(Joint Administration Requested)* |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER
AUTHORIZING (A) SALE OF ASSETS TO KBIDC INVESTMENTS, LLC
PURSUANT TO SECTIONS 105(a), 363(b), (f) AND (m) OF THE BANKRUPTCY
CODE AND (B) ASSUMPTION BY THE DEBTORS, AND ASSIGNMENT TO
KBIDC INVESTMENTS, LLC, OF CERTAIN EXECUTORY CONTRACTS
<u>PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE</u>**

UPON THE MOTION, dated December 4, 2015 (the "***Motion***[1]"), of Blue Matrix Labs, LLC ("**BML**"), Hydro Toys, LLC ("**Hydro Toys**"), Paradise Beverage, LLC ("**Paradise**"), Paradise Beverage Logistics, LLC ("**Paradise Logistics**"), and Shags, LLC ("**Shags**"; and, together with BML, Hydro Toys, Paradise and Paradise Logistics, the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order authorizing (a) the sale of substantially all of the assets of the Debtors to KBIDC Investments, LLC ("**Buyer**") and (b) the assumption and assignment to Buyer of certain executory contracts of the Debtors;

AND A HEARING HAVING BEEN HELD by the Court to consider the Motion on December __, 2015 (the "**Hearing**"), at which time all interested parties were offered an opportunity to be heard regarding the Motion, the Asset Purchase Agreement (defined herein), and the transactions contemplated by the Asset Purchase Agreement;

AND IT APPEARING that the Court has jurisdiction over this matter;

AND IT FURTHER APPEARING that the relief requested in the Motion is in the best interests of the Debtors and their estates;

AND after consideration of objections, if any, to the Motion;

NOW, THEREFORE, upon the record set forth by the Debtors, including the Motion, the pleadings and other documents filed in the Chapter 11 Cases, including, without limitation, the Declaration of William R. Patterson [Doc. 3] (the "**Patterson Declaration**"), and the record of

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

the Hearing, and after due deliberation and sufficient cause appearing therefor, the Court hereby finds as follows:

## I.  <u>FINDINGS OF FACT</u>[2]

### A.      <u>Background</u>

1.      On December 4, 2015, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Petition Date**").

2.      By previous order of this Court, the Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015.   The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee has been appointed in the Chapter 11 Cases.

3.      Prior to the date hereof, BML was advanced funds in an aggregate outstanding principal amount of $4,284,154.04 pursuant to that certain (i) Promissory Note, dated September 26, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Chapman Promissory Note**"), issued by BML and held by Dave Chapman ("**Chapman**"), (ii) Promissory Note, dated December 5, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Initial Kent Promissory Note**"), issued by the Company and held by Kent BML Investments, LP, a Texas limited partnership ("**Kent BML Investments**" and, together with Chapman, the "**Lenders**") as successor in interest to Jeffrey F. Kent, and (iii) Amended and Restated Promissory Note, dated August 27, 2014 (as further amended, restated, amended and restated,

---

[2] Any finding set forth under the heading "Findings of Fact" that may also be considered, in whole or in part, to constitute a conclusion of law shall be deemed set forth under the heading "Conclusions of Law" as if set forth in full therein.  All findings and conclusions of law announced by the Bankruptcy Court at the Hearing in relation to the Motion are hereby incorporated to the extent not inconsistent herewith.

supplemented or otherwise modified from time, the "**Additional Kent Promissory Note**" and, together with the Chapman Promissory Note and the Initial Kent Promissory Note, the "**Promissory Notes**"), issued by the Company and held by Kent BML Investments.

4.     On December 4, 2015, the Debtors and Buyer entered into that certain Asset Purchase Agreement under which Buyer agreed to purchase substantially all of the assets the Debtors and to assume certain cure related costs and other liabilities, subject to Bankruptcy Court approval (the "**Asset Purchase Agreement**").

5.     In connection with the execution of the Asset Purchase Agreement and the transaction contemplated herein, and solely to the extent required, the Debtors consented to the assignment or transfer of the interests of the Lenders under the Promissory Notes and related security documents and interests to Buyer and agreed that, to the extent necessary, Buyer and its respective affiliates shall not be prohibited assignees or transferees thereunder.  Kent BML Investments has also agreed to provide the Debtors with a $500,000 principal amount debtor in possession credit facility pursuant to that certain Debtor in Possession Credit Agreement dated as of December 4, 2015 between the Debtors and Kent BML Investments, as lender (the "**DIP Lender**").

**B.**     **The Auction Process**

6.     Prior to commencing these Chapter 11 Cases, Bridgepoint Consulting, LLC ("**Bridgepoint**") and BML's board of managers determined that the value of the Debtors' estates and the potential recovery for the Debtors' creditors would be maximized if the Debtors' businesses could be sold as a going concern.

7.     On October 1, 2015, the Debtors retained Global Toy Experts ("**GTE**"), a boutique investment bank that specializes in the toy industry, in an effort to market Hydro Toys.

4

Such retention was timed to coincide with Fall Toy Preview held October 5-8, 2015, an event that is hosted annually in Dallas, Texas by the Toy Industry Association, Inc. GTE agreed to show the assets to up to ten (10) companies for a 30 day process but would be entitled to compensation, "tail" protection if any entities introduced by GTE to Hydro Toys during the referenced marketing period subsequently purchased Hydro Toys or its assets. GTE, based on its long industry knowledge, reviewed a proprietary list of forty-five (45) potentially interested parties and reduced such list to eight (8) parties it concluded were the most likely buyers. Several of such parties signed non-disclosure agreements and conducted due diligence on the available assets. Two of such parties expressed a high degree of interest in the assets and continued conducting diligence until shortly before the Petition Date. As of the Petition Date, no viable offers had been submitted. Subject to Bankruptcy Court approval, the Debtors retained Steve Velte of GTE to continue marketing the assets of Hydro Toys and the other Debtors in the hope of locating a bidder prepared to offer a "higher and better" bid.

8.     After extensive, arm's length, good faith negotiations among the Buyer, the Debtors, and their respective advisers, the Debtors and Buyer executed the Asset Purchase Agreement. A copy of the Asset Purchase Agreement is annexed to the Motion as Exhibit A. Any capitalized term used but not defined in this order shall have the meaning ascribed to such term in the Asset Purchase Agreement. Pursuant and subject to the terms and conditions of the Asset Purchase Agreement, Buyer has agreed to purchase the "**Acquired Assets**" from the Debtors. In the event of any inconsistency or conflict between the summary of the provisions of the Asset Purchase Agreement set forth herein and the terms of the Asset Purchase Agreement, the Asset Purchase Agreement controls.

8780-3\00543917.002

9.      As part of the Debtors' efforts to realize the highest and best value for their business, on December __, 2015, the Debtors obtained an order of the Court that established bidding procedures for a sale of the Debtors' businesses (the "**Auction**") and scheduled various dates relating to the Auction (the "**Bidding Procedures Order**"), including, without limitation, _____, 2015, as the deadline for the submission of initial bids by interested bidders; _____, 2015, as the date for the Auction; and _____, 2015, as the date on which the Court would hold a hearing to approve the successful bidder selected at the Auction (the "**Successful Bidder**").

10.     The Debtors, through GTE, adequately marketed the transaction contemplated by the Asset Purchase Agreement to all potential purchasers in accordance with the Bidding Procedures Order.  The sale and marketing process afforded all potential bidders a full, fair, and reasonable opportunity to submit a higher or otherwise better offer to purchase the Acquired Assets and participate in the Auction.

11.     On _____, 2015, the Auction was conducted.   At the conclusion of the Auction, the Debtors selected Buyer as the Successful Bidder.

12.     The Auction was conducted fairly and in good faith, without collusion, and in accordance with the Bidding Procedures Order.  Buyer is the Successful Bidder for the Acquired Assets in accordance with the Bidding Procedures Order.  The Debtors' determination that the offer reflected in the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment. Buyer has complied in all respects with the Bidding Procedures Order and any other applicable order of the Bankruptcy Court in negotiating and entering into the Asset Purchase Agreement.

8780-3\00543917.002

**C.**     **Sale Hearing**

13.     The Bankruptcy Court conducted the Hearing on _____, 2015, at which time the Bankruptcy Court considered the Motion, the evidence and testimony presented, and the statements and argument of counsel in support of the Motion, the Asset Purchase Agreement, and the transactions contemplated by the Asset Purchase Agreement.

14.     Objections, if any, to the Motion were either overruled by the Bankruptcy Court or were withdrawn as a result of an agreement between the objecting party and the Debtors.

**D.**     **Sound Business Purpose**

15.     The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for consummation of the transaction contemplated by the Asset Purchase Agreement outside of the ordinary course of business and in accordance with the requirements of section 363(b) of the Bankruptcy Code.  The value of the Debtors' businesses is not likely to increase if the Debtors continue to operate their businesses during the pendency of the Chapter 11 Cases.  Indeed, the value of the Debtors' estates is likely to decrease the longer the time spent before consummating the transfer of the Acquired Assets.  Pursuant to the Asset Purchase Agreement, Buyer has agreed that the Debtors' estates may retain cash in an amount equal to the aggregate amount of accrued and unpaid fees and expenses owed by the Debtors on account of services provided to the Debtors after the Petition Date, but prior to the Closing, by (A) Taube Summers Harrison Taylor Meinzer Brown, LLP, (B) Bridgepoint Consulting, LLC, and (C) Conley Rose, P.C.  The value of the Debtors' estates will be maximized through a sale of the Acquired Assets on a going concern basis rather than through a piecemeal liquidation or a potentially delayed sale pursuant to a plan of reorganization.

16.     Given the substantial amount of secured debt owed to the DIP Lender and under the Promissory Notes, the Debtors' continuing need for working capital, and the importance of retaining employees to the continued success of the Debtors' businesses, the sale of the Acquired Assets is the best means of obtaining a recovery for creditors in the Chapter 11 Cases.

17.     Approval of the Asset Purchase Agreement pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code also is necessary in order to preserve the value of the Debtors' businesses.  The Debtors have determined, in their reasonable business judgment, that the Acquired Assets will have the greatest value if promptly sold.  It is also important that the transactions contemplated by the Asset Purchase Agreement be consummated as expeditiously as possible so as to avoid any potential loss of the Debtors' relationships that may be caused by uncertainty about the future of the Debtors' business.  In addition, in order to enable the Debtors to perform their obligations under the Asset Purchase Agreement, the Debtors seek to proceed to a Closing under the Asset Purchase Agreement promptly so as to avoid problems that may arise with employee attrition.

18.     As a result, the proposed sale to Buyer pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code upon the terms and conditions set forth in the Asset Purchase Agreement is the optimal vehicle for creating value for the benefit of the Debtors' estates.  The transactions contemplated by the Asset Purchase Agreement maximize the value of the Acquired Assets because the Acquired Assets are being sold as part of a going concern, and the continuity and remaining goodwill value associated with the Acquired Assets are being preserved, to the extent possible.  The relief requested in the Motion and set forth in this order is in the best interests of the Debtors and their respective estates.

8

19.     Time is of the essence in closing the transaction contemplated by the Asset Purchase Agreement.  Accordingly, to maximize the value of the Acquired Assets on a going concern basis, it is essential that the consummation of the transaction occur within the time constraints set forth in the Asset Purchase Agreement.

**E.     Fair Purchase Price**

20.     The total consideration to be provided by Buyer under the Asset Purchase Agreement is the highest and best offer received by the Debtors and constitutes fair value, fair, full, and adequate consideration, reasonably equivalent value, and reasonable market value for the Acquired Assets for purposes of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the other laws of the United States, any state, territory, or possession thereof, or the District of Columbia.

21.     The terms of the Asset Purchase Agreement and the transactions contemplated therein are fair and reasonable under the circumstances of the Debtors' businesses and their Chapter 11 Cases.

**F.     Notice of the Motion**

22.     Written notice (the "**Notice**") of the Motion and the Hearing was provided via facsimile, overnight delivery, and/or hand delivery, to the following parties: (i) the Office of the United States Trustee for the Western District of Texas, San Antonio Division (ii) counsel for any official or unofficial committees; (iii) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iv) counsel to Buyer. Kent BML, and the DIP Lender, Weil, Gotshal & Manges LLP, Attn: Brian S. Rosen, Esq. and Matthew P. Goren, Esq.; (v) Chapman, (vi) any other parties who have filed UCC-1 against the Debtor, (vii) all affected federal, state, and local regulatory and taxing

9

authorities; (viii) the Office of the United States Attorney for the State of Texas; (ix) the Office of the Attorney General for the State of Texas; (x) all parties identified by GTE as potentially interested in the assets of the Debtors; (xi) contract counterparties listed on the Assumed Contract Schedule; and (xii) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to Fed. R. Bankr. P. 2002).

23.     The Notice was adequate and sufficient under the circumstances, and the Debtors complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the procedural due process requirements of the United States Constitution in providing notice of the Motion and the relief requested therein.

## G.     **Good Faith of Buyer**

24.     Buyer is purchasing the Acquired Assets and has entered into the Asset Purchase Agreement at arm's length and in good faith.  Accordingly, Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and Buyer is, therefore, entitled to the protections of such provision.  The good faith of Buyer is evidenced by, among other things, the following facts:

> a.     The sale process conducted by the Debtors, including, without limitation, the marketing of the Debtors assets by GTE both prior to, and after, the Petition Date, and conducting the Auction pursuant to the bidding procedures set forth in the Bidding Procedures Order, was at arm's length, non-collusive, in good faith, and substantively and procedurally fair to all parties.  The Debtors offered all other bidders an opportunity to match or top the bid submitted by Buyer, and all other bidders declined to do so.

The Debtors evaluated each Qualifying Bid prior to selecting Buyer as the Successful Bidder.

b.    All payments to be made by Buyer in connection with the Asset Purchase Agreement have been disclosed.

c.    Buyer has not violated the provisions of section 363(n) by any action or inaction.

d.    While Buyer has members that are equity holders of the Debtors, decisions regarding the sale of the Assets to the Buyer were made by the CRO and the Debtors' other retained professionals.

e.    The Debtors and Buyer have engaged in substantial arm's length negotiations, in good faith.  The Asset Purchase Agreement is the product of this bargaining among the parties and, in many cases, reflect substantial concessions made by Buyer in an effort to accomplish the transactions contemplated by the Asset Purchase Agreement.

25.    The sale of the Acquired Assets pursuant to the Asset Purchase Agreement, all covenants in and conditions thereto, and all relief requested in the Motion, is an integrated transaction, meaning that each component is an essential part of every other component and that the entire transaction can be consummated only if all of its components are consummated. Accordingly, the entire transaction is subject to, and is protected by, the provisions of section 363(m) of the Bankruptcy Code.

**H.    Sale Free and Clear under Section 363(f)**

26.    The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The

11

Debtors have all title, interest, and/or rights in the Acquired Assets required to transfer and to convey the Acquired Assets to Buyer, as required by the Asset Purchase Agreement.

27.     With the exception of (i) the liens granted to Kent BML Investments under the DIP Facility, and (ii) the liens granted to Kent BML Investments and Chapman under the Promissory Notes, no other entity has any lien or encumbrance against or interest in the Acquired Assets or claims against the Acquired Assets (other than unsecured claims asserted in the Chapter 11 Cases).  The Debtors are aware that certain other parties may assert security interests in, or liens on, certain of the Acquired Assets.

28.     The DIP Facility will be satisfied by means of a credit to the Purchase Price under the Asset Purchase Agreement, and a portion of the Promissory Notes will be satisfied by means of a credit against the Purchase Price under the Asset Purchase Agreement.  Buyer, as the sole lender under the Promissory Notes (after giving effect to the assignment of the Promissory Notes from Kent BML Investments and Chapman), has consented to the sale of the Acquired Assets under the Asset Purchase Agreement free and clear of all liens granted under the Promissory Notes.

29.     To the extent any other liens, claims, or interests exist on or in the Acquired Assets, the Debtors have proposed that any such liens, claims, interests, and encumbrances with respect to the Acquired Assets attach to the sale proceeds the Debtors receive for the sale of the Acquired Assets.  Those liens will attach in the same order of priority, with the same validity, force, and effect that such creditor had prior to such sale, and subject to any claims and defenses the Debtors may possess with respect thereto.  The interests of the holders of such liens and encumbrances are being adequately protected pursuant to the provisions of this order.

8780-3\00543917.002

30.    Accordingly, the Debtors have satisfied the standard set forth in section 363(f) of the Bankruptcy Code for selling the Acquired Assets free and clear of all liens, claims, interests, and encumbrances.

## I.    No Successor Liability

31.    With the sole exception of the Assumed Liabilities, as expressly set forth in the Asset Purchase Agreement, Buyer is not expressly or impliedly agreeing under the terms and conditions of the Asset Purchase Agreement to assume any of the debts of the Debtors.

32.    The transaction does not amount to a consolidation, merger, or *de facto* merger of Buyer and the Debtors.

33.    Buyer is not merely a continuation of the Debtors.

34.    Buyer and the Debtors are not entering into the Asset Purchase Agreement fraudulently or in order to escape liability for the Debtors' obligations.

## J.    Assumption and Assignment of the Contracts

35.    The Debtors are required, as a condition to the obligation of Buyer to close, to assume the Asset Purchase Agreement and assume and assign to Buyer the "**Assumed Contracts**," and the schedule of all the "**Contracts**" that may be Assumed Contracts will be attached to the Motion (the "**Assumed Contracts Schedule**").

36.    At or before the Closing, Buyer may elect to exclude any Contract as an Assumed Contract (in which case it shall become an "**Excluded Contract**") by providing to the Debtors written notice of its election to exclude such Contract.  On or before the Closing, Buyer may elect to treat each such Contract as an Excluded Contract or as a "**Designated Contract**."  If such Contract is a Designated Contract, then Buyer may proceed to Closing and determine whether to treat the Designated Contract as an Assumed Contract or an Excluded Contract within

13

two (2) Business Days after resolution of such objection (whether by the Court's order or by agreement of Buyer and the Contract counterparty).

37.     Except as set forth on the Assumed Contracts Schedule, no defaults exist under any of the Assumed Contracts, and no amounts are due to the counterparties thereunder on account of any facts occurring prior to the deadline to object to the assumption or assignment of the counterparty's Contract or the amount of Cure Costs arising prior to Closing under such Contract.  Therefore, the Debtors are not required to pay any Cure Costs in connection with the assumption of any of the Assumed Contracts other than as set forth on the Assumed Contracts Schedule.  Buyer has agreed to pay any Cure Costs required to be paid under any Assumed Contracts directly subject to the terms and conditions set forth in Section 5.8 of the Asset Purchase Agreement.

38.     Assumption of the Asset Purchase Agreement and the assumption and assignment of the Assumed Contracts to Buyer, effective as of the Closing Date, are supported by sound business reasons and is in the best interests of the Debtors' estates.  Accordingly, the assumption of the Asset Purchase Agreement and the assumption and assignment of the Assumed Contracts are approved by the Court.

39.     Subject to the right of Buyer to treat any Contract on the Assumed Contracts Schedule as an Excluded Contract or a Designated Contract on or before the Closing Date, the assumption and assignment of the Assumed Contracts under this order will become effective upon the Closing Date of the transaction without any further action on the part of any party.

40.     The Debtors have provided adequate assurance that Buyer will be able to perform its obligations under the Assumed Contracts from and after the date the Contracts are assigned to

Buyer.  Buyer is financially viable and has experience in the industry in which the Debtors operate their businesses.

## K.  <u>No Fraudulent Intent</u>

41.    The Asset Purchase Agreement was not entered into, and the transaction contemplated by the Asset Purchase Agreement will not be consummated, for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors for purposes of the Bankruptcy Code, any other laws of the United States, and the laws of any state, territory, or possession thereof, or the District of Columbia.  Neither the Debtors nor Buyer are entering into the Asset Purchase Agreement or consummating the transactions contemplated by the Asset Purchase Agreement with any fraudulent or otherwise improper purpose.

## L.  <u>Sale Order Required by Buyer</u>

42.    Entry of this order approving the Asset Purchase Agreement is a requirement of the Asset Purchase Agreement and such requirement is an appropriate condition precedent to Buyer's consummation of the transactions contemplated by the Asset Purchase Agreement.

## M.  <u>Limited Liability Company Authority</u>

43.    Subject to entry of this order, (i) the Debtors have full limited liability company power and authority to perform all of their obligations under the Asset Purchase Agreement, and the Debtors' prior execution and delivery of, and performance of obligations under the Asset Purchase Agreement is hereby ratified, (ii) the Debtors have all of the limited liability company power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) the Debtors have taken all limited liability company actions necessary to authorize, approve, execute, and deliver the Asset Purchase Agreement and to consummate the transactions contemplated by the Asset Purchase Agreement, including, without

15

limitation, authorizing the CRO to authorize, approve, execute, and deliver the Asset Purchase Agreement on behalf of the Debtors.

## II. CONCLUSIONS OF LAW[3]

### A. Jurisdiction, Final Order, and Statutory Predicates

44.     The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District and in the Court is proper under 28 U.S.C. §§ 1408 and 1409.

45.     The statutory authorization for the relief granted herein is found in sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and the applicable Local Bankruptcy Rules.

### B. Section 363 Sale

46.     The proposed sale of the Acquired Assets to Buyer pursuant to the Asset Purchase Agreement constitutes a sale of property of the Debtors' respective estates outside the ordinary course of business within the meaning of section 363(b) of the Bankruptcy Code.

47.     For good and valid reasons, the Court may authorize and approve a sale of assets of a chapter 11 debtor pursuant to section 363(b) of the Bankruptcy Code without the necessity of following the procedures and making the findings required for the confirmation of a plan of reorganization or liquidation.  Such legitimate and compelling reasons exist in this case.  Under the circumstances of the Chapter 11 Cases, the sale of the Acquired Assets to Buyer pursuant to sections 105(a) and 363(b) and (f) of the Bankruptcy Code is both justified and appropriate.

---

[3] Any conclusion of law set forth under the heading "Conclusions of Law" that may also be considered, in whole or in part, to constitute a finding of fact shall be deemed set forth under the heading "Findings of Fact" as if set forth in full therein.  All findings and conclusions of law announced by the Bankruptcy Court at the Hearing in relation to the Motion are hereby incorporated to the extent not inconsistent herewith.

8780-3\00543917.002

48.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession is authorized to sell property of its estate free and clear of any liens, claims, interests, and encumbrances if any of the following requirements is satisfied: (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interest (section 363(f)(1)); (b) the entity holding the alleged lien, claim, interest, or encumbrance consents (section 363(f)(2)); (c) such interest is a lien, and the price at which such property is to be sold is greater than the aggregate value of all liens on such property (section 363(f)(3)); (d) such lien, claim, interest, or encumbrance is subject to a *bona fide* dispute (section 363(f)(4)); or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such lien, claim, interest, or encumbrance (section 363(f)(5)).

49.     For the following reasons, the provisions of section 363(f) of the Bankruptcy Code have been satisfied:

   a.     Kent BML Investments and Chapman, as prepetition lenders under the Promissory Notes, and Kent BML Investments, as the DIP Lender, have consented to the sale.

   b.     The Debtors are aware that certain other parties may assert security interests in, or liens on, certain of the Acquired Assets.

   c.     Other secured parties (if any) could be compelled to accept a money satisfaction of their liens, claims, interests, or encumbrances.

50.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets will be transferred to Buyer free and clear of all mortgages, security interests, conditional sale and/or title retention agreements, pledges, liens, judgments, demands, encumbrances, easements, restrictions, constructive or resulting trusts, or charges of any kind or nature,

17

including, but not limited to, any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership (the foregoing collectively referred to as "**Liens**" herein) and all debts arising in any way in connection with any acts of the Debtors, claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guarantees, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, arising prior to the Closing Date or relating to acts occurring prior to the Closing Date, and whether imposed by agreement, understanding, law, equity, or otherwise (the foregoing collectively referred to as "**Claims**" herein) with all such Liens and Claims to attach to the proceeds of the sale of the Acquired Assets in the order of their priority, with the validity, force, and effect that they now have as against the Acquired Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all interested parties with respect to such Liens and Claims and with the net proceeds from the transaction to be available for the benefit of the Debtors' estates; *provided*, *however*, that Buyer shall remain liable for only the Assumed Liabilities and the obligations under the Assumed Contracts, as provided in the Asset Purchase Agreement.

51.     The sale of the Acquired Assets to Buyer free and clear of any and all Liens and Claims upon the terms and conditions set forth in the Asset Purchase Agreement is in the best interest of the Debtors and their respective estates.

52.     Given the circumstances of the Chapter 11 Cases, including, without limitation, the Debtors' liquidity needs, the reasonable opportunity afforded other parties to make competing bids or offers for all or a portion of the Debtors' business, and the adequacy and fair value of the consideration being paid by Buyer under the Asset Purchase Agreement, the

proposed sale of the Acquired Assets to Buyer constitutes a reasonable and sound exercise of the Debtors' business judgment and is hereby approved in all respects.

**C.      Assumption and Assignment of the Contracts under Section 365**

53.      Section 365(a) of the Bankruptcy Code provides that "the [debtor in possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  It is in the best interests of the Debtors and their respective estates to assume the Asset Purchase Agreement and assume and assign the Assumed Contracts to Buyers effective on the Closing Date, in accordance with the terms and conditions of the Asset Purchase Agreement, and the Debtors have exercised sound business judgment in deciding to assume the Asset Purchase Agreement and the Assumed Contracts.

54.      Section 365(b) of the Bankruptcy Code requires a debtor in possession to cure any default and provide adequate assurance of future performance in order to assume an unexpired lease or executory contract under which a default has occurred.  Buyer will promptly pay any Cure Costs under any Assumed Contracts, and, therefore, this requirement has been satisfied. The Debtors' assumption and assignment of the Assumed Contracts to Buyer will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code. The transaction contemplated by the Asset Purchase Agreement will provide significant benefits to the Debtors' estates.   Buyer cannot obtain these benefits without the assumption and assignment of the Assumed Contracts, which are a material part of the Acquired Assets. Accordingly, assuming the Asset Purchase Agreement and the Assumed Contracts is in the sound exercise of the Debtors' business judgment.

55.      Pursuant to section 365(f) of the Bankruptcy Code, a debtor in possession may assign an unexpired lease or executory contract only if such lease or contract is assumed by the

19

debtor in possession, and the proposed assignee provides "adequate assurance of future performance" of the obligations arising under such lease or contract from and after the date of the assignment.

56.     Pursuant to this order, the Debtors' assumption of the Asset Purchase Agreement and the Assumed Contracts, effective as of the Closing Date, is approved.   Moreover, the Debtors have demonstrated that Buyer has the resources to perform the obligations under the Assumed Contracts.  Accordingly, the requirements for assignment of the Assumed Contracts to Buyer under section 365(f) of the Bankruptcy Code have been satisfied.

**D.     Retention of Jurisdiction**

57.     It is necessary and appropriate for the Court to retain jurisdiction to, *inter alia*, interpret and enforce the terms and provisions of this order, the Asset Purchase Agreement, and to adjudicate, if necessary, any and all disputes concerning the assumption and assignment of the Assumed Contracts and any alleged right, title, or property interest, including ownership claims, relating to the Acquired Assets and the proceeds thereof, as well as the extent, validity, perfection, and priority of any alleged Lien or Claim relating to the Debtors and/or the Acquired Assets.

**E.     No Successor Liability**

58.     Buyer, its affiliates, officers, directors, members, partners, and principals and any of their respective representatives, successors, or assigns shall not be deemed, as a result of the consummation of the transaction contemplated by the Asset Purchase Agreement or otherwise, (i) to be a legal successor, or otherwise be deemed a successor, to the Debtors or the Debtors' estates, (ii) to have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or any of the Debtors' estates, (iii) to be an alter ego, a continuation or substantial continuation

of any of the Debtors or any enterprise of any of the Debtors, or (iv) to be liable for any claim based on successor liability, transferee liability, derivative liability, vicarious liability, or any similar theories under applicable state or federal law, or otherwise.  Buyer shall not assume, or be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their respective estates.  The so-called "bulk sales," "bulk transfer," or other similar laws shall be waived in all necessary jurisdictions, including those relating to taxes. Nothing in this order or the Asset Purchase Agreement shall require Buyer to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit, or any other benefit plan, trust arrangement, or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, medical, welfare, and pension benefits payable after retirement or other termination of employment or (b) assume any responsibility as a fiduciary, plan sponsor, or otherwise for making any contribution to, or in respect of the funding, investment, or administration of any employee benefit plan, arrangement, or agreement (including, without limitation, pension plans) or the termination of or withdrawal from any such plan, arrangement, or agreement.  Except as expressly set forth in the Asset Purchase Agreement with respect to Assumed Liabilities, the transfer of the Acquired Assets to Buyer pursuant to the Asset Purchase Agreement shall not result in Buyer or any of its affiliates, officers, directors, members, partners, or principals or any of their respective representatives, successors, or assigns, or the Acquired Assets having any liability or responsibility whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly (x) any interest against the Debtors or against an insider of the Debtors or (y) the Debtors except as expressly set forth in the Asset Purchase Agreement.

8780-3\00543917.002

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED as follows:**

(1)     The relief requested in the Motion is granted and approved in all respects.

(2)     The transaction contemplated by the Asset Purchase Agreement, including, without limitation, the assumption of the Asset Purchase Agreement and the assumption and assignment of the Assumed Contracts, is hereby approved in all respects.

(3)     The Debtors have provided adequate notice in the form of the Cure Notice to counterparties on the Assumed Contract Schedule of the assumption and assignment to Buyer of such counterparty's Contract, the proposed Cure Cost for such Contract, and the deadline to object to the assumption of such counterparty's Contract or Cure Cost.  To the extent a counterparty has not provided written notice of any objection to the treatment of such counterparty's contract prior to the deadline set forth in the Cure Notice,  such counterparty is deemed to have assented to such matters and is forever barred, estopped and enjoined from asserting such objection against the Debtors or Buyer.

(4)     The assumption and assignment of the Assumed Contracts will not be effectuated if the Closing Date under the Asset Purchase Agreement does not occur and the Asset Purchase Agreement is terminated.  If Buyer elects to treat a Contract as an Excluded Contract, or later elects to treat a Designated Contract as an Excluded Contract, the assumption and assignment of such Contract will not be effectuated, and the Debtors, at a later date, may use its business judgment to determine whether to assume or reject the Contract at such time.

(5)     The Debtors are hereby authorized and directed to sell the Acquired Assets to Buyer upon and subject to the terms and conditions set forth in the Asset Purchase

22

Agreement, the provisions of which are incorporated herein by reference as if set forth in full herein.

(6)     Each of the Debtors is hereby authorized and directed to perform, consummate, and implement the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, and to take any and all further actions as may be necessary or appropriate to the performance of its obligations as contemplated by the Asset Purchase Agreement or this order.

(7)     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the closing of the transaction contemplated by the Asset Purchase Agreement, the Acquired Assets shall be transferred, sold, and delivered to Buyer free and clear of all Liens, Claims, interests, and encumbrances other than the Assumed Liabilities and the obligations arising under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date pursuant to the express terms of the Asset Purchase Agreement.  All Liens, Claims, interests, and encumbrances shall attach to the sale proceeds in the order of their priority, with the same validity, force, and effect that they now have as against the Acquired Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all interested parties with respect to such Liens and Claims, and the net proceeds from the transaction shall be available for the benefit of the Debtors' estates.

(8)     As a result of the transaction contemplated by the Asset Purchase Agreement, Buyer will not be a successor to any of the Debtors by reason of any theory of law or equity, and Buyer will have no liability, except as otherwise provided in the Asset Purchase

23

Agreement, for any obligation, Claim, or Lien of any of the Debtors as a result of any application of successor liability theories.

(9)     Without limiting the generality of the immediately preceding paragraph, but except as otherwise provided in the Asset Purchase Agreement with respect to the Assumed Liabilities and the obligations under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date, Buyer is not, pursuant to the Asset Purchase Agreement or otherwise, assuming, nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise for, any of the following Claims, Liens, liabilities, debts, or obligations: any liabilities, debts, or obligations of the Debtors or any liabilities, debts, or obligations in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operations or use of the Acquired Assets, including, without limitation, under the Contracts, prior to the Closing Date, or any liabilities calculable by reference to the Debtors or their assets or operations, or relating to continuing conditions existing at or prior to the Closing Date, which liabilities, debts, and obligations, as against Buyer, are hereby extinguished insofar as they may give rise to successor liability, without regard to whether the claimant asserting any such liabilities, debts, or obligations has delivered to Buyer a release thereof.  Without limiting the generality of the foregoing, Buyer shall not be liable or responsible, as a successor or otherwise, for the Debtors' Claims, Liens, liabilities, debts, or obligations, whether calculable by reference to the Debtors or their operations or under or in connection with (i) any employment or labor agreements; (ii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit

24

plans, agreements, practices, and programs, obligations that might otherwise arise or pursuant to (a) the Employee Retirement, Income, Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Age Discrimination and Employee Act of 1967, (e) the Federal Rehabilitation Act of 1973, the National Labor Relations Act, or (g) the Consolidated Omnibus Budget Reconciliation Act of 1985; (iv) worker's compensation, occupational disease, or unemployment or temporary disability insurance Claims, (v) environmental liabilities, debts, Claims, or obligations arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or waste) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*; (vi) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (viii) any litigation; and (ix) any products liability or similar Claims, whether pursuant to any state or federal laws or otherwise.[4]

(10)     Except as expressly provided in the Asset Purchase Agreement with respect to the Assumed Liabilities and the obligations under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date, no person or entity, including, without limitation, any federal, state, or local governmental agency, department, or instrumentality, shall assert by suit or otherwise against Buyer or its successors in interest any Claim or Lien that they had, have, or may have against the Debtors, or any liability, debt, or obligation relating to or arising from the Acquired Assets or the Debtors' operations or use of the

---

[4] The recitation in this paragraph (9) of this order of any specific agreements, plans, laws, ordinances, or statutes is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, or obligations referred to herein.

Acquired Assets, including, without limitation, any liabilities calculable by reference to the Debtors or their assets or operations.

(11) The terms and provisions of the Asset Purchase Agreement and all collateral documents, together with the terms and provisions of this order, shall be binding in all respects upon the Debtors, their estates, their creditors, and all parties in interest, including any and all successors and assigns (including, without limitation, any trustee appointed under the Bankruptcy Code).

(12) Except as provided in the Asset Purchase Agreement and except with respect to the obligations arising under the Assumed Contracts arising from facts or circumstances occurring from and after the Closing Date, all entities holding Liens, Claims, interests, or encumbrances of any kind and nature, including, without limitation, vendors, suppliers, employees, and landlords, be, and they hereby are, barred from asserting such Liens, Claims, interests, and encumbrances against Buyer and/or the Acquired Assets, all entities holding Liens, Claims, interests, or encumbrances of any kind and nature are ordered to release the Acquired Assets to Buyer and to assert their Liens, Claims, interests, or encumbrances against the proceeds from the transaction contemplated by the Asset Purchase Agreement.

(13) This order is and shall be effective as a determination that, (a) upon Closing, all Liens, Claims, interests, and encumbrances existing as to the Acquired Assets have been and hereby are adjudged and declared to be unconditionally released as to the Acquired Assets, and (b) the conveyances described herein have been made free and clear of all such Liens, Claims, interests, and encumbrances, which Liens, Claims, interests, and encumbrances shall attach to the proceeds to the same extent and with the same priority as they attached to the Acquired Assets.

8780-3\00543917.002

(14)     This order shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

(15)     All Liens, Claims, interests, and encumbrances of record shall, upon Closing, be removed and stricken as against the Acquired Assets, and all the entities described in the immediately preceding paragraph of this order are authorized and specifically directed to (a) strike all recorded Liens, Claims, interests, or encumbrances against the Acquired Assets from their records, official and otherwise, and (b) accept for filing or recording all instruments made or delivered by or to any of the Debtors and all deeds or other documents relating to the conveyance of the Acquired Assets to Buyer, and the Court specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

(16)     If any person or entity that has filed statements or other documents or agreements evidencing Liens, Claims, interests, or encumbrances on, or interests in, the Acquired Assets shall not have delivered to Debtors prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, interests, or encumbrances that the person or entity has or may assert with respect to the Acquired Assets, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on

27

behalf of such person or entity with respect to the Acquired Assets and shall incur no liability for acting in this limited capacity.

(17)    Pursuant to sections 365(a) and (f)  of the Bankruptcy Code, the Debtors' assumption of, and assignment to Borrower, of the Assumed Contracts, effective as of the Closing Date, is hereby approved.

(18)    The assumption and assignment of the Assumed Contracts to Buyer shall automatically be effective on the Closing Date without the need for the execution of any further documents, subject to Buyer's right at or before Closing to designate Assumed Contracts to be Excluded Contracts or Designated Contracts.

(19)    The Debtors are hereby authorized (a) to take such corporate action as may be necessary to implement the provisions of the Asset Purchase Agreement and any other document executed by the Debtors in connection therewith and (b) to execute and file any necessary document with any appropriate secretary of state.  This order shall constitute all approvals and consents, if any, required by the laws of any state necessary to file, record, and accept such documents.

(20)    Nothing contained in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, any order of confirmation confirming any plan of reorganization (or liquidation), or any other order of any type or kind entered in the Chapter 11 Cases or any related proceeding, including any subsequent chapter 7 case, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this order.

(21)    The Debtors are authorized and directed to execute, acknowledge, and deliver such deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer and to take such other actions as may be reasonably necessary to perform the terms

and provisions of the Asset Purchase Agreement and all other agreements related thereto, and the Debtors shall take any other action that reasonably may be requested by Buyer for the purpose of assigning, transferring, granting, conveying, and confirming to Buyer or reducing to possession any or all of the Acquired Assets (any such action not expressly contemplated by the Asset Purchase Agreement to be taken by the Debtors at the sole cost and expense of Buyer).

    (22)    The Court retains jurisdiction to:

    (a)    interpret, implement, and enforce the terms and provisions of this order, the Asset Purchase Agreement and any other agreement executed in connection therewith;

    (b)    protect Buyer, or any of the Acquired Assets, against any Liens, Claims, interests, and encumbrances;

    (c)    resolve any disputes arising under or related to the Asset Purchase Agreement, the transaction, or Buyer's peaceful use and enjoyment of the Acquired Assets, whether or not a plan of reorganization (or liquidation) has been confirmed in the Chapter 11 Cases and irrespective of the provisions of any such plan or order confirming any such plan;

    (d)    adjudicate all issues concerning all Liens, Claims, interests, and encumbrances and any other interest in and to the Acquired Assets, including the extent, validity, enforceability, priority, and nature of all such Liens, Claims, interests, and encumbrances and any other interests;

    (e)    adjudicate any and all issues and/or disputes relating to the Debtors' right, title, or interest in the Acquired Assets and the proceeds thereof, the Motion, and the Asset Purchase Agreement; and

(f)     adjudicate any and all remaining issues concerning the Debtors' right and authority to assume and assign the Assumed Contracts to Buyer, resolve any objections to Cure Costs, and determine Buyer's rights and obligations with respect to such assignment and the existence of any default under any Assumed Contract.

(23)    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the transaction contemplated by the Asset Purchase Agreement.

(24)    The failure specifically to include any particular provisions of the Asset Purchase Agreement in this order shall not diminish or impair the efficacy of such provision, it being the intent of the Court that the Asset Purchase Agreement and each and every provision, term, and condition thereof be authorized and approved in its entirety.

# # #

Prepared and Entry Requested By:

Eric J. Taube
Morris D. Weiss
Christopher Bradley
TAUBE SUMMERS HARRISON
  TAYLOR MEINZER BROWN LLP
100 Congress Avenue, 18th Floor
Austin, Texas 78701
Telephone:  (512) 472-5997
Facsimile: (512) 472-5248
etaube@taubesummers.com
mweiss@taubesummers.com
cbradley@taubesummers.com

PROPOSED ATTORNEYS FOR DEBTORS

8780-3\00543917.002